IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MARELLI AUTOMOTIVE LIGHTING USA LLC, *et al.*,[1] | ) Case No. 25-11034 (CTG) |
| Debtors. | ) (Jointly Administered) |

**DECLARATION OF JOHN SINGH
IN SUPPORT OF THE MOTION OF DEBTORS FOR
ENTRY OF AN ORDER (I) APPROVING THE DEBTORS' ENTRY
INTO THE NEW AR FACILITY TERM SHEET, (II) AUTHORIZING PAYMENT
OF FEES AND EXPENSES THEREUNDER, AND (III) GRANTING RELATED RELIEF**

I, John Singh, hereby declare under penalty of perjury:

1. I am a Partner in the Restructuring and Special Situations Group at PJT Partners LP ("PJT"), a global investment banking firm listed on the New York Stock Exchange with its principal offices located at 280 Park Avenue, New York, New York 10017. PJT has been retained as the investment banker for the debtors and debtors-in-possession (collectively, the "Debtors," and together with their non-debtor subsidiaries, the "Company") in the above-captioned chapter 11 cases.

2. I submit this declaration (this "Declaration") in support of the *Motion of Debtors for Entry of an Order (I) Approving the Debtors' Entry into the New AR Facility Term Sheet, (II) Authorizing Payment of Fees and Expenses Thereunder, and (III) Granting Related Relief* (the "Motion"),[2] filed on December 10, 2025.

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/Marelli. The location of Marelli Automotive Lighting USA LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 26555 Northwestern Highway, Southfield, Michigan 48033.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

3. Although PJT is being compensated for its work as the Debtors' investment banker in these chapter 11 cases, I am not being compensated separately for this Declaration or testimony. Except as otherwise indicated herein, all statements set forth in this Declaration are based upon (i) my personal knowledge of the Debtors' operations, finances, and restructuring initiatives; (ii) my review of relevant documents; (iii) information provided to me by the Debtors, the Debtors' management and/or the Debtors' other advisors; (iv) information provided to me by the employees of PJT working directly with me or under my supervision; or (v) my experience as a restructuring professional. If called to testify, I could and would testify to the statements set forth herein. I am over the age of 18 years and am authorized to submit this Declaration.

## Professional Background and Qualifications

4. PJT is a leading global financial advisory firm with more than 1,200 employees in fifteen offices in the U.S., Europe, and Asia. The firm offers integrated advisory services for mergers and acquisitions, restructuring and special situations, fund placement, and shareholder engagement. PJT is an industry leader in advising companies and creditors in all aspects of complex restructurings and bankruptcies. The firm has extensive experience providing financial advisory and investment banking services to financially distressed companies, including the representation of both debtors and lenders in the procurement and provision of postpetition financing. PJT is a registered broker dealer with the United States Securities and Exchange Commission, is a member of the Securities Investor Protection Corporation, and is regulated by the Financial Industry Regulatory Authority.

5. I received a BS in Finance and Economics from New York University and an MBA from the Wharton School of the University of Pennsylvania. I have approximately fifteen (15) years of investment banking and restructuring experience. Prior to joining PJT in 2015 as a

Managing Director, I was a Vice President in the Restructuring & Reorganization Group of The Blackstone Group ("Blackstone").

6. Between my experience at Blackstone and PJT, I have worked on a broad range of restructuring and reorganization assignments for companies, creditor groups, special committees, governmental entities, and acquirers of distressed assets. Over the course of my career, I have advised senior management and boards of directors in a wide variety of industries in connection with restructurings, mergers and acquisitions, and financing transactions, including for debtor-in-possession financing. In particular, I have been involved in the following publicly disclosed restructuring matters, among others: Automotores Gildemeister S.A.; BJ Services, LLC; Bristow Group; Cecon ASA (re: Davie Shipyard); CHC Helicopter; Core Scientific, Inc.; Desarrolladora Homex, S.A.B. de C.V.; Financial Guaranty Insurance Company; Fusion Connect, Inc.; Genesis Care Pty Ltd.; High Ridge Brands Co.; Homer City Generation; Houston Astros; Inversiones Alsacia S.A.; Kerzner International; MBIA, Inc. (re: Bank of America); M&G Chemicals S.A.; Mortgage Guaranty Insurance Corporation; Nortel Networks Corporation; Pacific Exploration & Production Corporation; Pension Benefit Guaranty Corporation (re: Smurfit Stone); PES Holdings, LLC; Phoenix Services Topco, LLC; Pierre Foods, Inc.; PHI, Inc.; Ruby Pipeline, L.L.C.; Simmons Bedding Company; Syncreon; Twin River; and Westinghouse Electric Company LLC.

**The Structuring Fee and Expense Reimbursement**

7. The New AR Facility Term Sheet contemplates an account receivables facility in the amount of up to $215,400,000 that will allow the Debtors to factor certain eligible accounts receivables from an enumerated list of customers. The New AR Facility Term Sheet provides that the Debtors shall, prior to December 31, 2025, pay a 1.75% Structuring Fee, 0.75% of which shall

3

be nonrefundable if the New AR Facility does not close before March 31, 2026, and agree to the Expense Reimbursement. The estimated cash outlay associated with the full Structuring Fee is approximately $3,769,500, and the portion of the Structuring Fee that is nonrefundable is approximately $1,615,500. I believe that payment of the Structuring Fee and the Expense Reimbursement are necessary steps for the Debtors to take if they wish to ultimately obtain approval of, and place, the New AR Facility.

8. *First*, as of the date hereof, I believe that the New AR Facility is the best, and in fact is currently the only, replacement for the Lapsed Facilities. Prior to filing the Motion, the Company and PJT reached out to seven potential lenders to ascertain their interest in providing an alternative factoring financing facility. Five of those parties declined to participate prior to executing a nondisclosure agreement. Of the two parties that executed a nondisclosure agreement and received diligence information, none decided to move forward in the process. I understand that those parties declined to participate because of the geographical complexities associated with the financing and an inability to provide factoring financing generally or on terms that would be superior to the New AR Facility (among other reasons). I understand that Deutsche Bank is uniquely positioned to provide factoring financing on the requisite timeline due to its familiarity with the chapter 11 cases as an existing DIP Lender and its status as a multinational bank with factoring expertise in the relevant jurisdictions. In addition, I understand that the Debtors engaged in significant discussions with the parties providing the Lapsed Facilities to ascertain whether those parties would be interested in renewing their commitments, but such discussions failed to materialize in an actionable renewal proposal. Accordingly, I believe that the New AR Facility is currently the only factoring facility that the Debtors are able to pursue if they wish to replace the Lapsed Facilities on the requisite timeline.

9. *Second*, I believe that obtaining authority, but not direction, to pay the Structuring Fee and obtaining approval of the Expense Reimbursement is necessary for the Debtors to be in a position to seek approval of the New AR Facility in January 2026. I understand that the New AR Facility Term Sheet contemplates a factoring facility that, if ultimately approved, will require the Debtors to factor accounts receivable across eight jurisdictions in multiple currencies. I understand that Deutsche Bank will be required to expend considerable efforts to build the infrastructure necessary to be in a position to close on the facility in January, including, but not limited to, finalizing and completing its KYC process, opening and setting up collection accounts in each jurisdiction, establishing a dilution reserve account, and ensuring its systems are prepared to process the multi-currency, multi-jurisdictional receivables on the terms agreed to in the Receivables Purchase Agreement. All of these items will need to be completed on an expedited basis. I also understand that Deutsche Bank will also be required to obtain multiple levels of internal approvals on the Receivables Purchase Agreement prior to December 31, 2025. I believe that obtaining approval of the Expense Reimbursement and authority to pay the Structuring Fee prior to December 31, 2025 is necessary to incentivize Deutsche Bank to work on an expedited basis, including over the upcoming holiday period, to finalize the terms of the New AR Facility and be in a position to close on the facility by the end of January.

10. *Third*, I have reviewed the *Declaration of Nicholas Grossi in Support of Motion of Debtors for Entry of an Order (I) Approving the Debtors' Entry into the New AR Facility Term Sheet, (II) Authorizing Payment of Fees and Expenses Thereunder, and (III) Granting Related Relief*, filed contemporaneously herewith (the "Grossi Declaration"). Based on my understanding of the Debtors' liquidity position, and as set forth in the Grossi Declaration, the additional liquidity

expected to be provided by the New AR Facility is necessary to enable the Debtors to continue to operate in the ordinary course of business and fund these chapter 11 cases.

11. *Finally*, I believe that there are appropriate conditions precedent to the Debtors' payment of the Structuring Fee. Although the Debtors are seeking authority to pay the Structuring Fee, the New AR Facility Term Sheet provides that payment of the Structuring Fee is in the Debtors' discretion, and that Deutsche Bank's credit committee must authorize entry into the Receivables Purchase Agreement prior to payment of the fee. Additionally, if the Structuring Fee is paid but the New AR Facility ultimately does not close, only $1,615,500 of the Structuring Fee is nonrefundable. Put simply, the Debtors are not obligated to pay the Structuring Fee in any circumstance, but can elect to pay the Structuring Fee if the Receivables Purchase Agreement is substantially finalized and the parties believe that the New AR Facility is likely to be placed. If the fee is paid but the facility ultimately does not close, $2,154,000 of the Structuring Fee is required to be refunded by DB to the Debtors. I believe these conditions maximize the likelihood that the Structuring Fee will be paid only if the Debtors believe there is a reasonable likelihood that, subject to the approval of this Court, the facility can be placed.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: December 12, 2025          *By: /s/ John Singh*
                                              Name: John Singh
                                              Title:  Partner
                                              PJT Partners LP