**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| MARELLI AUTOMOTIVE LIGHTING USA LLC, *et al.*,[1] | ) | Case No. 25-11034 (CTG) |
| Debtors. | ) | (Jointly Administered) |

**DISCLOSURE STATEMENT FOR THE JOINT PLAN OF REORGANIZATION OF MARELLI AUTOMOTIVE LIGHTING USA LLC AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Edward A. Corma (DE Bar No. 6718)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
tcairns@pszjlaw.com
ecorma@pszjlaw.com

*Co-Counsel for the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Nicholas M. Adzima (admitted *pro hac vice*)
Evan Swager (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: joshua.sussberg@kirkland.com
nicholas.adzima@kirkland.com
evan.swager@kirkland.com

-and-

Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Spencer A. Winters, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: ross.kwasteniet@kirkland.com
spencer.winters@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

Dated: August 3, 2026

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/Marelli. The location of Marelli Automotive Lighting USA LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 26555 Northwestern Highway, Southfield, Michigan 48033.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

**EACH OF THE DEBTORS STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS THAT ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE ACTUALLY RECEIVED BY THE CLAIMS, NOTICING, AND SOLICITATION AGENT NO LATER THAN OCTOBER 9, 2026, AT 4:00 P.M. (PREVAILING EASTERN TIME) PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOTS. THE BOARD OF DIRECTORS, SOLE STOCKHOLDER, MEMBER, OR MANAGER, AS APPLICABLE, FOR EACH OF THE DEBTORS HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST POSSIBLE RECOVERIES TO HOLDERS OF CLAIMS. AT THIS TIME, EACH DEBTOR BELIEVES THAT THE PLAN AND RELATED TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.**

**THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT PLAN OF REORGANIZATION OF MARELLI AUTOMOTIVE LIGHTING USA LLC AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY OR PERSON FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN.**

**THE PLAN ATTACHED HERETO AS EXHIBIT A IS SUPPORTED BY THE DEBTORS AND CERTAIN PARTIES IN INTEREST THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT, INCLUDING HOLDERS OF APPROXIMATELY 80 PERCENT OF THE SENIOR LOAN CLAIMS.**

**HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.**

**THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS AND ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN IN ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.**

**IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS AND THEIR FUTURE RESULTS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY SEEK TO OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.**

**THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT.**

**THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.**

**THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).**

**YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE IX HEREIN, ENTITLED "RISK-FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.**

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.**

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS AND FORWARD LOOKING STATEMENTS**

**The Plan and Disclosure Statement have neither been filed with, nor approved or disapproved by the SEC or any similar federal, state, local, or foreign federal regulatory authority and neither the SEC nor any such similar regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan. The securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities law ("Blue-Sky Laws"). Any representation to the contrary is a criminal offense. The securities may not be offered or sold within the United States or to, or for the account or benefit of, United States persons (as defined in Regulation S under the Securities Act), except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable laws of other jurisdictions.**

**The Debtors will rely on section 1145 of the Bankruptcy Code to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution, if applicable, of New Common Stock under the Plan (other than any New Common Stock issued in respect of the Management Incentive Plan), and to the extent such exemption is not available, then such New Common Stock will be offered, issued, and distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws, including Blue-Sky Laws. Neither the solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.**

**Any New Common Stock issued in respect of the Management Incentive Plan will be offered, issued, and distributed in reliance upon the exemption from registration provided by Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other exemptions from registration, and similar Blue-Sky Laws, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.**

**This Disclosure Statement contains "forward-looking statements" within the meaning of United States securities laws. Statements containing words such as "anticipate," "believe," "estimate," "expect," "intend," "plan," "project," "target," "model," "can," "could," "may," "should," "will," "would," or similar words or the negative thereof, constitute "forward-looking statements." However, not all forward-looking statements in this Disclosure Statement may contain one or more of these identifying terms. Forward-looking statements are based on the Debtors' current expectations, beliefs, assumptions and estimates. These statements are subject to significant risks, uncertainties and assumptions that are difficult to predict and could cause actual results to differ materially and adversely from those expressed or implied in the forward-looking statements. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:**

- The Debtors' plans, objectives, and expectations;
- The Debtors' business strategy;
- The Debtors' financial strategy, budget, projections, and operating results;
- The Debtors' financial condition, revenues, cash flows, and expenses;
- The success of the Debtors' operations;
- The costs of conducting the Debtors' operations;
- The Debtors' levels of indebtedness, liquidity, and compliance with debt covenants;
- The level of uncertainty regarding the Debtors' future operating results;
- The amount, nature, and timing of the Debtors' capital expenditures;
- The terms of capital available to the Debtors;

- The Debtors' ability to satisfy future cash obligations;
- The Debtors' ability to obtain all requisite governmental, regulatory, and third-party approvals and consents contemplated by the Plan;
- The integration and benefits of asset and property acquisitions and/or the effects of asset and property acquisitions or dispositions on the Debtors' cash position and levels of indebtedness;
- The risks associated with certain of the Debtors' acquisitions;
- The effectiveness of the Debtors' risk management activities;
- The Debtors' counterparty credit risk;
- The outcome of pending and future litigation claims;
- General economic and business conditions; and/or
- The potential adoption of new governmental regulations.

**Statements concerning these and other matters are not guarantees of the Reorganized Debtors' future performance. There are risks, uncertainties, and other important factors that could cause the Reorganized Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein. These risks, uncertainties and factors may include the following: (a) the Debtors' ability to confirm and consummate the Plan; (b) the potential that the Debtors may need to pursue an alternative transaction if the Plan is not confirmed; (c) the Debtors' ability to reduce their overall financial leverage; (d) the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees; (e) the risks associated with operating the Debtors' businesses during the Chapter 11 Cases; (f) customer responses to the Chapter 11 Cases; (g) the Debtors' inability to discharge or settle claims during the Chapter 11 Cases; (h) the Debtors' plans, objectives, business strategy, and expectations with respect to future financial results and liquidity, including the ability to finance operations in the ordinary course of business; (i) the Debtors' levels of indebtedness and compliance with debt covenants; (j) additional post-restructuring financing requirements; (k) the amount, nature, and timing of the Debtors' capital expenditures and cash requirements, and the terms of capital available to the Debtors; (l) the effect of competitive products, services, or procuring by competitors; (m) the outcome of pending and future litigation claims; (n) the proposed restructuring and costs associated therewith; (o) the effect of natural disasters, pandemics, and general economic and political conditions on the Debtors; (p) the Debtors' ability to implement cost-reduction initiatives in a timely manner; (q) adverse tax changes; (r) the terms and conditions of the New Common Stock, to be entered into, or issued, as the case may be, pursuant to the Plan; (s) the results of renegotiating certain key commercial agreements and any disruptions to relationships with sellers, suppliers, partners, among others; (t) compliance with laws and regulations including, without limitation, obtaining the requisite governmental, regulatory, and third-party approvals and consents contemplated by the Plan; and (u) each of the other risks identified in this Disclosure Statement. Due to these uncertainties, you cannot be assured that any forward-looking statements will prove to be correct. The Debtors are under no obligation to (and expressly disclaim any obligation to) update or alter any forward-looking statements whether as a result of new information, future events, or otherwise, unless instructed to do so by the Bankruptcy Court.**

**You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The liquidation analysis, financial projections, and other projections and forward-looking information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims among other things, may be affected by many factors that cannot be predicted. Any analyses, estimates, or recovery projections may or may not turn out to be accurate.**

# TABLE OF CONTENTS

Page


**I. INTRODUCTION ..... 1**

**II. PRELIMINARY STATEMENT ..... 1**

**III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN ..... 3**

- A. What is chapter 11? ..... 3
- B. Why are the Debtors sending me this Disclosure Statement? ..... 3
- C. Am I entitled to vote on the Plan? ..... 4
- D. What will I receive from the Debtors if the Plan is consummated? ..... 4
- E. What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, or a Priority Tax Claim? ..... 7
- F. Are any regulatory approvals required to consummate the Plan? ..... 10
- G. What happens to my recovery if the Plan is not confirmed or does not go effective? ..... 10
- H. Is there potential litigation related to the Plan? ..... 10
- I. What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan? ..... 10
- J. If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?" ..... 10
- K. How do I know if my Claim is a General Unsecured Claim? ..... 11
- L. If I Have a General Unsecured Claim, What Will My Recovery Be? ..... 11
- M. What are the sources of Cash and other consideration required to fund the Plan? ..... 11
- N. If My Contract Was Rejected, What Type of Claim Do I Have? ..... 11
- O. Are there risks to owning the New Common Stock upon emergence from Chapter 11? ..... 11
- P. Will there be releases and exculpation granted to parties in interest as part of the Plan? ..... 11
- Q. Does the Plan preserve Causes of Action? ..... 17
- R. What is the deadline to vote on the Plan? ..... 17
- S. How do I vote for or against the Plan? ..... 17
- T. Why is the Bankruptcy Court holding a Confirmation Hearing? ..... 18
- U. When is the Confirmation Hearing set to occur? ..... 18
- V. What is the purpose of the Confirmation Hearing? ..... 18
- W. What is the effect of the Plan on the Debtors' ongoing business? ..... 18
- X. Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors? ..... 19
- Y. What steps did the Debtors take to evaluate alternatives to a chapter 11 filing? ..... 19
- Z. Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ..... 19
- AA. Do the Debtors recommend voting in favor of the Plan? ..... 19
- BB. Who Supports the Plan? ..... 19

**IV. THE DEBTORS' HISTORY AND OPERATIONS ..... 20**

- A. The Debtors' Corporate Structure and History ..... 20
- B. The Debtors' Assets and Operations ..... 21
- C. The Debtors' Prepetition Capital Structure ..... 22

**V. EVENTS LEADING TO THESE CHAPTER 11 CASES ..... 22**

- A. Industry-Wide Headwinds and the Impact of the COVID-19 Pandemic ..... 22
- B. Liquidity Infusion and the 2022 ADR ..... 23
- C. Post-Pandemic Market Challenges and Headwinds ..... 23
- D. Liquidity Strain, Capital Raise Efforts, and Customer Support ..... 24
- E. Initial Engagement with the Ad Hoc Group of Senior Lenders and Japanese Lenders ..... 24

**TABLE OF CONTENTS**
**cont'd**

**Page**


F. In-Court Transaction Negotiations ....24
G. Special Committee Formation ....25
H. Consensus Amongst the Japanese Banks and the Ad Hoc Group of Senior Lenders ....25

**VI. MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES ....25**

A. First Day Motions and Other Case Matters ....25
B. Appointment of the Committee ....27
C. Second Day Relief ....28
D. Contract and Lease Rejection and Optimization ....28
E. Approval of the DIP Facilities ....29
F. Expiration of the "Go Shop" Period ....30
G. Retention of Professionals ....30
H. Schedules and Statements ....31
I. Plan Exclusivity ....31
J. Approval of the New AR Facility ....32
K. KEIP/KERP Motion ....32
L. Internal Merger ....32
M. Demerger Motion ....33
N. OPmobility Adversary Proceeding ....33
O. Vendor and OEM Negotiations ....33
P. Business Plan Negotiations ....33
Q. Independent Investigation ....33
R. Proposed Confirmation Schedule ....34

**VII. SUMMARY OF THE PLAN ....34**

A. General Settlement of Claims and Interests ....34
B. Restructuring Transactions ....35
C. The Reorganized Debtors ....35
D. Cancellation of Notes, Instruments, Certificates, and Other Documents ....35
E. Exemption from Certain Taxes and Fees ....36
F. Sources of Consideration for Restructuring Transactions ....36
G. New Stockholders Agreement ....36
H. Issuance and Distribution of New Common Stock ....36
I. Exit Facility ....36
J. Corporate Existence ....37
K. Vesting of Assets in the Reorganized Debtors ....37
L. Corporate Action ....38
M. New Organizational Documents ....38
N. Directors and Officers of the Reorganized Debtors ....38
O. Effectuating Documents; Further Transactions ....39
P. Preservation of Causes of Action ....39
Q. Management Incentive Plan ....39
R. Employee Obligations and Employee Arrangements ....39
S. Closing the Chapter 11 Cases ....40
T. Payment of Fees and Expenses of Certain Creditors ....41

**VIII. OTHER KEY ASPECTS OF THE PLAN ....41**

A. Assumption and Rejection of Executory Contracts and Unexpired Leases ....41
B. Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases ....41
C. Claims Based on Rejection of Executory Contracts or Unexpired Leases ....42

**TABLE OF CONTENTS**
**cont'd**


**Page**

D. Cure of Defaults for Assumed, or Assumed and Assigned, Executory Contracts and Unexpired Leases ....42
E. Survival of the Debtors' Indemnification Obligations and Insurance Obligations ....42
F. Director, Officer, Manager, and Employee Liability Insurance ....43
G. Modifications, Amendments, Supplements, Restatements, or Other Agreements ....43
H. Reservation of Rights ....43
I. Nonoccurrence of the Effective Date ....43
J. Contracts and Leases Entered Into After the Petition Date ....44
K. Conditions Precedent to the Effective Date ....44
L. Waiver of Conditions ....45
M. Substantial Consummation ....45
N. Effect of Nonoccurrence of Conditions to the Effective Date ....45

**IX. RISK FACTORS ....45**

A. Bankruptcy Law Considerations ....45
B. Risks Related to Recoveries Under the Plan ....49
C. Risks Related to the Debtors' and the Reorganized Debtors' Businesses ....51
D. Risks Related to the Offer and Issuance of Securities Under the Plan ....54

**X. SOLICITATION AND VOTING PROCEDURES ....56**

A. Classes Entitled to Vote on the Plan ....56
B. Classes Not Entitled to Vote on the Plan ....56
C. Votes Required for Acceptance by a Class ....56
D. Certain Factors to Be Considered Prior to Voting ....57
E. Solicitation Procedures ....57
F. Voting Procedures ....58
G. Voting Tabulation ....59
H. Ballots Not Counted ....59

**XI. CONFIRMATION OF THE PLAN ....60**

A. Requirements of Section 1129(a) of the Bankruptcy Code ....60
B. Best Interests of Creditors—Liquidation Analysis ....61
C. Feasibility ....61
D. Valuation ....61
E. Acceptance by Impaired Class ....61
F. Confirmation Without Acceptance by All Impaired Classes ....62

**XII. IMPORTANT SECURITIES LAWS DISCLOSURES ....63**

A. Issuance of Section 1145 Securities under the Plan ....63
B. Subsequent Transfers of 1145 Securities Issued under the Plan ....64
C. Issuance of 4(a)(2)/Regulation S Securities ....64

**XIII. CERTAIN U.S. FEDERAL TAX CONSEQUENCES AND JAPANESE TAX CONSEQUENCES OF THE PLAN ....66**

A. Introduction ....66
B. Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors ....67
C. Japanese Tax Consequences to the Debtors ....69
D. Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims ....69
E. Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims ....71

**TABLE OF CONTENTS**
**cont'd**

**Page**

F. U.S. Information Reporting and Withholding ....................................... 71
G. FATCA ....................................... 71
H. Japanese Tax Consequences to the Holders of Allowed Claims ....................................... 72

**XIV. RECOMMENDATION OF THE DEBTORS ....................................... 72**

**EXHIBITS**

| | |
|---|---|
| EXHIBIT A | Plan |
| EXHIBIT B | Restructuring Support Agreement |
| EXHIBIT C | Organizational Chart |
| EXHIBIT D | Financial Projections |
| EXHIBIT E | Valuation Analysis |
| EXHIBIT F | Liquidation Analysis |

## I. INTRODUCTION

Marelli Automotive Lighting USA LLC and its debtor Affiliates (each, a "Debtor," and collectively, the "Debtors," and together with Marelli Automotive Lighting USA LLC's non-Debtor Affiliates, "Marelli" or the "Company") submit this disclosure statement (including all exhibits hereto and as may be supplemented or amended from time to time, the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the Debtors' *Joint Plan of Reorganization of Marelli Automotive Lighting USA LLC and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2510] (as supplemented or amended from time to time, the "Plan"). A copy of the Plan is attached hereto as **Exhibit A** and is incorporated herein by reference. The Plan constitutes a separate chapter 11 plan for each of the Debtors.[2]

**THE DEBTORS AND CERTAIN CONSENTING LENDERS THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT, INCLUDING HOLDERS OF APPROXIMATELY 80% OF THE SENIOR LOAN FACILITY (COLLECTIVELY, THE "CONSENTING LENDERS"), BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS AND INTERESTS. THE DEBTORS BELIEVE THE PLAN IS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II. PRELIMINARY STATEMENT

Marelli is one of the largest automotive components suppliers in the world and a crucial conduit in the worldwide automotive supply chain. Headquartered in Saitama, Japan, Marelli employed over 46,000 employees in twenty-four countries around the world as of the Petition Date. As of the Petition Date, the Debtors had approximately $4.9 billion of funded debt obligations. Marelli commenced these Chapter 11 Cases to implement a comprehensive transaction or series of transactions to maximize the value of its business and, critically, maintain operational continuity for its customers, suppliers, vendors, employees, and business partners.

Marelli is a "Tier 1" automotive supplier and operates in twenty-four countries around the world, supplying over sixty-five OEMs and brands such as Stellantis, Nissan, Volkswagen, BMW, and Mercedes Benz. In 2024, Marelli generated over $10 billion of revenue. Marelli primarily manufactures advanced automotive components and systems, including automotive lighting and sensor systems and electronic and software solutions such as screen displays and engine and vehicle controls. Marelli's modern identity is derived from over 100 years of manufacturing excellence as well as a deep commitment to motorsports, racing, and persistent innovation that date back to the "Model T era" of automobile manufacturing. Marelli delivers component parts to its customers and OEMs on a "just in time" or "just in sequence" basis, matching the components to an OEM's exact build schedule for a particular day and shift, thereby reducing inventory levels. Any delay in Marelli's production or delivery jeopardizes an OEM's ability to continue production, as steps in the automotive supply chain cannot be skipped.

The Debtors' corporate structure consists of a parent company domiciled in Japan, five subsidiaries incorporated in the United States (including in Delaware), and others domiciled in 25 other countries around the world. The Debtors have approximately $4.9 billion in prepetition funded debt, most of which is denominated in Japanese yen and subject to Japanese-language credit documents governed by Japanese law. The Company's prepetition funded debt principally consists of two facilities: the approximately $350 million Emergency Loan Facility and the

---

[2] Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the *Declaration of David Slump, Chief Executive Officer of Marelli Automotive Lighting USA LLC, in Support of First Day Motions* [Docket No. 20] (the "First Day Declaration") and the Plan. Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I.B of the Plan. **The summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to the Plan and the documents being summarized. In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.**

approximately $4.55 billion Senior Loan Facility. The Emergency Loan Facility is contractually senior to the Senior Loan Facility, having separate guarantees and collateral.

Approximately 50% of the Senior Loan Facility is held by a group of original lenders consisting of commercial banks headquartered in Japan (the "Japanese Lenders"), including Mizuho, which also serves as the administrative agent under the Senior Loan Facility. Approximately 50% of the Senior Loan Facility is held by an ad hoc group of senior lenders, which includes several investors based outside of Japan (such lender group, the "Ad Hoc Group of Senior Lenders"). Unlike a typical U.S.-law-governed credit facility, the Senior Loan Facility requires a supermajority of lenders (at least 66.67% by principal amount) to direct the exercise of remedies and other material actions. The Company's equity is privately held by funds and accounts managed by Kohlberg Kravis Roberts & Co L.P. (the "Sponsors").

Marelli has navigated persistent industry softness over the past several years caused by a global downturn in automotive production, intense macroeconomic volatility, and geopolitical uncertainty. Marelli began engaging with its secured lenders beginning in August 2024 to address liquidity needs and potential modifications to the credit agreement. To assist in its restructuring efforts and its negotiations, Marelli retained Kirkland & Ellis LLP ("Kirkland") as counsel, Nishimura & Asahi and Mori Hamada & Matsumoto as Japanese counsel, PJT Partners ("PJT") as investment banker, and Alvarez & Marsal North America, LLC ("A&M") as financial advisor. To assist in prepetition negotiations with potential strategic investors (as further described below), Marelli retained JP Morgan Chase, N.A. ("JP Morgan") as investment banker. The Ad Hoc Group of Senior Lenders engaged Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") as counsel, Houlihan Lokey, Inc. ("Houlihan") as investment banker, and AlixPartners LLP ("Alix") as restructuring advisor. Mizuho engaged Davis Polk & Wardwell LLP and Nagashima Ohno & Tsunematsu as counsel.

Marelli, the Ad Hoc Group of Senior Lenders, and the Japanese Lenders engaged in extensive discussions and negotiations regarding a consensual out-of-court restructuring transaction to address the Company's approximately $4.9 billion of prepetition funded indebtedness and liquidity needs but were initially unable to reach agreement on the potential structure of a deal, due, in part, to the supermajority required under the Senior Loan Facility. However, before these Chapter 11 Cases were commenced, an agreement in principle was reached between the Company, Mizuho, the Ad Hoc Group of Senior Lenders, and the Sponsors. This agreement is memorialized in a Restructuring Support Agreement, which provides for the following key terms and conditions:

- up to approximately $1.1 billion of new-money priming DIP financing, funded by Deutsche Bank AG, London Branch, certain other new money lenders, and members of the Ad Hoc Group of Senior Lenders;
- a 47.5% rollup of Senior Loan Claims held by the DIP lenders, upon entry of the Final DIP Order;
- repayment in full in cash of the approximately $350 million Emergency Loan Facility;[3]
- an 11% cash out of the Senior Loan Claims held by the Japanese Lenders, upon consummation of the plan of reorganization;[4]

[3] **Note:** The Debtors have requested an amendment to the Restructuring Support Agreement's proposed Plan treatment of the Emergency Loan Claims from the applicable Consenting Lenders. Additionally, the Debtors are engaged in discussions with their key customers regarding the OEM Accommodation Agreements. The Debtors expect that they will reach an agreement on economic terms of the OEM Accommodation Agreements in advance of the Disclosure Statement Hearing and memorialize such economic terms in OEM Accommodation Agreements prior to the Confirmation Date. To the extent that the concessions obtained from the Debtors' customers are insufficient to support the business plan relied upon in the Debtors' exit financing process, the Debtors may seek further amendments to the terms of the Restructuring Support Agreement.

[4] **Note:** The Debtors have requested an amendment to the Restructuring Support Agreement's proposed Plan treatment of the Senior Loan Claims from the applicable Consenting Lenders. Additionally, the Debtors are engaged in discussions with their key customers regarding the OEM Accommodation Agreements. The Debtors expect that they will reach an agreement on economic terms of the OEM Accommodation Agreements in advance of the Disclosure Statement Hearing and memorialize such economic terms in OEM Accommodation Agreements prior to the Confirmation Date. To the extent that the concessions

- reinstatement or payment in full in cash of all general unsecured claims; and
- conversion of a portion of the DIP Facilities into 100% of the reorganized common equity of the Company, upon consummation of the Plan of reorganization.

In June 2026, the Debtors and the DIP Lenders agreed to amend the DIP Facilities (the "Amended DIP Facilities") to provide an additional $300 million in incremental liquidity and extend the maturity date under the existing DIP Facilities. For additional explanation of the Amended DIP Facilities, *see* Article VI.E of this Disclosure Statement.

The Restructuring Support Agreement included certain customary milestones to implement the restructuring transactions. Those milestones have been extended and otherwise modified throughout these Chapter 11 Cases, and the current milestones are as follows:

- No later than August 1, 2026, the Debtors shall have filed the Plan and the Disclosure Statement with the Bankruptcy Court.
- No later than September 11, 2026, the Bankruptcy Court shall have entered the Disclosure Statement Order.
- No later than October 16, 2026, the hearing on the confirmation of the Plan shall have occurred and the Bankruptcy Court shall have entered the Confirmation Order.

The Debtors strongly believe that the Plan is in the best interests of the Debtors' estates and represents the best available alternative at this time. Entering chapter 11 with strong consensus and support will allow Marelli to move efficiently through these cases, maximize the value of its business, and ensure that its business operations experience minimal disruption. The Debtors are confident that they can efficiently implement the restructuring set forth in the Restructuring Support Agreement and maximize value for its stakeholders. **For these reasons, and the reasons described in this Disclosure Statement, the Debtors strongly recommend that Holders of Claims entitled to vote to accept or reject the Plan vote to accept the Plan.**

## III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A. What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan of reorganization is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest Holder of the debtor (whether or not such creditor or equity interest Holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B. Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing

---

obtained from the Debtors' customers are insufficient to support the business plan relied upon in the Debtors' exit financing process, the Debtors may seek further amendments to the terms of the Restructuring Support Agreement.

adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of Claims whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C. Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (*i.e.*, as of September 1, 2026). Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Emergency Loan Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 4 | Senior Loan Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Preferred Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Common Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

### D. What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.[5] Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

[5] The recoveries set forth below may change based upon changes in the amount of Claims that are allowed as well as other factors related to the Debtors' business operations and general economic conditions.

| Class | Claim/ Interest | Treatment of Claim/Interest | Projected Allowed Amount of Claims | Estimated Recovery (%) |
|---|---|---|---|---|
| Class 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees, to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the election of the Debtors or Reorganized Debtors with the consent of the Required Plan Sponsors (not to be unreasonably withheld), as applicable, either: (i) payment in full in Cash of the unpaid portion of its Other Secured Claim on the Effective Date or as soon as reasonably practicable thereafter (or if payment is not then due, shall be paid in accordance with its terms); (ii) Reinstatement; or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. | $0 | 100% |
| Class 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | $0 | 100% |
| Class 3 | Emergency Loan Claims | Except to the extent that a Holder of an Allowed Emergency Loan Claim agrees to a less favorable treatment and to the extent not paid prior to the Effective Date, on the Effective Date, each Holder of an Allowed Emergency Loan Claim shall receive, in full and final satisfaction, settlement, release and discharge of and in exchange for each Holder's Allowed Emergency Loan Claim, payment in full in Cash.[6] | $300,000,000 | 100% |
| Class 4 | Senior Loan Claims | On the Effective Date, except to the extent that a Holder of an Allowed Senior Loan Claim agrees to a less favorable treatment: (i) each Non-Participating Senior Lender shall, on account of such Holder's Allowed Senior Loan Claim, receive Cash in an amount equal to 11.00% of the principal amount of such Holder's Allowed Senior Loan Claim; and (ii) each Participating Senior Lender shall waive any recovery on account of such Holder's Allowed Senior Loan Claim.<br><br>For the avoidance of doubt, the recovery set forth for this Class 4 shall be the only recovery for Senior Loan Claims and Holders of Senior Loan Claims shall not be entitled to treatment in any other Class, including, for the | $2,100,000,000 | 11% |

[6] **Note:** The Debtors have requested an amendment to the Restructuring Support Agreement's proposed Plan treatment of the Emergency Loan Claims from the applicable Consenting Lenders. Additionally, the Debtors are engaged in discussions with their key customers regarding the OEM Accommodation Agreements. The Debtors expect that they will reach an agreement on economic terms of the OEM Accommodation Agreements in advance of the Disclosure Statement Hearing and memorialize such economic terms in OEM Accommodation Agreements prior to the Confirmation Date. To the extent that the concessions obtained from the Debtors' customers are insufficient to support the business plan relied upon in the Debtors' exit financing process, the Debtors may seek further amendments to the terms of the Restructuring Support Agreement.

| Class | Claim/ Interest | Treatment of Claim/Interest | Projected Allowed Amount of Claims | Estimated Recovery (%) |
|---|---|---|---|---|
| | | avoidance of doubt, on account of any purported deficiency claim.[7] | | |
| Class 5 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, at the option of the Debtors with the consent of the Required Plan Sponsors, each Holder of an Allowed General Unsecured Claim shall either (i) be Reinstated; or (ii) receive other treatment rendering such Allowed General Unsecured Claim as Unimpaired under the Plan.[8] | $200,000,000 | 100% |
| Class 6 | Intercompany Claims | Each Allowed Intercompany Claim shall be, at the option of the Reorganized Debtors, with the consent of the Required Plan Sponsors, and in a manner consistent with the Restructuring Transactions Memorandum, Reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Intercompany Claim, or such other treatment as reasonably determined by the Reorganized Debtors and the Required Plan Sponsors. | N/A | N/A |
| Class 7 | Intercompany Interests | In full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Intercompany Interest, Allowed Intercompany Interests shall, in a manner consistent with the Restructuring Transactions Memorandum, as applicable, be either: (i) Reinstated; or (ii) distributed, contributed, set off, cancelled, and released without any distribution on account of such Claims, or otherwise addressed at the option of the Reorganized Debtors, with the consent of the Required Plan Sponsors (not to be unreasonably withheld). | N/A | N/A |
| Class 8 | Preferred Equity Interests | All Preferred Equity Interests will be cancelled, released, and extinguished and will be of no further force and effect. No Holders of Preferred Equity Interests will receive a distribution under the Plan. | $0 | 0% |
| Class 9 | Common Stock Interests | All Common Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect. No Holders of Common Stock Interests will receive a distribution under the Plan. | $0 | 0% |

[7] **Note:** The Debtors have requested an amendment to the Restructuring Support Agreement's proposed Plan treatment of the Senior Loan Claims from the applicable Consenting Lenders. Additionally, the Debtors are engaged in discussions with their key customers regarding the OEM Accommodation Agreements. The Debtors expect that they will reach an agreement on economic terms of the OEM Accommodation Agreements in advance of the Disclosure Statement Hearing and memorialize such economic terms in OEM Accommodation Agreements prior to the Confirmation Date. To the extent that the concessions obtained from the Debtors' customers are insufficient to support the business plan relied upon in the Debtors' exit financing process, the Debtors may seek further amendments to the terms of the Restructuring Support Agreement.

[8] **Note:** The Debtors and the Required Plan Sponsors continue to diligence the General Unsecured Claims. Subject to completion of such diligence efforts, the Debtors may seek to further amend the treatment of General Unsecured Claims in advance of the Disclosure Statement Hearing.

| Class | Claim/ Interest | Treatment of Claim/Interest | Projected Allowed Amount of Claims | Estimated Recovery (%) |
|---|---|---|---|---|
| Class 10 | Section 510(b) Claims | On the Effective Date, all Section 510(b) Claims will be cancelled, released, discharged, extinguished, and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive any distribution on account of such Section 510(b) Claims. | N/A | 0% |

## E. What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, or a Priority Tax Claim?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, Quarterly Fees, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

### 1. Administrative Claims

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Restructuring Expenses, Professional Fee Claims, DIP Claims or subject to 11 U.S.C. § 503(b)(1)(D), unless previously Filed, requests for payment of Allowed Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code) must be Filed and served on the Debtors or Reorganized Debtors, as applicable, no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Debtors or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party by the Claims Objection Bar Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order of the Bankruptcy Court.

Except with respect to the Professional Fee Claims, DIP Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of the Judicial Code, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtor(s) against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, or such Holder has been paid by any Debtors on account of such Allowed Administrative Claim prior to the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, each Holder of an Allowed Administrative Claim shall receive, subject to the consent of the Ad Hoc Group of Senior Lenders (other than Administrative Claims held by Consenting Senior Bank Lenders), an amount of Cash equal to the amount of the unpaid or unsatisfied portion of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court. For the avoidance of doubt, nothing contained in Article II.A of the Plan is intended as or shall be construed or deemed to be a waiver of any party's rights to dispute any Claim, including any Administrative Claims, on any grounds.

**2. Professional Fee Claims**

**(a) Final Fee Applications and Payment of Professional Fee Claims**

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy Rules. The Reorganized Debtors shall pay Professional Fee Claims in Cash to such Professionals in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account. For the avoidance of doubt, the Ad Hoc Group of Senior Lenders' Professionals shall not be required to File any fee applications in respect of their Professional Fee Claims with the Bankruptcy Court. The Ad Hoc Group of Senior Lenders' Professionals' Professional Fee Claims shall be paid pursuant to the terms of the Restructuring Support Agreement, the Restructuring Term Sheet, and the DIP Orders.

**(b) Professional Fee Escrow Account**

No later than the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Reorganized Debtors, as applicable. After all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

**(c) Professional Fee Escrow Amount**

Professionals shall deliver to the Debtors a reasonable and good faith estimate of their unpaid Professional Fee Claims incurred in rendering services to the Debtors or the Committee before and as of the anticipated Effective Date, and shall deliver such estimate no later than 5 Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors shall estimate the unpaid and unbilled fees and expenses of such Professional for purposes of funding the Professional Fee Escrow Account. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account.

**(d) Post-Confirmation Date Fees and Expenses**

Except as otherwise specifically provided for in the Plan, from and after the Confirmation Date, the Debtors and/or the Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to administration of the Chapter 11 Cases, prosecution of Causes of Action, and implementation of the Plan and Consummation incurred by the Debtors, the Reorganized Debtors, and/or the Committee. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court.

**3. DIP Claims**

Pursuant to the Plan and the DIP Orders, the Tranche A DIP Claims, Tranche A-1 DIP Claims, Tranche B DIP Claims, and Tranche C Roll-Up DIP Claims shall constitute Allowed superpriority Administrative Claims in an amount equal to the outstanding principal amount of the Tranche A DIP Loans, Tranche A-1 DIP Loans, Tranche B DIP Loans, and Tranche C DIP Loans, as applicable, as of the Effective Date, together with any accrued and unpaid interest thereon and any other DIP Obligations (as defined in the Final DIP Order and amended by the DIP Amendment Final Order) or other amounts due, owing, or payable under the DIP Facilities, as applicable.

On the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to other treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim:

1. Each Holder of a Tranche A DIP Loan shall be paid in full in Cash;

2. Each Holder of a Tranche A-1 DIP Loan shall be paid in full in Cash;

3. each Holder of a Tranche B DIP Loan shall, at the election of the Required Plan Sponsors and which election shall be applicable to all Tranche B DIP Loan Claims: (a) be paid in full in Cash; (b) exchange all or a portion of their Tranche B DIP Claims for Exit Facility Loans and be paid in Cash for any Tranche B DIP Claims not exchanged for Exit Facility Loans; or (c) convert all or a portion of their Tranche B DIP Claims into their Pro Rata share of New Common Stock or a combination of Cash and New Common Stock (subject to dilution by the Management Incentive Plan and any other equity issued by the Reorganized Debtors with the consent of the Required Plan Sponsors); and

4. each Holder of a Tranche C DIP Loan shall receive their Pro Rata share of New Common Stock (subject to dilution by the Management Incentive Plan and any other equity issued by the Reorganized Debtors with the consent of the Required Plan Sponsors).

Upon the satisfaction of the Allowed DIP Claims in accordance with the terms of the Plan, or other such treatment as contemplated by Article II.C of the Plan, all guarantees provided with respect to such Allowed DIP Claims shall be automatically released, terminated, and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

**4. Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code.

**5. Restructuring Expenses**

On the Effective Date or as soon as reasonably practicable thereafter, the Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash (to the extent not previously paid) in accordance with, and subject to, as applicable, the terms of the Restructuring Support Agreement and the DIP Orders and any other fee arrangements, without any requirement to File retention applications, fee applications, or any other applications in the Chapter 11 Cases and without any requirement for further notice or Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least 5 Business Days before the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. Following the Effective Date, invoices for all Restructuring Expenses shall be submitted to the Reorganized Debtors for payment.

**6. Statutory Fees**

All fees due and payable pursuant to 28 U.S.C. § 1930(a)(6) plus any interest due and payable under 31 U.S.C. § 3717 (together, the "Quarterly Fees") before the Effective Date shall be paid by the applicable Reorganized

Debtor (or the Disbursing Agent on behalf of each applicable Reorganized Debtor) for each quarter (including any fraction thereof) until such Reorganized Debtor's Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.

### F. Are any regulatory approvals required to consummate the Plan?

It is anticipated that certain antitrust filings, foreign investment approvals, or other regularly approvals may be required in connection with the Restructuring Transactions and to consummate the Plan. However, to the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan or the Restructuring Transactions, it is a condition precedent to the Effective Date that they be obtained, and the Debtors are engaging as appropriate in order to procure such approvals, authorizations, consents, rulings, or documents (as applicable).

### G. What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Holders of Claims will receive the potential recoveries reflected herein. It is possible that any alternative plan may provide Holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of extended Chapter 11 Cases, or of a liquidation scenario, *see* Article XI.B of this Disclosure Statement, titled "Best Interests of Creditors—Liquidation Analysis" and the Liquidation Analysis attached hereto as **Exhibit F**.

### H. Is there potential litigation related to the Plan?

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article XI of this Disclosure Statement, entitled "Confirmation of the Plan."

### I. What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?

The Management Incentive Plan is the post-emergence management incentive plan providing for the issuance, from time to time, of awards with respect to the New Common Stock to be adopted by the New Board following the Effective Date, the terms and conditions of which, including any and all awards granted thereunder, shall be determined by the New Board in all respects, including, without limitation, with respect to the participants, allocation, timing, form, and structure.

The ownership percentage represented by the New Common Stock distributed on the Effective Date under the Plan will be subject to dilution from the New Common Stock issued in connection with the conversion of any other options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence, including pursuant to the Management Incentive Plan.

### J. If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Distributions to Holders of Allowed Claims will be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. "Consummation" of the Plan refers to the occurrence of the Effective Date. *See* Article VIII.K of this Disclosure Statement, entitled "Conditions

Precedent to the Effective Date" for a discussion of conditions precedent to Confirmation and Consummation of the Plan.

### K. How do I know if my Claim is a General Unsecured Claim?

General Unsecured Claim means any unsecured Claim, including, without limitation, (i) any Claim arising from or related to any indemnification obligation or provision that is not Reinstated or assumed pursuant to the Plan, and (ii) any Claim held by an ordinary course trade vendor of the Debtors against any of the Debtors on account of ordinary course goods and/or services provided to any of the Debtors, against a Debtor, that is not (a) a DIP Claim, (b) an Administrative Claim, (c) a Priority Tax Claim, (d) an Other Secured Claim, (f) an Other Priority Claim, (g) an Emergency Loan Claim, (h) a Senior Loan Claim, including any deficiency claim held by any Senior Lender on account of a Senior Loan Claim, (i) an Intercompany Claim, (j) a Preferred Equity Interest, (k) a Common Stock Interest, or (l) a Section 510(b) Claim.

### L. If I Have a General Unsecured Claim, What Will My Recovery Be?

Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, at the option of the Debtors with the consent of the Required Plan Sponsors, each Holder of an Allowed General Unsecured Claim shall either (i) be Reinstated; or (ii) receive other treatment rendering such Allowed General Unsecured Claim as Unimpaired under the Plan.

### M. What are the sources of Cash and other consideration required to fund the Plan?

The Debtors and/or the Reorganized Debtors, as applicable, will fund distributions under the Plan with (i) Cash on hand on the Effective Date; (ii) the New Common Stock; and (iii) the Exit Facility and/or the Cash proceeds thereof, as applicable. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Stock, will be exempt from registration under the Securities Act, as described more fully in Article VI.F of the Plan.

### N. If My Contract Was Rejected, What Type of Claim Do I Have?

Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims.

### O. Are there risks to owning the New Common Stock upon emergence from Chapter 11?

Yes. *See* Article IX of this Disclosure Statement, entitled "Risk Factors" for a discussion of such risks. The Debtors do not intend to seek a listing of the New Common Stock on the New York Stock Exchange, the Nasdaq Stock Market or another comparable national securities exchange upon the Effective Date. The Debtors do not expect that Reorganized Marelli or the Reorganized Debtors will be required to file public reports pursuant to the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise.

### P. Will there be releases and exculpation granted to parties in interest as part of the Plan?

Yes, Article VIII of the Plan proposes to provide releases to the Released Parties and to exculpate the Exculpated Parties.

**THE RELEASES AND EXCULPATIONS IN THE PLAN ARE EXPRESSLY SUBJECT TO THE OUTCOME OF THE INDEPENDENT INVESTIGATION AND THE DISINTERESTED DIRECTORS' RIGHTS TO OBJECT TO SUCH PROVISIONS OR SEEK TO LIMIT THE SCOPE OF SUCH PROVISIONS.**

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' chapter 11 process through efforts to negotiate and implement the Plan, which will maximize value for the

benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

**IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES: (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) THE CONSENTING STAKEHOLDERS; (D) THE DIP AGENT AND THE DIP LENDERS; (E) THE INITIAL TRANCHE A LENDER; (F) THE PLAN SPONSORS; (G) THE PREPETITION AGENTS; (H) THE AD HOC GROUP OF SENIOR LENDERS' PROFESSIONALS; (I) THE CONSENTING SENIOR BANK LENDERS' PROFESSIONALS; (J) THE COMMITTEE; (K) EACH MEMBER OF THE COMMITTEE (SOLELY IN THEIR CAPACITIES AS SUCH); (L) HOLDERS OF CLAIMS OR INTERESTS WHO VOTE TO ACCEPT THE PLAN; (M) HOLDERS OF CLAIMS OR INTERESTS WHO VOTE TO REJECT THE PLAN AND ARE PROVIDED WITH THE OPPORTUNITY TO OPT OUT OF THE RELEASES SET FORTH THEREIN AND DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES SET FORTH THEREIN; (N) HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO ACCEPT OR DEEMED TO REJECT THE PLAN AND THAT AFFIRMATIVELY OPT IN TO THE RELEASES SET FORTH THEREIN; (O) HOLDERS OF CLAIMS OR INTERESTS WHO ABSTAIN FROM VOTING ON THE PLAN AND THAT AFFIRMATIVELY OPT IN TO THE RELEASES SET FORTH THEREIN; (P) WITH RESPECT TO EACH OF THE ENTITIES IN THE FOREGOING CLAUSES (A) THROUGH THE FOLLOWING CLAUSE (Q), EACH SUCH ENTITY'S CURRENT AND FORMER PREDECESSORS, SUCCESSORS, AFFILIATES (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), SUBSIDIARIES, DIRECT AND INDIRECT EQUITY HOLDERS, AND FUNDS; AND (Q) WITH RESPECT TO EACH OF THE ENTITIES IN FOREGOING CLAUSE (A) THROUGH THIS CLAUSE (Q), EACH OF THEIR RELATED PARTIES; PROVIDED, HOWEVER, THAT ANY HOLDER OF A CLAIM OR INTEREST THAT (1) ELECTS TO OPT OUT OF, OR NOT OPT IN TO, AS APPLICABLE, THE RELEASES PROVIDED BY THE PLAN OR (2) OBJECTS TO THE RELEASES IN THE PLAN, SHALL NOT BE A "RELEASING PARTY"[9] FOR PURPOSES OF THE PLAN. THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, to the extent requested by the Bankruptcy Court, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. For the avoidance of doubt, final approval of the release and exculpation provisions in the Plan remain subject to the conclusion of the Independent Investigation, described in Article VI.Q below, and shall be sought, subject to the conclusion of the Independent Investigation at the Confirmation Hearing, and the inclusion of such provisions in this Disclosure Statement does not represent the Bankruptcy Court's approval of such provisions at this time. The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

### 1. Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have, or any distribution to be made on account of such Allowed Claim or Allowed Interest that have been effectuated through a Rule 9019 Order, or otherwise expressly identified as a settlement as may be set forth in the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the

[9] For the avoidance of doubt, all releases remain subject to the Independent Investigations.

Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle any Claims and Causes of Action against other Entities.

**2. Discharge of Claims and Termination of Interests**

Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services that employees of the Debtors have performed prior to the Effective Date and that arise from a termination of employment, any contingent or non contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (1) a Proof of Claim based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. Unless expressly provided in the Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to occurrence of the Effective Date.

**3. Term of Injunctions or Stays**

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**4. Release of Liens**

**Except as otherwise specifically provided in the Plan, the Confirmation Order, the Exit Facility Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, as applicable. The DIP Agent and the Prepetition Agents shall, at the Reorganized Debtors' sole cost and expense, execute and deliver all documents reasonably requested by the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests on such assets of the Debtors that are subject to the Restructuring.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan or any agent for such Holder has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then such Holder (or the agent for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder) and take any and all steps requested by the Debtors or the Reorganized Debtors, that are necessary or desirable to record or effectuate the**

**cancellation and/or extinguishment of such Liens and/or security interests, including the execution and delivery of such releases and the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings, at the Reorganized Debtors' sole cost and expense, on such Holder's behalf. The presentation or Filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens. Notwithstanding the foregoing paragraph, Article VIII.D of the Plan shall not apply to any Secured Claims that are Reinstated pursuant to the terms of the Plan.**

5. **Debtor Release**[10]

**Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy and sufficiency of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case to the maximum extent permitted by Law, from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, including any derivative claims asserted or assertable on behalf of any of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part: (i) the Debtors (including the management, ownership, or operation thereof), the business or contractual arrangement between the Debtors and any Released Party, any Securities issued by the Debtors and the ownership thereof, the Debtors' restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement; (ii) any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Restructuring Transactions, the Disclosure Statement, the Plan (including the Plan Supplement), the Definitive Documents, the DIP Facilities, the DIP Documents, the Exit Facility Documents, or the negotiation, preparation, formulation or implementation of the foregoing; (iii) the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the negotiation of and entry into the OEM Accommodation Agreements, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or (iv) any other act or omission, transaction, agreement, event, or other occurrence, in each case relating to any of the foregoing, taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Retained Causes of Action List to be attached as an exhibit to the Plan Supplement, or (iii) Claims or Causes of Action arising from any act or omission determined by a Final Order to have constituted actual fraud.**

6. **Release by Holders of Claims or Interests**[11]

**Except as otherwise specifically provided in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy and sufficiency of which is hereby confirmed, each Released Party is deemed to be conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each Releasing Party to the maximum extent permitted by Law from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, including any**

---

[10] The releases set forth in the Plan remain subject to the Independent Investigation.

[11] The releases set forth in the Plan remain subject to the Independent Investigation.

**derivative Claims asserted or assertable on behalf of any of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any Holder of any Claim or Interest, or that such Releasing Party could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part: (i) the Debtors (including the management, ownership, or operation thereof), the business or contractual arrangement between the Debtors and any Released Party, any Securities issued by the Debtors and the ownership thereof, the Debtors' restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement; (ii) any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Restructuring Transactions, the Disclosure Statement, the Plan (including the Plan Supplement), the Definitive Documents, the DIP Facilities, the DIP Documents, the Exit Facility Documents, or the negotiation, preparation, formulation or implementation of the foregoing; (iii) the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the negotiation of and entry into the OEM Accommodation Agreements, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or (iv) any other act or omission, transaction, agreement, event, or other occurrence, in each case relating to any of the foregoing, taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any commercial Claims arising between two non-Debtor parties in the ordinary course of business, such as accounts receivable and accounts payable on account of goods and services being performed, (ii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (iii) any Causes of Action specifically retained by the Debtors pursuant to the Retained Causes of Action List to be attached as an exhibit to the Plan Supplement, or (iv) Claims or Causes of Action arising from any act or omission determined by a Final Order to have constituted actual fraud.**

**7. Exculpation**

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Independent Investigation, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and, upon completion of the Plan, shall be deemed to have participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

**8. Injunction**

**Except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Causes of Action, or Interests that have been discharged or released pursuant to the Plan, or are subject to exculpation pursuant to the Plan, are conclusively, absolutely, unconditionally, irrevocably, and forever enjoined, from and after the Effective Date, to the maximum extent permitted by Law, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Causes of Action, or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Causes of Action, or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Causes of Action, or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Causes of Action, or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim, Cause of Action, or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Causes of Action, or Interests released or settled pursuant to the Plan.**

**9. Definitions Related to the Releases**

**"*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) the Committee; (d) each member of the Committee; and (e) with respect to each of the foregoing Entities in clauses (a) through (d), each of their respective Related Parties.**

**"*Related Party*" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.**

**"*Released Party*" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) the Consenting Stakeholders; (d) the DIP Agent and the DIP Lenders; (e) the Initial Tranche A Lender; (f) the Plan Sponsors; (g) the Prepetition Agents; (h) the Ad Hoc Group of Senior Lenders' Professionals; (i) the Consenting Senior Bank Lenders' Professionals; (j) the Committee; (k) each member of the Committee (solely in their capacities as such); (l) with respect to each of the Entities in foregoing clause (a) through the following clause (m), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and funds; and (m) with respect to each of the Entities in foregoing clause (a) through this clause (m), each of their Related Parties; *provided, however,* that any Holder of a Claim or Interest that objects to the releases in the Plan or elects to opt out of, or not opt in to, as applicable, the releases provided by the Plan shall not be a "Released Party."**

**"*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) the Consenting Stakeholders; (d) the DIP Agent and the DIP Lenders; (e) the Initial Tranche A Lender; (f) the Plan Sponsors; (g) the Prepetition Agents; (h) the Ad Hoc Group of Senior Lenders' Professionals; (i) the Consenting Senior Bank Lenders' Professionals; (j) the Committee; (k) each member of the Committee (solely in their capacities as such); (l) Holders of Claims or Interests who vote to**

**accept the Plan; (m) Holders of Claims or Interests who vote to reject the Plan and are provided with the opportunity to opt out of the releases set forth therein and do not affirmatively opt out of the releases set forth therein; (n) Holders of Claims or Interests that are deemed to accept or deemed to reject the Plan and that affirmatively opt in to the releases set forth therein; (o) Holders of Claims or Interests who abstain from voting on the Plan and that affirmatively opt in to the releases set forth therein; (p) with respect to each of the Entities in the foregoing clauses (a) through the following clause (q), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and funds; and (q) with respect to each of the Entities in foregoing clause (a) through this clause (q), each of their Related Parties; *provided, however,* that any Holder of a Claim or Interest that (1) elects to opt out of, or not opt in to, as applicable, the releases provided by the Plan or (2) objects to the releases in the Plan, shall not be a "Releasing Party"[12] for purposes of the Plan.**

**Q. Does the Plan preserve Causes of Action?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or a Final Order.

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided in the Plan, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of the Bankruptcy Court.

**R. What is the deadline to vote on the Plan?**

The deadline to vote on the Plan (the "Voting Deadline") is **October 9, 2026, at 4:00 p.m. (prevailing Eastern Time).**

**S. How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. To be counted as a vote to accept or reject the Plan, each ballot (a "Ballot") must be properly executed, completed, and delivered in accordance with the instructions provided such that a vote cast is **actually received** before the Voting Deadline by Kurtzman Carson Consultants, LLC dba Verita Global

[12] For the avoidance of doubt, all releases remain subject to the Independent Investigation.

("Verita" or the "Claims, Noticing, and Solicitation Agent"). *See* Article X of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL NOT BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.**

**T. Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**U. When is the Confirmation Hearing set to occur?**

The Confirmation Hearing is scheduled for **October 16, 2026 at [●]:00 [a/p].m. (prevailing Eastern Time)**. The Confirmation Hearing may be adjourned from time to time. If the Confirmation Hearing is adjourned, a notice of such adjournment will be filed on the docket. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties by **October 9, 2026, at 4:00 p.m. (prevailing Eastern Time)** in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

The Debtors will publish the notice of the Confirmation Hearing following entry of the Disclosure Statement Order, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The New York Times* (national edition) and the *Financial Times* (global edition), or any other such publications that the Debtors deem appropriate, to provide notification to those persons who may not receive notice by mail. The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

**V. What is the purpose of the Confirmation Hearing?**

The Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan. The purpose of the Confirmation Hearing is for the Bankruptcy Court to determine whether the Plan satisfies the requirements for Confirmation set forth in the Bankruptcy Code, including, among other things, whether the Plan has been proposed in good faith and is in the best interests of Holders of Claims and Interests. The Bankruptcy Code also provides that any party in interest may object to Confirmation of the Plan.

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court to such plan of reorganization in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt or claim that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt or claim in accordance with the terms of the confirmed plan of reorganization.

**W. What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code. Following Confirmation, the Plan will be consummated on the Effective Date, which is the first Business Day after which all conditions to Consummation have been satisfied or waived. *See* Article IX of the Plan. On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the

Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

### X. Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?

On the Effective Date, the term of the current board of directors of the Debtors shall expire, and the directors for the initial term of the New Board shall be designated and appointed in accordance with the terms set forth in the New Organizational Documents and the New Stockholders Agreement. The initial members of the New Board will be identified in the Plan Supplement, as well as those Persons that will serve as officers of the Reorganized Debtors. Each such member and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents, the New Stockholders Agreement, and other constituent documents of Reorganized Marelli.

To the extent any identified director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Provisions regarding the removal, appointment, and replacement of members of the New Board will be disclosed in the New Organizational Documents.

### Y. What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?

As described in Article V herein, as well as in the First Day Declaration, prior to the Petition Date, the Debtors evaluated numerous potential alternatives, including out-of-court restructuring alternatives, in-court sale transactions, and debt and/or equity investments from third party investors and current stakeholders.

### Z. Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims, Noticing, and Solicitation Agent:

> *By electronic mail at:*
> https://www.veritaglobal.com/Marelli
>
> *By telephone (toll free) at*:
> (877) 606-7509 (domestic) or +1(310) 751-2626 (international) and request to speak with a member of the Solicitation Team.

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Debtors' Claims, Noticing, and Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims, Noticing, and Solicitation Agent at https://www.veritaglobal.com/Marelli (free of charge) or the Bankruptcy Court's website at https://www.deb.uscourts.gov (for a fee).

### AA. Do the Debtors recommend voting in favor of the Plan?

Yes. The Debtors believe that the Plan provides for a greater distribution to the Debtors' stakeholders than would otherwise result from any other available alternative. The Debtors believe that the Plan, which provides for a substantial deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of the Debtors' stakeholders, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

### BB. Who Supports the Plan?

The Debtors commenced these Chapter 11 Cases with the support of holders of approximately 80% of the Senior Loan Claims, the Consenting Equity Sponsor, the Plan Sponsors, and Mizuho Bank, Ltd., in its capacity as the Holder of the Emergency Loan Claims and Holder of certain Senior Loan Claims.

# IV. THE DEBTORS' HISTORY AND OPERATIONS

## A. The Debtors' Corporate Structure and History

Marelli is the result of the consolidation of two multinational manufacturing companies: Calsonic Kansei, a Japanese company, and Magneti Marelli, an Italian company. Calsonic Kansei was founded in 1938 as Nihon Radiator Manufacturing Company, Ltd. ("Nihon"), a Japanese automobile radiator manufacturer headquartered in Japan. After World War II, Nihon grew rapidly due to its ties to Nissan Motor Co., Ltd. ("Nissan"), which ultimately acquired a controlling stake in Nihon in 1959. In 1978, Nihon launched its first U.S. manufacturing plant in California under the name "Calsonic," demonstrating the company's desire to expand its international footprint. In 1988, Nihon officially changed its name to Calsonic Corporation ("Calsonic").

In 2000, Calsonic acquired Kanto Seiki Company, Ltd ("Kanto"), a longstanding Japanese automotive manufacturer. Kanto expanded its geographic footprint in 1973 and began exporting to Europe in response to increased market demand for its products. By 1990, Kanto had established itself as a leading supplier of electronic instrument panels, control systems, and sensors. In 1991, Kanto formally changed its name to Kansei Corporation ("Kansei"). The merger of Calsonic and Kansei created Calsonic Kansei Corporation ("Calsonic Kansei"), one of Japan's leading "Tier 1" automotive suppliers. Throughout the 2000s, Calsonic Kansei expanded its global manufacturing footprint, opening new facilities across North America, Europe, and Asia. The company heavily invested in next generation components for electric and hybrid vehicles to align with industry trends towards fuel efficiency, emissions reduction, and technological innovation. In 2017, Calsonic Kansei's consolidated revenue exceeded approximately $8.7 billion.

Magneti Marelli was founded in 1919 in Milan, Italy, as a joint venture between the car manufacturer Fiat S.p.A ("Fiat") and the Italian engineer and inventor, Ercole Marelli. In 1967, Fiat became the sole owner of Magneti Marelli. Magneti Marelli's early production centered around designing electric machines and ignition systems, as well as automobile batteries and sparkplugs. Magneti Marelli was also at the forefront of motorsports innovation and design, and many of its designs ultimately became key components in everyday automobiles as well, including the semi-automatic gearbox, the "intelligent" steering wheel, and the KERS regenerative braking and acceleration system. With the support of Fiat, Magneti Marelli eventually expanded internationally and began to manufacture electronic control units and manifold intakes, high-performance LED lighting, and fuel injection systems.

In 2017, the Sponsors acquired Calsonic Kansei. Around the same time, Fiat began to analyze potential ways to raise new money to fund research and development and investments into new technologies. In October 2018, Calsonic Kansei announced that it had acquired Magneti Marelli. The two brands agreed to unite under the Marelli name. The resulting consolidation allowed the two companies to integrate their respective product lines, expand their customer base, and leverage their international strengths to service over fifty carmakers worldwide. In early March 2020, the Company relocated the former Magneti Marelli North American headquarters from Auburn Hills, Michigan, and the former Calsonic Kansei technical center in Farmington Hills, Michigan, to form a consolidated headquarters in Southfield, Michigan to better service the U.S. market.

Today, Marelli is one of the largest international automotive parts suppliers in the world. Headquartered in Saitama, Japan, Marelli employed over 46,000 employees in twenty-four countries as of the Petition Date. Marelli maintains both long- and short-term contractual arrangements with over sixty-five OEMs and brands, including Stellantis N.V. ("Stellantis"), Nissan, Volkswagen Group ("Volkswagen"), Bayerische Motoren Werke AG (*i.e.*, "BMW"), Mercedes-Benz, Honda Motor Company, Ltd., General Motors Company, and Tesla, Inc. Marelli's operations are supported by a complex global infrastructure, comprised of research and development centers, manufacturing facilities, and application centers around the world.

An overview of Marelli's organizational structure as of the Petition Date is set forth in **Exhibit C**.[13]

[13] Contemplated postpetition changes to Marelli's organizational structure are set forth in Article VI.L–M herein.

### B. The Debtors' Assets and Operations

Marelli organizes its production into seven businesses: Lighting, Electronics, Interiors, Green Technologies, Ride Dynamics, Propulsion, and Aftermarket.

The Lighting business specializes in the development, design, and manufacturing of lighting systems and electrical services. Known for its strong reputation and premium products portfolio, Lighting's main product lines include "Core Lighting" (LED systems, headlamp and rear lamp systems, electronic control units, and lighting software) and "New Lighting" (360-degree illumination, communication, and sensing solutions). In lockstep with the Company's shift towards carbon neutrality, Lighting focuses on developing energy efficient technologies and alternatives for its products. Lighting provides lighting and electrical services predominately to automakers in the European and North American markets and serves a diverse portfolio of clients. With a global footprint of nineteen production plants in eleven countries, sixteen research and development and application centers, and approximately 16,100 employees as of the Petition Date, Lighting is the Company's largest business.

The Electronics business provides high growth products, including hardware design and manufacturing, human machine interfaces (e.g., clusters[14] and ignition switches), comfort electronics, control units that manage various sensor systems, telecommunications systems, and occupant detection systems. Electronics leverages its legacy hardware and software capabilities to drive innovation towards architecture for Software Defined Vehicles (i.e., vehicles in which features and functions are primarily enabled through software). In recent years, Electronic has prioritized strategic investments in China and India to capture growth and to diversify its client portfolio. Employing approximately 5,800 employees across eleven manufacturing sites in ten countries as of the Petition Date, Electronics is Marelli's second largest business and maintains a strong manufacturing presence in all major automotive regions, including strong research and development capabilities across numerous research, development, and application centers.

The Interiors business combines innovation, art, styling, design, and production to provide turn-key solutions that elevate the on-board experience. Interiors' product portfolio includes, among others, steering wheel components, instrument panels, central consoles, and passenger safety validation systems as well as on-site assembly services. With a team of over 400 engineers at four research and development sites as of the Petition Date, Interiors boasts strong engineering and innovation capabilities, as evidenced by a portfolio of over seventy patents and the milestone of being the first "Tier 1" automotive supplier to launch smart surface technology. As of the Petition Date, Interiors' global footprint included twenty-five manufacturing sites in eight countries and approximately 6,000 employees. Interiors has partnerships with several key partners in China and Taiwan and has invested in research and development efforts to grow and capture those markets.

The Ride Dynamics business develops and manufactures products utilized in the frame and body, such as suspension systems and shock absorbers, of passenger and light commercial vehicles. Ride Dynamics' products are powertrain agnostic—the products that Ride Dynamics provides are compatible with a variety of powertrains, including internal combustion engines, hybrid, electric, and hydrogen fuel cell vehicles, rather than being designed for a specific system. As of the Petition Date, Ride Dynamics employed approximately 3,700 employees across twelve manufacturing sites in six countries.

The Propulsion business provides an extensive product portfolio designed to improve engine and fuel performance and transmission controls. Propulsion manufactures, among other things, components for internal combustion engines (*e.g.*, air and fuel components, engine management systems, and transmission controls) and electric "engines" (*e.g.*, high/low voltage systems, high revolution speed eMotors, and power inverters). The Company is a top performer in the propulsion market more broadly and boasts a history of successful motorsport collaborations with top competitors such as McLaren and Ferrari NV ("Ferrari"). With a global footprint of seven manufacturing sites in seven countries, Propulsion employed approximately 3,800 employees as of the Petition Date.

The Green Technologies business produces a range of products for both traditional and electric vehicles that are designed to improve emissions performance. Supported by a strong engineering team dedicated to Marelli's

[14] A cluster is a collection of dials and gauges behind the steering wheel that provides information about the vehicle's performance and status (*e.g.*, indicators for speed, fuel levels, engine temperature, exterior temperature).

culture of innovation and competition, Green Technologies supports OEMs' transition to electric vehicles by providing new "hot-end" innovations designed to reduce $CO_2$ emissions and "cold-end" technologies designed to achieve noise reduction. Green Technologies also introduced into mass production its heat exchange technology originally designed for competitors in Formula 1 and Super GT, a sportscar racing series in Japan. With over 6,700 employees across thirty-one manufacturing sites in fourteen countries as of the Petition Date, Green Technologies is one of the largest international providers of emission-regulating products.

Marelli's Aftermarket business is a trading organization dedicated to supplying spare automotive parts and workshop services to the independent aftermarket (i.e. repair shops and distributors rather than car manufacturers) indirectly through a service network. In 2024, Aftermarket distributed approximately 80,000 spare parts to over 3,000 customers in ninety-five countries. Marelli Aftermarket also promotes partnerships between automotive workshops, body shops, spare parts dealers, rental companies, insurance companies, and other automotive players through various training courses for the automotive industry.

Marelli also has a longstanding partnership with the Nissan Formula E Team[15] as well as partnerships with Red Bull KTM Factory Racing, Ducati Corse Lenovo's MotoGP team, McLaren, Nissan, and Mercedez-Benz.

### C. The Debtors' Prepetition Capital Structure

#### 1. The Debtors' Debt Obligations

As of the Petition Date, Marelli had approximately $4.9 billion[16] in total funded debt obligations, as reflected in the chart below.

| ***Funded Debt*** | ***Maturity*** | ***Approximate Amount Outstanding (in millions)*** |
|---|---|---|
| Emergency Loan Facility | December 31, 2027 | $350 |
| Senior Loan Facility | -- | -- |
| *Revolving Credit Facility* | June 29, 2029 | $540 |
| *Term Loan Facility* | June 29, 2029 | $4,010 |
| ***Total Debt Obligations*** | | ***$4,900*** |

#### 2. Equity Interests in Marelli

The equity of Marelli Holdings Co. Ltd. consists of several series of preferred equity shares plus common equity shares. As of the Petition Date, the majority of the Company's common equity interests were held by the Sponsors.

## V. EVENTS LEADING TO THESE CHAPTER 11 CASES

### A. Industry-Wide Headwinds and the Impact of the COVID-19 Pandemic

The onset of the COVID-19 pandemic fundamentally changed Marelli's trajectory and set off a series of events that bear relevance to the Company's current financial and operational challenges.

---

15 Nissan's Formula E Team is a motorsport racing team that competes in all-electric racing series. This past season (2024/25), Nissan's Formula E team won two races and secured a podium position in five other races, earning them fourth in both the Teams' and Drivers' championship and third in the Manufacturer's championship.

16 For purposes of this Disclosure Statement, yen and euros were converted to United States dollars using a conversion rate of 144.55 yen/USD and 0.88 euro/USD respectively, which represented the closing spot rate, as of June 9, 2025.

Automotive suppliers are heavily dependent on unfettered access to raw materials and the labor market to turn a profit. COVID-19 restricted accessibility to both inputs. In response to government lockdown mandates, the Company temporarily suspended all production activities at most of its plants around the world, and many of its customers followed suit. The Company was forced to reduce its labor force by approximately 18,600 employees. Displacement associated with a severely fractured and inefficient worldwide supply chain was exacerbated by reduced customer demand for automobiles due to work from home policies and quarantine measures. Ultimately, the COVID-19 pandemic resulted in a sixteen percent decline in global automotive production in 2020, with European production decreasing more than twenty one percent on average and American production decreasing by approximately twenty percent. Less production led to reduced demand and tighter margins for suppliers.

The recovery from the COVID-19 pandemic was uneven. As "COVID era restrictions" began to fall away, consumer demand rose amidst a "return to normal" sentiment. The worldwide supply chain, however, was ill prepared to meet those demands. Labor and raw material shortages created massive shipping delays and a significant increase in shipping and manufacturing costs. Impeded semiconductor production had a particularly acute effect on automotive production—the inability to obtain sufficient chips led to an estimated 11 million vehicles being removed from production in 2021. Automotive suppliers like Marelli were unable to procure sufficient resources to meet manufacturer demand, creating a shortage of vehicles that ultimately led to surging prices for new vehicles and, eventually, used vehicles. Simply put, such long lasting disruption and fragmented recovery resulted in significantly increased costs and tighter margins at each stage of production that yielded an end product that priced out many consumers and ultimately resulted in a demand decrease.

### B. Liquidity Infusion and the 2022 ADR

The COVID-19 pandemic significantly strained the Company's margins and liquidity position. In May 2020, the Company successfully raised an additional $1.2 billion of new financing from the Sponsors, Mizuho, and Development Bank of Japan Inc. ("DBJ") in the form of the Emergency Loan Facility and equity capital. However, the prolonged effects of the COVID-19 pandemic ultimately demonstrated that the 2020 liquidity infusion was insufficient for the Company to weather the storm, especially in light of the Company's $9.5 billion of funded debt. In 2022, the Company began to evaluate potential strategic alternatives to generate liquidity and bridge to a more fulsome market recovery.

After significant discussions with its lenders and the Sponsors on a potential transaction, four Marelli entities—Marelli Corporation, Marelli Kyushu Co., Ltd, Marelli Fukushima Co., Ltd, and Marelli Machine Works Co., Ltd.—initiated a restructuring under Japan's turnaround alternative dispute resolution framework on March 1, 2022 (the "ADR"). The ADR process required that the Company select a "plan sponsor" and negotiate the terms of a restructuring transaction with its lenders to "emerge" from the ADR. Marelli selected the Sponsors as its sponsor and finalized a sponsor agreement that memorialized the key terms of a proposed restructuring plan (the "ADR Plan"). While the ADR Plan gained the support of at least ninety percent of known claims, it failed to obtain the unanimous consent required to emerge. Accordingly, Marelli immediately commenced civil rehabilitation proceedings in the Tokyo District Court in a further attempt to implement a restructuring transaction. The Company proposed a plan (the "Revitalization Plan") that contemplated (i) participating creditors forgiving a significant amount of their existing debt and providing renewed creditor support and (ii) the Sponsors injecting $600 million of new equity capital into the business. The Company obtained the requisite ninety five percent of creditor support, effectuated the Revitalization Plan, and emerged from its Japanese restructuring proceedings on August 9, 2022.

### C. Post-Pandemic Market Challenges and Headwinds

By 2022, most pandemic era restrictions had been replaced by "return to normal" initiatives, but the worldwide supply chain continued to suffer from lingering labor shortages, disruptions, and persistently high costs. The macroeconomic effects of the monetary policy undertaken by governments around the world in response to the COVID-19 pandemic manifested in high inflation and rising prices for raw materials. The Company incrementally renegotiated prices with several of its customers in an attempt to offset its higher expenses, but higher prices reduced demand for the Company's products as customers facing their own liquidity issues struggled to adjust.

The electric vehicle space also proved to be challenging. As discussed herein, Marelli invested heavily in the electric vehicle space to implement its own environmental goals as well as to support a global shift to sustainability. Many OEMs and suppliers implemented similar initiatives. In 2023, however, consumer demand for electric vehicles

decreased as higher interest rates and lower fuel costs shifted the costs and benefits of purchasing an electric vehicle. Consequently, the electric vehicle market faced industry wide challenges in 2023 and 2024, which significantly strained automotive manufacturers who held a surplus of electric vehicle inventory due to the manufacturer's shift towards electric vehicles.

The result of the "new normal" and whiplash in the marketplace was a challenging operating environment for automotive suppliers and OEMs alike. Between 2022 and 2024, over twenty-five automotive manufacturers and suppliers implemented in-court or out-of-court transactions in response to such distress.

### D. Liquidity Strain, Capital Raise Efforts, and Customer Support

In June 2024, the Company began to experience significant liquidity constraints. Though the Company generated $10 billion in revenue in 2024, high fixed costs and sluggish demand for automobiles that continued to persist strained the Company's margins. Additionally, the Company's $150 million of annual interest expense put pressure on the Company's operating cash flow. Accordingly, the Company commenced two parallel processes.

First, the Company launched a capital raise process led by JP Morgan. Ultimately, the Company did not receive any actionable financing proposals from participants in the financing process due to, among other things, general reticence to invest in the automotive sector and the Company's complicated international corporate and capital structure. Additionally, the quantum of financing contemplated in the indications of interest the Company did receive were insufficient.

Second, the Company engaged with its customers on the terms of deferred payment arrangements and order advances to provide the Company with additional liquidity (known as "customer support"). The Company's customers provided the Company with over $750 million of customer support in 2024 and 2025 which, ultimately, facilitated the Company's ability to pursue strategic alternatives and negotiate with its stakeholders on a potential transaction. However, the Company and its customers both understood that customer support was a temporary bridge to a more fulsome liquidity solution or strategic transaction.

In August 2024, it became clear that the Company would need to expand its review of strategic alternatives and potential transactions. The Company retained Kirkland as counsel and each of Nishimura & Asahi and Mori Hamada & Matsumoto as Japanese counsel to assist in a comprehensive review of strategic alternatives and potential next steps. Shortly thereafter, the Company retained PJT as investment banker.

### E. Initial Engagement with the Ad Hoc Group of Senior Lenders and Japanese Lenders

In late September 2024, the Company was notified that the Ad Hoc Group of Senior Lenders had formed. The Company, the Ad Hoc Group of Senior Lenders, and the Japanese Lenders engaged in extensive discussions and negotiations around a consensual, out-of-court transaction for more than eight months. The Company and the Ad Hoc Group of Senior Lenders exchanged a significant number of proposals and counterproposals but were unable to reach agreement at that time. Because the Senior Loan Facility required the consent of approximately sixty-seven percent of the Senior Loan Facility Lenders to direct the Prepetition Agent to exercise remedies or otherwise take action, neither the Ad Hoc Group of Senior Lenders nor the Japanese Lenders had sufficient ownership of the Company's funded debt to implement a transaction without the other group.

### F. In-Court Transaction Negotiations

In March 2025, the Company's liquidity position began to worsen due to, among other things, macroeconomic headwinds associated with the imposition of tariffs in countries around the world. Marelli was severely affected by tariffs due to its import/export-focused business and the imposition of tariffs specifically against automotive manufacturers and suppliers. Macroeconomic headwinds cast uncertainty on the Company's forecast and ability to service a large capital structure that would be magnified by the quantum of new financing required. Due to the Company's financial profile and the severe distress that affected the automotive industry generally, the Company and its advisors began to believe that the Company would need to deleverage to right-size its business. Accordingly, in March 2025, the Company commenced contingency preparations in the event that a pivot to an in-court transaction was necessary. The Company engaged A&M as its financial advisor to assist in those preparations.

### G. Special Committee Formation

In early March 2025, the Company appointed Stefan Selig and Roger Meltzer to its board of directors and established a special committee (the "Special Committee") comprised of the two newly appointed directors and Noboru Yamamoto, an independent director who joined the Marelli board in April 2024. The Special Committee was formed to leverage its restructuring and distressed financing experience and assist the board in its evaluation of strategic alternatives.

### H. Consensus Amongst the Japanese Banks and the Ad Hoc Group of Senior Lenders

As the Company's liquidity concerns mounted and a consensual path forward failed to materialize, the Company commenced a multipronged strategy to develop and negotiate a potential in-court transaction that could be implemented over the objection of one of its lender groups. The Company received a "firm offer" from a strategic purchaser for a stalking horse purchase agreement and several non-binding term sheets from potential third-party DIP providers for a DIP financing facility that would allow the Company to implement an in-court transaction.

In the weeks leading up to these Chapter 11 Cases, the Company commenced negotiations on definitive documentation evidencing a sale to the stalking horse purchaser financed by a third-party DIP facility while simultaneously engaging with its existing lenders and facilitating discussions between the Japanese Lenders and the Ad Hoc Group of Senior Lenders on the terms of a potential consensual transaction. Those discussions continued through June 7, 2025, when agreement regarding the terms of a consensual transaction amongst the Company's secured lenders was reached.

On June 10, 2025, the Company and certain of its Senior Loan Facility Lenders holding approximately eighty percent of the Senior Loan Facility executed the Restructuring Support Agreement and secured commitments for the DIP Facilities in the aggregate principal amount of approximately $1.1 billion. The Restructuring Support Agreement contemplated a forty-five day "go shop" period (measured from the Petition Date) on the terms set forth in the Marketing Procedures attached as Exhibit 3 to the Restructuring Support Agreement to ensure that the proposed restructuring transactions represented the best available terms. The Marketing Procedures contemplated that the Debtors would launch a postpetition marketing process to ascertain third-party interest in purchasing 100% of the new common stock that would be issued pursuant to the plan of reorganization (a "Superior Proposal"). The Restructuring Support Agreement provided the DIP lenders with the right to overbid a Superior Proposal, but required that, in the event the Debtors executed definitive documentation with respect to a Superior Proposal, the Consenting Stakeholders (as defined in the Restructuring Support Agreement) would support and be bound to such Superior Proposal. The "go shop" period has since expired, no higher or better proposal was received, and the Debtors believe that the Restructuring Transactions contemplated by the Restructuring Support Agreement represent the best available terms for the Company and its stakeholders.

## VI. MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A. First Day Motions and Other Case Matters

On the Petition Date, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the chapter 11 cases and minimize disruption to the Debtors' operations. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration. At a hearing on June 12, 2025 (the "First Day Hearing"), the Bankruptcy Court granted certain of the relief initially requested in the First Day Motions on an interim and final basis, as applicable. Following the First Day Hearing, the Bankruptcy Court granted the following First Day Motions, as specified below:[17]

- **Verita Retention Application**: On June 12, 2025, the Bankruptcy Court entered an order [Docket No. 106] approving the *Application of Debtors for Entry of an Order (I) Authorizing the Debtors to Employ and Retain Kurtzman Carson Consultants, LLC dba Verita Global as*

[17] The First Day Motions, and all orders for relief entered in the chapter 11 cases, can be viewed free of charge on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/marelli.

*Claims and Noticing Agent Effective as of the Petition Date and (II) Granting Related Relief* [Docket No. 7] on a final basis.

- **Joint Administration Motion**: On June 12, 2025, the Bankruptcy Court entered an order [Docket No. 102] approving the *Motion of Debtors for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 3] on a final basis.

- **Automatic Stay Motion**: On June 12, 2025, the Bankruptcy Court entered an order [Docket No. 111] approving the *Motion of Debtors Seeking Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code, (II) Approving the Form and Manner of Notice, and (III) Granting Related Relief* [Docket No. 9] on a final basis.

- **NOL Motion**: On June 12, 2025, the Bankruptcy Court entered an order [Docket No. 114] approving the *Motion of Debtors for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock and (II) Granting Related Relief* [Docket No. 6] (the "NOL Motion") on an interim basis. The Bankruptcy Court entered an order approving the NOL Motion on a final basis on July 15, 2025 [Docket No. 285].

- **Utilities Motion**: On June 12, 2025, the Bankruptcy Court entered an order [Docket No. 110] approving the *Motion of Debtors for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* [Docket No. 8] (the "Utilities Motion") on an interim basis. The Bankruptcy Court entered an order approving the Utilities Motion on a final basis on July 16, 2025 [Docket No. 280].

- **Insurance Motion**: On June 12, 2025, the Bankruptcy Court entered an order [Docket No. 117] approving the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance Coverage Entered Into Prepetition and Pay Related Prepetition Obligations, (B) Renew, Supplement, Modify, or Purchase Insurance Coverage, (C) Maintain, Renew, or Supplement the Surety Bonds, and (D) Pay Brokerage Fees and (II) Granting Related Relief* [Docket No. 11] (the "Insurance Motion") on an interim basis. The Bankruptcy Court entered an order approving the Insurance Motion on a final basis on July 22, 2025 [Docket No. 305].

- **Critical Vendors Motion**: On June 12, 2025, the Bankruptcy Court entered an order [Docket No. 118] approving the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of (A) Foreign Vendors, (B) Lien Claimants, (C) 503(b)(9) Claimants, and (D) Critical Vendors, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* [Docket No. 13] (the "Critical Vendors Motion") on an interim basis. The Bankruptcy Court entered an order approving the Critical Vendors Motion on a final basis on July 11, 2025 [Docket No. 266] (the "Critical Vendors Order").

- **Customer Programs Motion**: On June 12, 2025, the Bankruptcy Court entered an order [Docket No. 104] approving the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain and Administer Their Existing Customer Programs and (B) Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief* [Docket No. 14] (the "Customer Programs Motion") on an interim basis. The Bankruptcy Court entered an order approving the Customer Programs Motion on a final basis on July 11, 2025 [Docket No. 267].

- **Creditor Matrix Motion**: On June 12, 2025, the Bankruptcy Court entered an order [Docket No. 105] approving the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Redact Certain Confidential Information of Customers, (B) Redact Certain Personally Identifiable Information of Individuals, and (C) Serve Certain Parties In Interest By Email, (II) Approving the Form and Manner of Service of the Notice of Commencement, and (III) Granting Related Relief* [Docket No. 16] (the "Creditor Matrix Motion") on an interim basis. The Bankruptcy Court entered an order approving the Creditor Matrix Motion on a final basis on July 16, 2025 [Docket No. 279].

- **Factoring Motion**: On June 12, 2025, the Bankruptcy Court entered an order [Docket No. 103] approving the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue Performing Under the Factoring Program and (II) Granting Related Relief* [Docket No. 21] (the "Factoring Motion") on an interim basis. The Bankruptcy Court entered an order approving the Factoring Motion on a final basis on July 17, 2025 [Docket No. 286].

- **Schedules and SOFAs Extension Motion**: On July 16, 2025, the Bankruptcy Court entered an order [Docket No. 278] approving the *Motion of Debtors Seeking Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports and (II) Granting Related Relief* [Docket No. 27] on a final basis.

- **Tax Motion**: On June 12, 2025, the Bankruptcy Court entered an order [Docket No. 108] approving the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* [Docket No. 4] (the "Tax Motion") on an interim basis. The Bankruptcy Court entered an order approving the Tax Motion on a final basis on July 23, 2025 [Docket No. 320].

- **Wages Motion**: On June 12, 2025, the Bankruptcy Court entered an order [Docket No. 113] approving the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue the Compensation and Benefits Programs and (II) Granting Related Relief* [Docket No. 12] (the "Wages Motion") on an interim basis. The Bankruptcy Court entered an order approving the Wages Motion on a final basis on July 23, 2025 [Docket No. 321].

- **Cash Management Motion**: On June 12, 2025, the Bankruptcy Court entered an order [Docket No. 119] approving the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions and (II) Granting Related Relief* [Docket No. 15] (the "Cash Management Motion"), and the Court has entered subsequent interim orders periodically during the Chapter 11 Cases.

### B. Appointment of the Committee

On June 25, 2025, the U.S. Trustee filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 184] appointing the official committee of unsecured creditors (the "Committee"). The U.S. Trustee has since reconstituted the Committee, which now comprises the following entities: Nissan North America, Inc.; Mazda

North American Operations; and Avnet, Inc., and the Committee is represented by Paul Hastings LLP and Morris James LLP.[18]

### C. Second Day Relief

In addition to the First Day Motions, the Debtors filed several motions (the "Second Day Motions") to allow the Debtors to continue to progress the Chapter 11 Cases. The Bankruptcy Court entered orders granting each of the Second Day Motions on a final basis (such orders, the "Second Day Orders").

- **De Minimis Assets Procedures Motion**: On July 22, 2025, the Bankruptcy Court entered an order [Docket No. 304] approving the *Motion of Debtors for Entry of an Order (I) Authorizing and Establishing Procedures for the De Minimis Asset Transactions, (II) Authorizing and Establishing Procedures for De Minimis Asset Abandonment, (III) Approving the Form and Manner of the Notice of De Minimis Asset Transactions and Abandonment, (IV) Authorizing the Payment of Fees and Expenses Incurred in Connection Therewith, and (V) Granting Related Relief* [Docket No. 28] on a final basis.

- **Removal Motion**: On August 4, 2025, the Bankruptcy Court entered an order [Docket No. 464] approving the *Motion of Debtors for Entry of an Order (I) Enlarging the Period Within Which the Debtors May Remove Actions and (II) Granting Related Relief* [Docket No. 254], enlarging the period within which the Debtors may seek removal of actions pursuant to 28 U.S.C. § 1452 (the "Removal Period") through and including August 13, 2025. On January 5, 2026, the Bankruptcy Court entered an order [Docket No. 1488] further enlarging the Removal Period through and including May 7, 2026. On May 6, 2026, the Bankruptcy Court entered an order [Docket No. 2056] further enlarging the Removal Period through and including November 3, 2026.

### D. Contract and Lease Rejection and Optimization

In preparation for the filing of these Chapter 11 Cases, and continuing on a postpetition basis, the Debtors, with the assistance of their advisors, undertook a comprehensive review of their contract and lease portfolio. The Debtors' analysis of their contract and lease portfolio remains ongoing. As of the date hereof, the Debtors have taken steps to preserve their ability to reject certain contracts and leases in the event that the Debtors determine, in their business judgment, that the costs incurred under such contracts and leases constitute an unnecessary burden on the Debtors' Estates and that the rejection of such contracts and leases would maximize the value of the Debtors' reorganized business.

- On July 22, 2025, the Bankruptcy Court entered an order granting the relief requested in the *Motion of Debtors for Entry of an Order (I) Authorizing and Approving Procedures to Reject Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No. 306].

- On October 6, 2025, the Bankruptcy Court entered an order granting the *Debtors' Motion for Entry of An Order Extending the Time Within Which the Debtors Must Assume or Reject Unexpired Leases of Nonresidential Real Property* [Docket No. 1054].

- On January 7, 2026, the Bankruptcy Court entered an order granting the relief requested in the *Debtors' Omnibus Motion for Entry of an Order (I) Authorizing the Debtors to Assume Certain Unexpired Leases, (II) Authorizing the Assumption Notice Related Thereto, and (III) Granting Related Relief* [Docket No. 1498] (the "Assumption Order"). On April 2 and July 15, 2026, respectively, the Bankruptcy Court entered amended orders to reflect certain amendments to leases assumed under the Assumption Order [Docket Nos. 1892 and 2393].

---

[18] *See Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 230]; *Second Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 922]; *Third Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 1780].

### E. Approval of the DIP Facilities

As part of the Restructuring Support Agreement, the Consenting Lenders agreed to fund delayed draw super-senior and senior secured debtor-in-possession financing facilities (the "Initial DIP Facilities") in an aggregate amount of approximately $1.1 billion, consisting of: (i) a delayed draw first-out super-senior secured debtor-in-possession financing facility pursuant to the Senior DIP Credit Agreement (the "Senior DIP Facility") which shall consist of first-out super-senior "new money" term loans denominated in USD in an aggregate principal amount up to approximately $865 million available in up to three draws with the first draw in aggregate principal amount up to approximately $519 million and the subsequent two draws in an aggregate principal amount up to approximately $346 million (the "Tranche A DIP Loans"); (ii) a delayed draw second-out senior secured debtor-in-possession financing facility pursuant to the Junior DIP Credit Agreement (the "Junior DIP Facility") which shall consist of (x) second-out senior "new money" term loans, denominated in USD in an aggregate principal amount up to approximately $242 million available in up to three draws (the "Tranche B DIP Loans," and together with the Tranche A DIP Loans, the "DIP New Money Loans") and (y) subject to entry of the Final DIP Order, a roll-up in the total amount of 47.5% of the Senior Loan Claims held by DIP Lenders (or their respective Affiliates) providing their Pro Rata portion of Tranche B DIP Loans into "last out" term loans under the DIP Facilities, which shall be denominated in EUR and JPY (together, the "Tranche C DIP Loans" and such roll-up of Senior Loan Claims, the "Roll-Up"), respectively, in the same currency as the corresponding Senior Loan Claims subject to the Roll-Up (the Tranche C DIP Loans and the DIP New Money Loans, together, the "DIP Loans"). In the event the Plan is confirmed and the Plan Sponsors' DIP Claims with respect to Tranche B DIP Loans and Tranche C DIP Loans are equitized pursuant to the Plan, the Plan Sponsors shall waive recovery on account of their non-rolled-up Senior Loan Claims.

On July 25, 2025, the Bankruptcy Court entered the *Second Interim Order Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Use Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Certain Prepetition Secured Parties; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 355] (the "Second Interim DIP Order") approving a second interim draw of $130 million in Tranche A DIP Loans. The relief granted in the Second Interim DIP Order incorporates the terms of negotiations with the Committee and Mizuho, and resolved Mizuho's objection to entry of the Final DIP Order filed prior to the DIP hearing. *See Mizuho Bank, Ltd.'s (I) Objection and Reservation of Rights with Respect to the DIP Motion and (II) Emergency Cross Motion for Adjournment of Final DIP Hearing* [Docket No. 300].

On July 30, 2025, the Bankruptcy Court entered the *Final Order Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Use Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to Certain Prepetition Secured Parties; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [Docket No. 449] (the "Final DIP Order"), approving the DIP Facilities on a final basis.

Subsequently, to provide the Debtors with additional time and liquidity to finalize their post-emergence business plan, the Debtors filed a motion to amend the DIP Credit Agreements (the "DIP Amendment Motion") to extend the maturities under the existing DIP Facilities and provide $300 million of incremental liquidity on the following terms: (i) the aggregate principal amount of Tranche A DIP Loans under the Senior DIP Credit Agreement was increased from approximately $865 million to $900 million under the Senior DIP Facility comprised of existing Tranche A DIP Loans that were "rolled" into new first-out super-senior secured term loans and incremental first-out super-senior secured "new money" term loans; (ii) the aggregate principal amount of the loans under the Junior DIP Credit Agreement was increased from approximately $242 million to up to $542 million through a new senior secured debtor-in-possession financing facility (the "Tranche A-1 DIP Facility" and together with the Initial DIP Facilities, the "DIP Facilities") consisting of senior "new money" term loans denominated in USD in an aggregate principal amount of up to $300 million (the "Tranche A-1 DIP Loans" and together with the Tranche A DIP Loans, the Tranche B DIP Loans and the Tranche C DIP Loans, the "DIP Loans"), which are senior in right of payment to the Tranche B DIP Loans under the Junior DIP Facility; and (iii) the maturity date under each of the Senior DIP Credit Agreement and the Junior DIP Credit Agreement was extended to December 31, 2026 (subject to automatic extension to March 31, 2027 upon satisfaction of certain conditions). On July 23, 2026, the Debtors submitted a borrowing notice for the remaining Tranche A-1 DIP Loans for a borrowing on August 7, 2026, at which point the DIP Loans will have been drawn in full. The amendments to the DIP Facilities provided the Debtors with approximately $300 million in incremental liquidity to fund the Debtors' operations and restructuring efforts.

On June 8, 2026, the Bankruptcy Court entered the *Order (I) Authorizing the Debtors to Amend the DIP Credit Agreements and (II) Granting Related Relief* [Docket No. 2218] (the "DIP Amendment Order"), approving amendments to the Debtors' existing DIP Facilities.

The Amended DIP Facilities provide the Debtors with liquidity to fund operations during these proceedings, enabling business continuity into the foreseeable future. The Debtors will continue to use the proceeds of the Amended DIP Facilities to, among other things, (1) pay the costs, fees, and expenses associated with the Chapter 11 Cases, including the carve-out contemplated by the Amended DIP Facilities and (2) fund working capital needs, capital improvements, and expenditures of the Debtors during the Chapter 11 Cases, in accordance with an approved budget. Obtaining access to the Amended DIP Facilities and the consensual use of cash collateral were each key components of the Restructuring Support Agreement and critical to preserving and maximizing value for the Debtors' Estates.

The Amended DIP Facilities also require the Debtors to meet certain milestones that mirror those included in the Restructuring Support Agreement. Failure to meet any of the milestones is an event of default under the DIP Facilities.

## F. Expiration of the "Go Shop" Period

Pursuant to the Restructuring Support Agreement, the Debtors launched a forty-five-day postpetition marketing process to ascertain third-party interest in purchasing 100% of the new common stock that will be issued pursuant to the Plan. The forty-five day "go shop" period, measured from the Petition Date, has expired and no Superior Proposal was presented to the Debtors.

## G. Retention of Professionals

### 1. *Retention of Debtor Professionals*

To assist the Debtors in carrying out their duties as debtors in possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Debtors filed applications requesting that the Bankruptcy Court authorize the Debtors to retain and employ the following advisors pursuant to sections 327, 328, and 363 of the Bankruptcy Code, as applicable. As of the date hereof, the Bankruptcy Court has entered orders authorizing the Debtors' retention of the following professionals:

- Kirkland and Ellis LLP and Kirkland and Ellis International LLP, as co-counsel [Docket No. 482];
- Pachulski Stang Ziehl & Jones as co-counsel [Docket No. 479];
- Alvarez and Marsal North America, LLC as financial advisor [Docket No. 478];
- KPMG LLP to provide tax consulting and tax compliance services [Docket No. 466];
- Selendy Gay PLLC as counsel to the Debtors at the direction of the Special Committee [Docket No. 467];
- PwC Advisory LLC as auditor [Docket No. 486];
- Greenberg Traurig Studio Legale Associato as special counsel [Docket No. 752];
- PJT Partners as investment banker [Docket No. 696]; and
- Ernst & Young LLP as accounting and tax services provider [Docket No. 1909].

The Debtors' retained professionals have filed monthly fee statements and interim applications for compensation with the Bankruptcy Court pursuant to the procedures set forth in the Interim Compensation Order (as defined herein).

On January 15, 2026, upon the agreement of the Debtors, the U.S. Trustee, the Ad Hoc Group of Senior Lenders, and the Committee, the Bankruptcy Court appointed Lori Lapin Jones as an independent fee examiner to review and assess all interim and final applications for allowance of compensation and reimbursement of expenses filed by retained professionals for compliance with the applicable standards of section 330 of the Bankruptcy Code and Local Rule 2016-1.

2. *Interim Compensation*

On August 5, 2025, the Bankruptcy Court entered the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief* [Docket No. 477] (the "Interim Compensation Order"). The Interim Compensation Order established procedures for the allowance and payment of compensation and reimbursement of expenses for attorneys or other professionals whose retentions are approved by the Bankruptcy Court pursuant to sections 327 or 1103 of the Bankruptcy Code, and who will be required to file applications for allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code.

3. *Retention of Ordinary Course Professionals*

On August 6, 2025, the Bankruptcy Court entered *Order (I) Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 487] (the "Ordinary Course Professionals Order"), authorizing the Debtors to retain and compensate certain ordinary course professionals on a postpetition basis without the need for each ordinary course professional to file a formal application for retention and compensation. As of the date hereof, the Debtors have retained approximately 125 professionals utilized in the ordinary course of business pursuant to the Ordinary Course Professionals Order.

4. *Retention of Senior Financial Consultant*

On December 16, 2025, the Bankruptcy Court entered the *Order Authorizing the Debtors to Retain and Designate Brian Worell as Senior Financial Consultant to the Debtors Effective as of November 13, 2025 and (II) Granting Related Relief* [Docket No. 1351], authorizing, among other things, the Debtors' appointment of Brian Worrell as a senior financial consultant. Mr. Worrell assisted the Debtors' management team and advisors with, among other things, engagement with key stakeholders, stabilization and active management of the Company's liquidity, vendor management negotiations, and preparation of a go-forward business plan.

Mr. Worrell's employment has concluded.

5. *Appointment of Chief Restructuring Officer*

On January 22, 2026, the Bankruptcy Court entered the *Order (I) Authorizing the Debtors to (A) Retain Ankura Consulting Group, LLC to Provide the Debtors and Debtors in Possession a Chief Restructuring Officer and Certain Additional Personnel and (B) Designate Philip J. Gund as Chief Restructuring Officer for the Debtors Effective as of December 12, 2025 and (II) Granting Related Relief* [Docket No. 1522], authorizing, among other things, the Debtors' appointment of Philip J. Gund as chief restructuring officer ("CRO"). The CRO has assisted, and will continue to assist, the Debtors and their advisors on all aspects of their restructuring efforts, including, but not limited to, assessment and execution of operational improvement opportunities, negotiations with OEMs and critical vendors, analysis of prepetition liabilities, obtaining exit financing, and engagement with key stakeholders.

**H. Schedules and Statements**

The Debtors filed their Schedules on August 11–12, 2025.

**I. Plan Exclusivity**

On October 6, 2025, the Bankruptcy Court entered an order extending the Debtors' exclusive periods to file a chapter 11 plan and solicit acceptances thereof (the "Exclusivity Period") through and including February 6, 2026 [Docket No. 1055]. On February 3, 2026, the Bankruptcy Court entered an order further extending the Exclusivity Period through and including August 12, 2026 [Docket No. 1639]. On June 12, 2026, the Bankruptcy Court entered an order further extending the Exclusivity Period through and including October 13, 2026 [Docket No. 2242].

### J. Approval of the New AR Facility

To replace certain factoring facilities that were set to lapse in January 2026, the Debtors entered into a $215.4 million uncommitted account receivables purchase facility (the "New AR Facility") with Deutsche Bank AG, New York Branch ("Deutsche Bank"). Under the New AR Facility, Deutsche Bank will purchase up to $215.4 million of accounts receivable from the Debtors, fully offsetting the loss of the lapsed factoring facilities.

On December 17, 2025, the Bankruptcy Court entered the *Order (I) Approving the Debtors' Entry Into the New AR Facility Term Sheet, (II) Authorizing Payment of Fees and Expenses Thereunder, and (III) Granting Related Relief* [Docket No. 1358], authorizing entry into the New AR Facility term sheet and the payment of certain fees thereunder to secure Deutsche Bank's commitment to finalize and place the New AR Facility.

On February 24, 2026, the Bankruptcy Court entered the *Order (I) Approving the Debtors' Entry into and Execution of True Sales Under the Receivables Purchase Agreement, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing Payment of Fees and Expenses Thereunder, and (IV) Granting Related Relief* [Docket No. 1676], authorizing the Debtors' entry into the New AR Facility on a final basis.

### K. KEIP/KERP Motion

On January 27, 2026, the Bankruptcy Court entered the *Order (I) Authorizing and Approving the Debtors' Key Employee Incentive Plan, (II) Authorizing and Approving the Debtors' Key Employee Retention Plan, and (III) Granting Related Relief* [Docket No. 1541] (the "KEIP/KERP Order"), approving incentive and retention programs (respectively, the "KEIP" and the "KERP") for certain key employees. The KEIP contemplates a cash-based compensation program designed to incentivize twelve key executives to focus on the crucial role they play in these Chapter 11 Cases, along with their day-to-day business responsibilities. The KERP contemplates three cash-based incentive and retention programs to retain the services of approximately 13,000 employees who are critical to the Debtors' operations.

Since entry of the KEIP/KERP Order, the Debtors have continued to focus on finalizing their customer negotiations and business plan to facilitate emergence from these Chapter 11 Cases. In early April 2026, the Debtors announced several important management changes intended to facilitate the conclusion of those discussions and the Debtors' emergence. In particular, the Debtors announced Frederick A. "Fritz" Henderson as their new Interim Chief Executive Officer, Roberto Fioroni as their new Chief Financial Officer, and Helen Redfern as their new Chief Human Resources Officer. On May 28, 2026, the Bankruptcy Court entered the *Order (I) Amending the Key Employee Incentive Plan Order and (II) Granting Related Relief* [Docket No. 2109], amending the KEIP/KERP Order to add the incoming Chief Financial Officer and incoming Chief Human Resources Officer as participants in the KEIP. In July 2026, the Debtors engaged John Nicholson as their new General Counsel. In advance of the Disclosure Statement Hearing, the Debtors intend to file a motion seeking authority from the Bankruptcy Court to add Mr. Nicholson to the KEIP/KERP.

### L. Internal Merger

To avoid duplicative costs, the Debtors anticipates consummating a merger of three Debtor entities: Marelli Sophia Antipolis France (Case No. 25-1072), Marelli Smart Me Up (Case No. 25-11067), and Marelli France (Case No. 25-11037). Marelli Sophia Antipolis France and Marelli Smart Me Up (collectively, the "Redundant Entities") would merge with Marelli France and designate Marelli France as the sole surviving entity pursuant to French law. For the purposes of these Chapter 11 Cases, the Chapter 11 Cases of the Redundant Entities will remain open despite their dissolution under French law. Until the merger occurs, the Debtors are required to pay registration fees, conduct statutory audits, engage local counsel for administration and governance support, and pay other miscellaneous costs associated with maintaining the Redundant Entities, and these costs, and the efforts associated with them, do not benefit the estate.

On June 29, 2026, the Bankruptcy Court entered the *Order (I) Authorizing the Debtors to Consummate the Internal Merger and (II) Granting Related Relief* [Docket No. 2277], authorizing the consummation of the merger.

### M. Demerger Motion

To align the Debtors' legal structure with their business units, the Debtors have sought authorization to consummate a demerger of Debtor Marelli Europe S.p.A (Case No. 25-11109) into two legal entities. The Debtors' historical acquisitions resulted in a misalignment between the Debtors' legal structure and operational structure. This misalignment entangled the business units structurally and financially, limited performance management, and complicated statutory reporting requirements. While this demerger will be part of the Debtors' broader reorganization, it has to be effectuated on an expedited timeline to ensure certain Italian regulatory requirements are satisfied in a timely fashion.

On July 23, 2026, the Debtors filed the *Motion of Debtors for Entry of an Order (A) Authorizing the Debtors to Consummate an Internal Demerger and (B) Granting Related Relief* [Docket No. 2414], requesting authorization to consummate the demerger.

### N. OPmobility Adversary Proceeding

On June 16, 2026, OPmobility Gestion and certain of its affiliates (collectively, "OPmobility") filed an adversary proceeding against the Debtors and Strategic Value Partners ("SVP") alleging that the Debtors are attempting to hire OPmobility's former CEO, Laurent Favre while he remains subject to a non-compete agreement and asserting purported causes of action related thereto. The complaint seeks three forms of relief: first, injunctive relief to protect OPmobility's trade secrets; second, an injunction to prevent the Debtors from hiring Mr. Favre until his non-compete expires in November 2027; and third, OPmobility seeks damages, including "disgorgement of any profits earned" by the Debtors through the misuse of trade secrets disclosed by Mr. Favre The Debtors contend that, contrary to the allegations in the complaint, the Debtors have not, and are not attempting to, hire Mr. Favre during these Chapter 11 Cases. This adversary proceeding is ongoing.

### O. Vendor and OEM Negotiations

Since the Petition Date, the Debtors have engaged in extensive negotiations with their vendors, suppliers, and OEMs regarding purchase orders, pricing, payment terms, and various other trade terms. The Debtors and their advisors have worked constructively with the OEMs to agree to certain accommodations that allow the Debtors to manage their liquidity during these Chapter 11 Cases and finalize their go-forward business plan while the Debtors pursue a value-maximizing restructuring transaction. The Debtors have made substantial progress towards reaching agreement with their customers on the terms of their post-emergence contractual arrangements.[19]

Additionally, pursuant to the Critical Vendors Order, the Debtors and their advisors have negotiated and executed approximately 830 trade agreements with critical vendors to obtain trade terms consistent with ordinary course practice, facilitating the continued production and supply of essential parts and resources used by the Debtors to meet customer demands.

### P. Business Plan Negotiations

Since the Petition Date, the Debtors have made significant progress in developing, formulating, and advancing the Debtors' go-forward business plan. Specifically, the Debtors have engaged in consistent negotiations with OEMs, the DIP Lenders, the Committee, and other key stakeholders on the Debtors' business plan and related workstreams. Such related workstreams require input, analysis, and coordination from the Debtors' management, employees, and advisors across each of the 26 jurisdictions in which the Debtors operate to prepare and develop a top-to-bottom analysis of each Debtor and line of business.

### Q. Independent Investigation

Prior to the Petition Date, the board of directors of Marelli Holdings Co., Ltd. (the "Board") appointed Stefan M. Selig and Roger Meltzer as disinterested directors of the Board and established the Special Committee comprised

[19] The Plan is premised on a number of assumptions, including, among others, the Debtors' ability to achieve and consummate the OEM Accommodation Agreements.

of the two newly appointed directors and Noboru Yamamoto, an independent director who joined the Marelli board in April 2024. The Special Committee was delegated authority (i) on all matters in which a conflict of interest exists or is reasonably likely to exist between Marelli Holdings Co., Ltd., on the one hand, and any Related Party, on the other hand (each, a "Conflict Matter") and (ii) to make a determination as to whether any matter constitutes a Conflict Matter. The Special Committee participated in the evaluation of all received transaction proposals and, ultimately, the negotiation of the Restructuring Transactions contemplated by the Plan.

In addition, the Special Committee has been conducting an independent investigation with respect to potential claims or causes of action of the Debtors, if any, against any Related Party (the "Independent Investigation"), which is substantially progressed but not yet finalized. The Debtors retained Selendy Gay to provide independent legal counsel to the Special Committee, and to assist the Special Committee in connection with the Independent Investigation.

### R. Proposed Confirmation Schedule

Under the Restructuring Support Agreement, the Debtors agreed to certain milestones to ensure an orderly and timely implementation of the Restructuring Transactions, which have since been extended. The Debtors intend to proceed swiftly to confirmation of the Plan and emergence from these Chapter 11 Cases to mitigate uncertainty among customers, vendors, suppliers, and employees, minimize disruptions to the Company's business, and curtail professional fees and administrative costs. To that end, the Debtors have proposed the following case timeline, subject to Court approval and availability:

| Event | Date |
|---|---|
| Voting Record Date | September 1, 2026 |
| Solicitation Mailing Deadline | September 11, 2026, which is 3 Business Days after entry of the Disclosure Statement Order |
| Publication Deadline | September 11, 2026, which is 3 Business Days after entry of the Disclosure Statement Order |
| Plan Supplement Filing Deadline | October 2, 2026, which is no later than 7 days prior to the Voting Deadline |
| Voting Deadline | October 9, 2026, at 4:00 p.m. (prevailing Eastern Time) |
| Plan Objection Deadline | October 9, 2026, at 4:00 p.m. (prevailing Eastern Time) |
| Deadline to File Voting Report | October 13, 2026 |
| Confirmation Brief and Plan Objection Reply Deadline | October 13, 2026 |
| Confirmation Hearing Date | October 16, 2026 |

**No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

## VII. SUMMARY OF THE PLAN

### A. General Settlement of Claims and Interests

To the greatest extent permissible under the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan. To the greatest extent permissible under the Bankruptcy Code, the Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors, their Estates, and Holders of Claims against and Interests in the Debtors. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims in any Class are intended to be, and shall be, final.

**B. Restructuring Transactions**

Before, on, and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions in accordance with the terms, conditions, and consent rights under the Restructuring Support Agreement, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, demerger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Restructuring Support Agreement, and that satisfy the requirements of applicable Law and any other terms to which the applicable Entities may agree, including the documents comprising the Plan Supplement and the New Organizational Documents; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and Restructuring Support Agreement and having other terms for which the applicable parties agree; (3) the execution, delivery, and filing of appropriate certificates or articles of incorporation, reincorporation, merger, demerger, consolidation, conversion, or dissolution pursuant to applicable Law, including any applicable New Organizational Documents; (4) the issuance and distribution of New Common Stock; (5) the consummation of the Exit Facility, including the execution, delivery, and filing of all Exit Facility Documents and other closing deliverables; (6) such other transactions that are required to effectuate the Restructuring Transactions, including as contemplated by the Restructuring Support Agreement; and (7) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable Law. The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all of the foregoing and all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan and the Plan Supplement, including any and all actions required to be taken under applicable non-bankruptcy Law, in each case, in accordance with the terms, conditions, and consent rights contained in the Restructuring Support Agreement.

**C. The Reorganized Debtors**

On the Effective Date, the New Board shall be established, and each Reorganized Debtor shall adopt its New Organizational Documents, if any. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated by the Plan as necessary to consummate the Plan.

**D. Cancellation of Notes, Instruments, Certificates, and Other Documents**

Except for the purpose of evidencing a right to a distribution under the Plan, on the Effective Date, except as otherwise specifically provided for in the Plan or the Plan Supplement: (1) the obligations of any Debtor under all certificates, shares, notes, bonds, indentures, purchase rights, or other instruments or documents, directly or indirectly evidencing or creating any indebtedness or obligations of or ownership interest, equity, or portfolio interest in the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest shall be cancelled and deemed surrendered to the Debtors without any need for a Holder to take further action with respect thereto, except as required under the laws and requirements of each applicable jurisdiction, and the Debtors shall not have any continuing obligations thereunder and Holders of or parties to such cancelled instruments, certificates, and other documentation will have no rights arising from or relating to such instruments, certificates, and other documentation, or the cancellation thereof, except the rights, distributions, and treatment provided for pursuant to the Plan or the Confirmation Order; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, compromised and discharged.

Notwithstanding such cancellation and discharge, the Senior Loan Documents shall continue in effect to the extent necessary (1) to allow the Holders of Senior Loan Claims to receive distributions under the Plan; (2) to allow the Debtors, the Reorganized Debtors, and the Prepetition Agents to make post-Effective Date distributions or take such other action pursuant to the Plan on account of such Claims and to otherwise exercise their rights and discharge their obligations relating to the interests of the Holders of such Claims; and (3) to allow the Prepetition Agents to

enforce their rights, claims, and interests vis-à-vis any party other than the Debtors, including any rights with respect to priority of payment and/or to seek reimbursement or indemnification.

On the Effective Date, the Prepetition Agents shall be relieved of all further duties and responsibilities related to the Senior Loan Documents.

**E. Exemption from Certain Taxes and Fees**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto, including the issuance, transfer, or exchange of any debt, security, or other interest in the Debtors or the Reorganized Debtors under the Plan or the Restructuring Transactions shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

**F. Sources of Consideration for Restructuring Transactions**

The Debtors and/or the Reorganized Debtors, as applicable, will fund distributions under the Plan with (i) Cash on hand on the Effective Date; (ii) the New Common Stock; and (iii) the Exit Facility and/or the Cash proceeds thereof, as applicable. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Stock, will be exempt from registration under the Securities Act, as described more fully in Article VI.F of the Plan.

**G. New Stockholders Agreement**

On and as of the Effective Date, each Holder of New Common Stock shall be deemed to be a party to the New Stockholders Agreement without the need for execution by such Holder. The New Stockholders' Agreement shall be binding on all Entities receiving, and all Holders of, the New Common Stock (and their respective successors and assigns), whether such New Common Stock is received or to be received on or after the Effective Date and regardless of whether such Entity executes or delivers a signature page to the New Stockholders Agreement.

**H. Issuance and Distribution of New Common Stock**

On the Effective Date, Reorganized Marelli shall issue the New Common Stock to certain Holders of Allowed Claims and Allowed Interests in accordance with Article III of the Plan. The issuance of New Common Stock under the Plan, including pursuant to the Management Incentive Plan, shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the Holders of Claims or Interests, as applicable. All New Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

On the Effective Date, Reorganized Marelli and all Holders of New Common Stock then outstanding shall be deemed to be parties to the New Organizational Documents, substantially in the form contained in the Plan Supplement, without the need for execution by any such Holder. On the Effective Date, the New Organizational Documents shall be binding on the Reorganized Debtors and all parties receiving, and all Holders of, the New Common Stock.

**I. Exit Facility**

On the Effective Date, Reorganized Marelli and/or one or more other Reorganized Debtors shall enter into the Exit Facility, the terms of which shall be set forth in the Exit Facility Documents, which shall be in form and substance reasonably acceptable to the Required Plan Sponsors.

The Confirmation Order shall be deemed final approval of the Exit Facility and the Exit Facility Documents and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the Exit Facility. On the Effective Date, any Liens and security interests to be granted in accordance with the Exit Facility Documents (i) shall be deemed to be granted, (ii) shall be legal, binding, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the respective terms of the Exit Facility Documents, (iii) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit Facility Documents, and (iv) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law. The Reorganized Debtors and the Entities granting such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order (subject solely to the occurrence of the Effective Date) and any such filings, recordings, approvals, and consents shall not be required unless required by the Exit Facility Documents), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties. On and as of the Effective Date, the Exit Facility Lenders shall be deemed to be parties to, and bound by, the Exit Facility Documents, without the need for execution thereof by any such Exit Facility Lender. To the extent any Exit Facility Lender is also a DIP Lender, each DIP Lender thereby instructs and directs the Disbursing Agent and the Exit Facility Agent (as applicable), to (a) act as Disbursing Agent to the extent required by the Plan, (b) execute and deliver the Exit Facility Documents (each to the extent it is a party thereto), as well as to execute, deliver, file, record and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, to which the Exit Facility Agent is a party and to promptly consummate the transactions contemplated thereby, and (c) take any other actions required or contemplated to be taken by the Exit Facility Agent and/or the Disbursing Agent (as applicable) under the Plan or any of the Definitive Documents to which it is a party.

### J. Corporate Existence

Except as otherwise provided in the Plan, the New Organizational Documents, the Restructuring Transactions Memorandum, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable Law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

### K. Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or in any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, pursuant to section 1141 of the Bankruptcy Code and any additional documentation that may be required under the laws and requirements of each applicable jurisdiction, all property in each Debtor's Estate, all Causes of Action, and any property acquired by each of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances and such other Liens or other encumbrances as may be permitted thereby. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise, or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**L. Corporate Action**

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan and the Definitive Documents, and all actions as may be required under any law or requirements of any applicable jurisdiction to implement the Restructuring Transactions, shall be deemed authorized and approved by the Bankruptcy Court in all respects without any further corporate or equity holder action, including, as applicable: (1) the implementation of the Restructuring Transactions; (2) the adoption, execution, and filing of the New Organizational Documents; (3) the selection of the directors, managers, and officers for the Reorganized Debtors; (4) the execution and delivery of the Exit Facility Documents and the incurrence of credit thereunder; (5) the adoption of the Management Incentive Plan by the New Board; (6) the issuance, transfer, and/or distribution of the New Common Stock and the execution, delivery, and filing of any documents pertaining thereto, as applicable; (7) the formation of any Entities pursuant to the Restructuring Transactions; (8) the consummation of the Exit Facility, including the execution, delivery, and filing, as applicable, of the Exit Facility Documents; (9) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (10) all other actions contemplated under or necessary to implement the Plan and the Restructuring Transactions (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan and the Definitive Documents involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the other Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Debtors. On or before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the Exit Facility, the New Organizational Documents, the New Common Stock, the Management Incentive Plan, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by Article IV.L of the Plan shall be effective notwithstanding any requirements under non-bankruptcy Law.

**M. New Organizational Documents**

On or before the Effective Date, each of the Reorganized Debtors will file its New Organizational Documents, if applicable, with the applicable Secretaries of State and/or other applicable authorities in its respective jurisdiction of incorporation or formation in accordance with the applicable Laws of the respective jurisdiction of incorporation or formation. The New Organizational Documents shall be consistent with the Restructuring Support Agreement, the Restructuring Term Sheet, and section 1123(a)(6) of the Bankruptcy Code, and shall be in form and substance acceptable to the Debtors or the Reorganized Debtors, as applicable, and the Required Plan Sponsors. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents in accordance with the terms thereof and as permitted by the Laws of their respective jurisdictions of incorporation or formation and their respective New Organizational Documents.

**N. Directors and Officers of the Reorganized Debtors**

On the Effective Date, the term of the current board of directors of the Debtors shall expire, and the directors for the initial term of the New Board shall be designated and appointed in accordance with the terms set forth in the New Organizational Documents and the New Stockholders Agreement, and as may be required under the laws and requirements of each applicable jurisdiction; *provided* that the Special Committee shall retain authority following the Effective Date with respect to matters relating to Professional Fee Claims requests by Professionals acting at their authority and direction in accordance with the terms of the Plan. The Special Committee shall not have any of its privileged and confidential documents, communications, or information transferred (or deemed transferred) to Reorganized Marelli. The initial members of the New Board will be identified in the Plan Supplement, as well as those Persons that will serve as officers of the Reorganized Debtors. Each such member and officer shall serve from

and after the Effective Date pursuant to the terms of the New Organizational Documents, the New Stockholders Agreement, and other constituent documents of the Reorganized Debtors.

To the extent any identified director or officer is an Insider, the nature of any compensation to be paid to such director or officer will also be disclosed prior to the Effective Date. Provisions regarding the removal, appointment, and replacement of members of the New Board will be disclosed in the New Organizational Documents.

**O. Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtors, their officers, and the members of the New Board are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and Definitive Documents, including the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents.

**P. Preservation of Causes of Action**

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided in the Plan, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of the Bankruptcy Court.

**Q. Management Incentive Plan**

Following the Effective Date, the New Board shall be authorized to adopt and implement the Management Incentive Plan, which will provide for the grants of equity and equity-based awards to employees, directors, consultants, and other service providers of the Reorganized Debtors, as determined at the discretion of the New Board in all respects. The terms and conditions, including with respect to participants, allocation, timing, form, and structure of the equity or equity-based awards shall be determined at the discretion of the New Board.

**R. Employee Obligations and Employee Arrangements**

[Unless otherwise provided in the Plan, and subject to Article V of the Plan, on the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall be deemed to have assumed the Employment Agreements, except for (1) all employee equity or equity based incentive plans, and any provisions set forth in the Employment Agreements that provide for rights to acquire Interests or New Common Stock, which shall not constitute or be deemed to constitute Executory Contracts and shall be deemed terminated on the Effective Date; (2) any agreement or plan whose value is

related to Interests or New Common Stock or other ownership interests of the Debtors, in each case, shall not constitute or be deemed to constitute Executory Contracts and shall be deemed terminated on the Effective Date; and (3) Employment Agreements that have been rejected pursuant to an order of the Bankruptcy Court. After the Effective Date, the Debtors or Reorganized Debtors, as applicable shall be permitted to make payments to employees pursuant to employment programs then in effect, and to implement additional employee programs and make payments thereunder, without any further notice to or action, order, or approval of the Bankruptcy Court. Pursuant to section 1129(a)(13) of the Bankruptcy Code, as of the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.][20]

Each Debtor is a contributing sponsor of the Pension Plan, 29 U.S.C. § 1301(a)(13), or a member of the contributing sponsor's controlled group, 29 U.S.C. § 1301(a)(14). The Pension Plan is covered by Title IV of ERISA. The Plan provides that on the Effective Date the Reorganized Debtors shall assume and continue the Pension Plan to the extent of their respective obligations under the Pension Plan and applicable law.

PBGC asserts that if the Pension Plan terminates under 29 U.S.C. §§ 1341(c) or 1342, the Debtors will each be jointly and severally liable to PBGC for each of the following Claims: (1) any unpaid minimum funding contributions owed to the Pension Plan under 29 U.S.C. §§ 1082, 1083, 1362(b) and 26 U.S.C. §§ 412, 430; (2) the Pension Plan's unfunded benefit liabilities under 29 U.S.C. § 1362(b); and (3) pension insurance premiums under 29 U.S.C. §§ 1306 and 1307, including termination premiums at the rate of $1,250 per plan participant per year for three years under 29 U.S.C. § 1306(a)(7).

The Debtors and the Reorganized Debtors reserve all rights and defenses relating to any asserted liability, including but not limited to contesting the validity, priority, and amount of such Claims.

After the Effective Date, the Reorganized Debtors shall (1) satisfy the minimum funding requirements for the Pension Plan under 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083; (2) pay all required premiums for the Pension Plan, if any, owed to PBGC under 29 U.S.C. §§ 1306 and 1307; and (3) administer the Pension Plan in accordance with the applicable provisions of ERISA and the Internal Revenue Code, and the Reorganized Debtors reserve all of their rights thereunder.

With respect to the Pension Plan, nothing in this Disclosure Statement, the Plan, the Confirmation Order, or any other document filed in these Chapter 11 Cases, or section 1141 of the Bankruptcy Code shall be construed to discharge, release, limit, or relieve any individual from any Claim by PBGC or the Pension Plan for breach of any fiduciary duty under ERISA with respect to the Pension Plan, including prohibited transactions, subject to any and all applicable rights and defenses of such parties, which are expressly preserved. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duty or related liability by any of the provisions in the Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code, or other document Filed in these Chapter 11 Cases. For the avoidance of doubt, the Reorganized Debtors shall not be released from any liability or obligation under ERISA, the Internal Revenue Code, or any other applicable law relating to the Pension Plan.

### S. Closing the Chapter 11 Cases

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases, except for the Chapter 11 Case of one Debtor entity, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of such Debtor entity.

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Reorganized Debtors shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of the remaining Debtor entity in accordance with the Bankruptcy Code and the Bankruptcy Rules.

---

[20] **<u>Note:</u>** The Debtors and the Required Plan Sponsors continue to diligence, review, and analyze the Debtors' contracts, agreements, and leases. Subject to completion of such efforts, the Debtors may seek to further amend the treatment of such contracts, agreements, and leases in advance of the Disclosure Statement Hearing.

The Debtors expect that the Effective Date will occur on the same date for substantially all Debtors. However, subject to applicable tax considerations and compliance with the Plan, the Plan Supplement, and any applicable Definitive Documents, the Debtors and the Required Plan Sponsors may consent, each in their sole discretion, for conditions precedent to the Effective Date to apply to each Debtor on an individual basis such that the Effective Date for any individual Debtor may occur prior to the Effective Date of any other individual Debtor.

### T. Payment of Fees and Expenses of Certain Creditors

Following the Confirmation Date, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course, the Restructuring Expenses related to the Plan and implementation, Consummation, and defense of the Restructuring Transactions, whether incurred before, on, or after the Effective Date, in accordance with any applicable engagement letter, the DIP Orders, and the Restructuring Support Agreement.

## VIII. OTHER KEY ASPECTS OF THE PLAN

### A. Assumption and Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be deemed assumed by the Reorganized Debtors, effective as of the Effective Date, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; or (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date or for which the requested effective date of such rejection is after the Effective Date. Except as otherwise provided in the Plan, the Debtors shall assume, assume and assign, or reject, as the case may be, Executory Contracts and Unexpired Leases set forth in the applicable Schedules in the Plan Supplement.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order. Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal Law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease.

To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease, such requirement shall be satisfied if the Debtors make an election to assume or reject such Executory Contract or Unexpired Lease prior to the deadline set forth by the Bankruptcy Code or the Bankruptcy Rules, as applicable, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

### B. Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such

Executory Contract or Unexpired Lease. Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy Law to the contrary, the Debtors and Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

**C. Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims, Noticing, and Solicitation Agent at the address specified in any notice of entry of the Confirmation Order and served on the Reorganized Debtors no later than 30 days after the effective date of such rejection.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.H of the Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim against the applicable Debtor that is the counterparty to any such Executory Contract or Unexpired Lease as set forth in Article III.C of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

**D. Cure of Defaults for Assumed, or Assumed and Assigned, Executory Contracts and Unexpired Leases**

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

In the event of a dispute regarding: (a) the amount of any payments to cure such a default; (b) the ability of the Reorganized Debtors or any assignee to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, the Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following either (1) the entry of a Final Order or orders resolving the dispute and approving the assumption or (2) the settlement of the dispute between the parties which may be entered into without further order of the Bankruptcy Court.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. For the avoidance of doubt, assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not override or otherwise release any indemnification obligations in such Executory Contract or Unexpired Lease. **Any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged as of the Effective Date, without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

**E. Survival of the Debtors' Indemnification Obligations and Insurance Obligations**

Consistent with applicable law, all indemnification provisions currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other

organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the Indemnified Parties shall be Reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to the Indemnified Parties than the indemnification provisions in place prior to the Effective Date.

None of the Debtors or Reorganized Debtors shall amend and/or restate their respective charters, bylaws, operating agreements, or other organization documents (as applicable) on or after the Petition Date to terminate, reduce, discharge, impair, or adversely affect any of the Debtors' or Reorganized Debtors' obligations referred to in the preceding paragraph. All such obligations shall be deemed and treated as Executory Contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors.

In addition, after the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date and all other individuals covered by such insurance policies, will be entitled to the full benefits of each such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date.

All Claims arising from or related to any indemnification obligations that are not Reinstated or assumed shall be treated as General Unsecured Claims as set forth in Article III.C of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

### F. Director, Officer, Manager, and Employee Liability Insurance

The Reorganized Debtors shall purchase and maintain new D&O liability insurance policies for directors, officers, employees, attorneys, or other professionals and agents of the Reorganized Debtors.

### G. Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### H. Reservation of Rights

Nothing contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

### I. Nonoccurrence of the Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting any Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### J. Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### K. Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.B of the Plan):

1. the Restructuring Support Agreement shall have not been terminated as to all parties thereto and shall remain in full force and effect (and no event shall have occurred that purports to terminate the Restructuring Support Agreement as to all parties thereto (even if such termination does not occur as a result of the automatic stay of section 362 of the Bankruptcy Code or otherwise));

2. the Bankruptcy Court shall have entered the DIP Orders, which shall be in full force and effect;

3. the Debtors shall have otherwise substantially consummated the Restructuring Transactions, including all transactions contemplated by the Restructuring Term Sheet, in a manner consistent with the Restructuring Support Agreement and the Plan;

4. the Definitive Documents shall (i) be consistent in all material respects with the consent rights, terms and conditions set forth in the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights set forth therein and (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable parties;

5. all actions, documents, and agreements constituting the applicable Definitive Documents, including any exhibits, schedules, amendments, modifications, or supplements thereto, shall have been executed and/or effectuated, and shall be in form and substance materially consistent with and subject to the consent rights set forth in the Restructuring Support Agreement, and shall be mutually agreed to by the Debtors, and the Required Plan Sponsors, and only to the extent the rights of the Holders of General Unsecured Claims are affected, in consultation with the advisors to the Committee;

6. (i) any and all requisite governmental, regulatory, and third-party approvals and consents shall have been obtained or waived, not be subject to unfulfilled conditions, and be in full force and effect, and (ii) all applicable waiting periods shall have expired or terminated, in each case under each clause of (i) and (ii) above, without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on the Restructuring Transactions, or the financial benefits of such Restructuring Transactions to the Plan Sponsors;

7. all professional fees and expenses of retained Professionals required to be approved by the Bankruptcy Court shall have been paid in full in Cash or amounts sufficient to pay such fees and expenses in full after the Effective Date have been placed in the Professional Fee Escrow Account;

8. all accrued and unpaid (i) Restructuring Expenses and (ii) fees and expenses of the Consenting Stakeholders, the DIP Lenders, the Initial Tranche A Lender, and the DIP Agent shall have been paid in full and in Cash in accordance with the Restructuring Support Agreement, the DIP Orders, and the DIP Documents;

9. the New Common Stock shall have been issued by Reorganized Marelli;

10. the Exit Facility Documents shall have been duly executed and delivered by all of the Entities that are party thereto and all conditions precedent to the effectiveness of the Exit Facility shall have been satisfied or duly waived in writing in accordance with the terms of the Exit Facility Documents and the closing of the Exit Facility shall have occurred;

11. the OEM Accommodation Agreements, in the form and substance acceptable to the Debtors and the Required Plan Sponsors, shall have been approved by the Bankruptcy Court, either by a separate Final Order(s) or as part of the Confirmation Order; and

12. the Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall not have been reversed, stayed, modified, or vacated on appeal.

### L. Waiver of Conditions

The conditions to the Effective Date of the Plan with respect to any Debtor set forth in Article IX of the Plan may only be waived, in whole or in part, in writing (which may be via electronic mail) with the consent of the Debtors and the Required Plan Sponsors, *provided that*, with respect to the fourth and eighth conditions, the consent of any Consenting Stakeholders who have consent rights set forth in the Restructuring Support Agreement over the applicable Definitive Document shall also be required. Any such waiver shall be effective without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan. Subject to the terms contained therein, the Plan may become effective as to any one or more Debtors without becoming effective as to all Debtors.

### M. Substantial Consummation

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date. For the avoidance of doubt, the nonoccurrence of the Effective Date with respect to one or more Debtors in accordance with the Plan shall not, by itself, prevent or delay a finding that the Plan has been substantially consummated with respect to all other Debtors.

### N. Effect of Nonoccurrence of Conditions to the Effective Date

If the Effective Date does not occur with respect to any Debtor, the Plan shall be null and void in all respects with respect to that Debtor and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims or Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of a Claim or Interest, or any other Entity in any respect; *provided* that all provisions of the Restructuring Support Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof.]

## IX. RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

### A. Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

**1. The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors**

If the Restructuring Transactions are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, commencing section 363 sales for the Debtors' assets, and any other transaction that would maximize the value of the Debtors' estates. The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the Confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors. For example, it would adversely affect:

- the Debtors' ability to raise additional capital and secure exit financing;
- the Debtors' liquidity;
- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies;
- the Debtors' enterprise value; and
- the Debtors' business relationship with customers and vendors and suppliers.

**2. Parties in Interest May Object to the Plan's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**3. The Restructuring Support Agreement May Be Terminated**

As more fully set forth in the Restructuring Support Agreement, the Restructuring Support Agreement may be terminated upon the occurrence of certain events, including, among others, the Debtors' failure to meet specified milestones relating to the Filing, Confirmation, and Consummation of the Plan, and breaches by the Debtors and/or the Consenting Lenders of their respective obligations under the documents. In the event that the Restructuring Support Agreement is terminated, the Debtors may seek a non-consensual restructuring alternative, including a potential liquidation of their assets.

**4. The Conditions Precedent to the Effective Date of the Plan May Not Occur**

As more fully set forth in Article IX of the Plan, the Confirmation and Effective Date of the Plan are subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Confirmation and Effective Date of the Plan will not take place. In the event that the Effective Date does not occur, the Debtors may seek Confirmation of a new plan. If the Debtors do not secure sufficient working capital to continue their operations or if the new plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

**5. The Debtors May Fail to Satisfy Vote Requirements**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction, subject to the terms of the Restructuring Support Agreement. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

**6. The Debtors May Not Be Able to Secure Confirmation of the Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

The Committee reserves the right to seek to adjourn its objection deadline and the Confirmation Hearing in the event that the Debtors file material modifications to the Plan including alterations, amendments, supplements, or modifications to the Plan impacting the treatment of Holders of General Unsecured Claims under the Plan.

**7. The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

**8. Even if the Restructuring Transactions are Successful, the Debtors Will Face Continued Risk Upon Confirmation**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the automotive industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for the Debtors' products and services, increasing expenses, and go-forward business plan risks. See Article IX.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Businesses." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their petitions for chapter 11 relief. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

**9. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a Chapter 11 Case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations. For a more detailed description of the consequences of an extended Chapter 11 Case, or of a liquidation scenario, *see* Article XI.B of this Disclosure Statement, titled "Best Interests of Creditors—Liquidation Analysis" and the Liquidation Analysis attached hereto as **Exhibit F**.

**10. The Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan, subject to the terms of the Restructuring Support Agreement. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**11. Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. Similarly, there can be no assurance that the requisite governmental, regulatory, and third-party approvals and consents contemplated by the Plan will be granted or waived.

#### 12. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims and the outcome of negotiations with the OEMs. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

#### 13. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties is necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and Plan and the significant deleveraging and financial benefits that they embody.

### B. Risks Related to Recoveries Under the Plan

#### 1. Estimated Valuations of the Exit Facility and the New Common Stock and Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values

The Debtors' estimated recoveries to Holders of Allowed Claims and Allowed Interests are not intended to represent the market value of the Debtors' Securities. The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to maintain adequate liquidity to fund operations; (d) the assumption that capital and equity markets remain consistent with current conditions; and (e) the Debtors' ability to maintain critical existing customer relationships, including customer relationships with key customers.

#### 2. The Debtors May Not Be Able to Obtain Exit Financing Commitments or Refinance the DIP Facilities

Based on the financial projections attached hereto as **Exhibit D**, the Debtors believe that they will need exit financing or alternative sources of liquidity to support their efforts to effectuate this restructuring and exit from these Chapter 11 Cases. There is a risk that the Debtors may not be able to secure exit financing commitments and consummate the Plan. If the Debtors are unable to secure exit financing commitments, the Plan may not be feasible.

If the Chapter 11 Cases take longer than expected to conclude, such delay could result in failure to meet certain milestones or the occurrence of other events of termination under the DIP Facilities. In such event, if the Debtors do not receive necessary waivers or amendments and are unable to refinance the DIP Facilities, the Debtors

could lose access to cash collateral needed to operate their businesses. There is no assurance that the Debtors would be able to obtain additional financing from the Debtors' existing lenders or otherwise, nor is there any assurance that the Debtors will receive consent from the DIP Lenders to continue to use their cash collateral in the event that the DIP Facilities mature. If the Debtors are unable to obtain such waivers or amendments or are unable to refinance the DIP Facilities, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

**3. The Reorganized Debtors May Not Be Able to Generate or Receive Sufficient Cash to Service Their Debt and May Be Forced to Take Other Actions to Satisfy Their Obligations, Which May Not Be Successful**

The Reorganized Debtors' ability to make scheduled payments on their debt obligations depends on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to maintain a level of cash flow sufficient to permit them to pay the principal, premium, if any, and interest on their debt, including the Exit Facility.

If cash flows and capital resources are insufficient to fund the Reorganized Debtors' debt obligations, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance debt, including the Exit Facility. These alternative measures may not be successful, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

Further, if the Reorganized Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and rating agencies and the willingness of third parties to do business with them could be adversely affected.

**4. The Terms of the Exit Facility Documents and the New Organizational Documents Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court**

The final terms of the Exit Facility Documents and the New Organizational Documents have not been finalized and are subject to negotiations between the Debtors and the Consenting Lenders. Holders of Claims that are not the Consenting Lenders will not participate in these negotiations, and the results of such negotiations may affect the rights of holders of the Exit Facility and the New Common Stock following the Effective Date. As a result, the final terms of the Exit Facility Documents and the New Organizational Documents may be less favorable to Holders of Claims and Interests than as described herein and in the Plan.

**5. A Decline in the Reorganized Debtors' Credit Ratings Could Negatively Affect the Debtors' Ability to Refinance Their Debt**

The Debtors' or the Reorganized Debtors' credit ratings could be lowered, suspended, or withdrawn entirely, at any time, by the rating agencies, if, in each rating agency's judgment, circumstances warrant, including as a result of exposure to the credit risk and the business and financial condition of the Debtors or the Reorganized Debtors, as applicable. Downgrades in the Reorganized Debtors' long-term debt ratings may make it more difficult to refinance their debt and increase the cost of any debt that they may incur in the future.

**6. Certain Tax Implications of the Plan May Increase the Tax Liability of the Reorganized Debtors and Holders of Certain Claims**

Holders of Allowed Claims should carefully review Article XIII of this Disclosure Statement, entitled "Certain U.S. Federal Tax Consequences and Japanese Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of certain Claims.

#### 7. The Distributions Contemplated by the Plan Are Subject to Certain Assumptions

The Plan is premised, among other things, on the assumption that the Debtors will be able to consummate the OEM Accommodation Agreements. If this assumption is not met, the Restructuring Support Agreement may need to be amended, and the treatment of Claims provided for in the Plan may need to be modified.

### C. Risks Related to the Debtors' and the Reorganized Debtors' Businesses

#### 1. The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness

The Reorganized Debtors' ability to make scheduled payments on, or refinance, their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, under the Exit Facility and upon emergence.

#### 2. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with customers, suppliers, vendors, service providers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

#### 3. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be

subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

#### 4. Financial Results May Be Volatile and May Not Reflect Historical Trends

Unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the value of the New Common Stock and the ability of the Debtors to make payments with respect to their indebtedness.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date. In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' historical consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Finally, the business plan was developed by the Debtors with the assistance of their advisors. There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors and their business plan. Any deviations from the Debtors' existing business plan would necessarily cause a deviation.

#### 5. The Debtors May Fail to Retain or Attract Customers, Which Would Adversely Affect the Debtors' Business and Financial Results

The Debtors' future revenue is dependent in large part upon the retention and growth of their existing customer base, in terms of customers continuing to purchase products and services. This is particularly important given that a significant portion of the Debtors' revenue is derived from current market participant purchases. Existing customers may purchase fewer products and new customers may avoid entry into the marketplace, which could have a material adverse effect on the Debtors' business and results of operations. In such cases, there can be no assurance that the Debtors will be able to retain their current customers.

A variety of factors could affect the Debtors' ability to successfully retain and attract customers, including the level of demand for their products and services, the quality of the Debtors' customer service, the Debtors' ability to update their products and develop new products and services needed by customers, and the Debtors' ability to integrate and manage any acquired businesses. Further, the industry in which the Debtors operate is highly competitive and the Debtors may not be able to compete effectively. The Debtors' revenue comes from the sale of the Debtors' products. It is impossible to predict with perfect accuracy what market demand for the Debtors' products will be.

#### 6. The Debtors' Business is Subject to Complex Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business

The Debtors' operations are subject to extensive laws and regulations in a number of different countries across the globe, including complex environmental laws and occupational health and safety laws and evolving environmental standards. The Debtors may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil and criminal penalties, which could have a material adverse effect on the business, financial condition, results of operations and cash flows of the Reorganized Debtors. Although the Debtors expect to remain in compliance with all applicable environmental laws and regulations, the Debtors may not be in complete compliance with these laws and permits at all times and any related violations could result in governmental fines or other sanctions, some of which could be material.

### 7. The Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising out of the Chapter 11 Cases

The Debtors may be or become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan or pursue rights and remedies with respect to such Claims during the pendency of the Chapter 11 Cases. It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Debtors' businesses and financial stability, however, could be material.

### 8. The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors may experience increased levels of employee attrition. Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience, and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

### 9. Certain Labor Matters Could Adversely Affect the Debtors' Business

Certain of the Debtors' employees are subject to collective bargaining agreements. If the Debtors are unable to renew expiring collective bargaining agreements, it is possible that the affected unions could take action in the form of strikes or work stoppages. Such actions, higher costs in connection with renegotiated collective bargaining agreements, or significant labor disputes could adversely affect the Debtors' businesses.

### 10. Cyberattacks or the Improper Disclosure or Control of Personal Information Could Result in Liability and Harm the Debtors' Reputation, Which Could Adversely Affect Its Business

The Debtors are dependent on networks and systems to process, transmit and store electronic information, and they may be required to store sensitive or confidential data in connection with the services they provide. As a result, the Debtors are subject to contractual terms and numerous U.S. and foreign laws and regulations designed to protect this information. Furthermore, data privacy is subject to frequently changing rules and regulations, which sometimes conflict among the various jurisdictions and countries in which the Debtors provide services. Although the Debtors have implemented appropriate policies and procedures to reduce the possibility of physical, logical and personnel security breaches, no such measures can completely eliminate the risk of cybersecurity attacks, especially in light of advances in criminal capabilities (including cyber-attacks or cyber intrusions over the internet, malware, computer viruses and the like), discovery of new vulnerabilities or attempts to exploit existing vulnerabilities in interconnected third party systems that are beyond the Debtors' control systems.

Unauthorized disclosure, either actual or perceived, of sensitive or confidential client or customer data, whether through systems failure, system intrusion, employee negligence, fraud, or otherwise could damage the Debtors' reputation and cause the Debtors to lose clients. Similarly, unauthorized access to or through the Debtors' information systems or those the Debtors develop for clients, whether by the Debtors' employees or third parties, could result in negative publicity, legal liability and damage to the Debtors' reputation, business, financial condition, results of operations and cash flows.

While the Debtors have not experienced a significant compromise to date, significant data loss or material financial losses related to cyber security attacks that has had an adverse effect on the Debtors' operations, there is no assurance that there may not be a material adverse effect in the future. Although the Debtors maintain cyber liability insurance, such insurance may not adequately or timely compensate the Debtors for all losses they may incur as any of the Debtors' client contracts do not contain limitations of liability for such losses.

#### 11. The Debtors May Not Be Able to Accurately Report Their Financial Results

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required under the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

#### 12. The Cyclical Nature of the Automotive Parts Sector May Lead to Volatility

The Debtors' business is highly cyclical. With respect to seasonality, the spring and summer are generally the Debtors' busiest seasons with substantially less sales volume and revenue during the rest of the year. Additionally, the Debtors' business operations are volatile and highly susceptible to a downturn in market conditions.

#### 13. Deteriorations in Business Relationships May Impact the Ability to Source Parts

The Debtors' success depends in part on their ability to source various parts, materials, and equipment necessary to sell the Debtors' automotive products. These parts are sourced from a broad range of suppliers. As a result, the Debtors' business depends on maintaining productive business relationships with their international network of third-party suppliers. The Debtors' operations could be disrupted if such business relationships decline, for whatever reason, or if such suppliers go out of business or are unable to provide parts to the Debtors as they have on a historical basis. There is a risk that economic conditions could lead to financial, operational, production, labor, regulatory, or quality assurance difficulties that could result in a reduction or interruption in the Debtors' parts, material, and equipment supply.

#### 14. The Debtors Face Significant Competition and May Lose Market Share to Their Competitors

The market for the Debtors' products is competitive and characterized by rapid changes in technology, customer preferences, industry standards, and frequent introductions of new products and improvements of existing products. The Debtors compete with many established automotive parts suppliers, as well as new entrants. As customer preferences evolve, and as new products, services, and technologies are introduced, if the Debtors are unable to anticipate or effectively react to these competitive challenges, the Debtors' competitive position could weaken, and they could experience a decline in revenue or growth rate that could materially and adversely affect their business and results of operations.

### D. Risks Related to the Offer and Issuance of Securities Under the Plan

#### 1. Certain Significant Holders of Shares of New Common Stock May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date

Assuming that the Effective Date occurs, holders of Claims who receive distributions representing a substantial percentage of the outstanding shares of the New Common Stock may be in a position to influence matters requiring approval by the holders of shares of New Common Stock, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors. The holders may have interests that differ from those of the other holders of shares of New Common Stock and may vote in a manner adverse to the interests of other holders of shares of New Common Stock. This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of New Common Stock. In addition, a holder of a significant number of shares of New Common Stock may sell all or a large portion of its shares of New Common Stock within a short period of time, which sale may adversely affect the trading price of the shares of New Common Stock. A holder of a significant number of shares of New Common Stock may, on its own account, pursue acquisition opportunities that may be complementary to the

Reorganized Debtors' businesses, and as a result, such acquisition opportunities may be unavailable to the Reorganized Debtors. Such actions by holders of a significant number of shares of New Common Stock may have a material adverse impact on the Reorganized Debtors' businesses, financial condition, and operating results.

**2. An Active Trading Market May Not Develop for the New Common Stock**

The New Common Stock are a new issue of securities and, accordingly, there is currently no established public trading market for the New Common Stock. The Reorganized Debtors do not intend to seek a listing of the New Common Stock on the New York Stock Exchange, the Nasdaq Stock Market or another comparable national securities exchange upon the Effective Date. If no active trading market in the New Common Stock develops, the market price and liquidity of the New Common Stock may be adversely affected. If a trading market does not develop or is not maintained, holders of New Common Stock may experience difficulty in reselling such securities at an acceptable price or may be unable to sell them at all. Even if a trading market were to exist, such market could have limited liquidity and the New Common Stock could trade at prices higher or lower than the value attributed to such securities in connection with their distribution under the Plan, depending upon many factors, including, without limitation, markets for similar securities, industry conditions, financial performance, prevailing interest rates, conditions in financial markets, or prospects and investor expectations thereof. As a result, there may be limited liquidity in any trading market that does develop for the New Common Stock. Finally, the New Organizational Documents may also contain restrictions on the transferability of the New Common Stock, which may adversely affect the liquidity in the trading market for the New Common Stock.

**3. The New Common Stock are an Equity Interest and Therefore Subordinated to the Indebtedness of the Reorganized Debtors**

In any liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Stock would rank junior to all debt claims against the Reorganized Debtors. As a result, holders of New Common Stock will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all of their obligations to their debt holders have been satisfied.

**4. Certain Holders of New Common Stock May Be Restricted in Their Ability to Transfer or Sell Their Securities**

To the extent that the New Common Stock is issued under the Plan pursuant to section 1145(a) of the Bankruptcy Code, such New Common Stock may be resold by the holders thereof without registration under the Securities Act, subject to applicable securities laws, including state securities laws, unless the holder is an "underwriter" with respect to such securities. Resales by Persons who receive New Common Stock pursuant to the Plan that are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such Persons would only be permitted to sell such securities without registration if they are able to comply with an available exemption from registration under the Securities Act. The exemption from registration provided by Rule 144 under the Securities Act may not be available to affiliated holders or "underwriters" as Reorganized Marelli will not be a public reporting company and the public information required by Rule 144 may not be available. The resale by any holder of securities issued in reliance of section 1145 of the Bankruptcy Code may also be subject to restrictions under the New Organizational Documents and applicable state and local securities laws, including Blue-Sky Laws.

The New Common Stock will not be registered under the Securities Act or any state securities law, and the Reorganized Debtors make no representation regarding the right of any holder of New Common Stock to freely resell the New Common Stock.

**5. The New Common Stock is Subject to Dilution**

The ownership percentage represented by the New Common Stock distributed on the Effective Date under the Plan will be subject to dilution from the New Common Stock issued in connection with the conversion of any other options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence, including pursuant to the Management Incentive Plan.

## X. SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.

PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER AND SOLICITATION PROCEDURES FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A. Classes Entitled to Vote on the Plan

The following Class is entitled to vote to accept or reject the Plan (the "Voting Class"):

| Class | Claim or Interest | Status |
|---|---|---|
| 4 | Senior Loan Claims | Impaired |

If your Claim or Interest is not included in the Voting Class, you are not entitled to vote and you will not receive a Solicitation Package (as defined below). If you are a Holder of a Claim in the Voting Class, you should read your Ballot(s) and carefully follow the instructions included in the Ballot(s). Please use only the Ballot(s) that accompanies this Disclosure Statement or the Ballot(s) that the Debtors, or the Claims, Noticing, and Solicitation Agent on behalf of the Debtors, otherwise provided to you.

### B. Classes Not Entitled to Vote on the Plan

Under the Bankruptcy Code, holders of claims or interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan. Accordingly, the following Classes of Claims against and Interests in the Debtors are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status |
|---|---|---|
| 1 | Other Secured Claims | Unimpaired |
| 2 | Other Priority Claims | Unimpaired |
| 3 | Emergency Loan Claims | Unimpaired |
| 5 | General Unsecured Claims | Unimpaired |
| 6 | Intercompany Claims | Unimpaired/Impaired |
| 7 | Intercompany Interests | Unimpaired/Impaired |
| 8 | Preferred Equity Interests | Impaired |
| 9 | Common Stock Interests | Impaired |
| 10 | Section 510(b) Claims | Impaired |

### C. Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

### D. Certain Factors to Be Considered Prior to Voting

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;
- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;
- the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and
- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Class or necessarily require a resolicitation of the votes of Holders of Claims in the Voting Class.

For a further discussion of risk factors, please refer to the "Risk Factors" described in Article IX of this Disclosure Statement.

### E. Solicitation Procedures

#### 1. Claims, Noticing, and Solicitation Agent

The Debtors have applied to retain Verita to act, among other things, as the Claims, Noticing, and Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

#### 2. Solicitation Package

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims in the Voting Class:

- a copy of the Solicitation and Voting Procedures (as defined in the Disclosure Statement Order);
- the applicable form of Ballot, together with detailed voting instructions and instructions on how to submit the Ballot;
- the Cover Letter (as defined in the Disclosure Statement Order);
- the Confirmation Hearing Notice (as defined in the Disclosure Statement Order);
- this Disclosure Statement (and exhibits thereto, including the Plan);
- the Disclosure Statement Order (without exhibits, except the Solicitation and Voting Procedures);
- a pre-addressed, postage pre-paid reply envelope (if applicable); and
- any additional documents that the Bankruptcy Court has ordered to be made available.

### 3. Distribution of the Solicitation Package and Plan Supplement

The Debtors are causing the Claims, Noticing, and Solicitation Agent to distribute the Solicitation Package by email, where available, and otherwise by first-class mail to those Holders of Claims in the Voting Class by **September 11, 2026.**

The Solicitation Package (without the Ballot, unless you are an eligible voting party) may also be obtained from the Claims, Noticing, and Solicitation Agent by: (a) calling 877-606-7509 (USA or Canada) or +1 310-751-2626 (International) and asking for a member of the Solicitation Team; (b) submitting an inquiry to www.veritaglobal.net/Marelli/inquiry; (c) writing to Marelli Ballot Processing Center c/o KCC dba Verita, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; or (d) e-mailing MarelliInfo@veritaglobal.com and referencing "Marelli" in the subject line. You may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, www.veritaglobal.net/Marelli, or the Bankruptcy Court's website at https://www.deb.uscourts.gov (for a fee). Holders should choose only one method to return their Ballot.

The Debtors shall file the Plan Supplement, to the extent reasonably practicable, with the Bankruptcy Court **no later than 7 days before the Voting Deadline**. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be filed with the Bankruptcy Court and made available on the Debtors' restructuring website.

## F. Voting Procedures

**September 1, 2026** (the "Voting Record Date"), is the date that will be used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures. Except as otherwise set forth in the Disclosure Statement Order, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of a Claim in the Voting Class to have its Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be executed, completed, and electronically submitted via (i) the Debtors' online balloting portal at www.veritaglobal.net/Marelli pursuant to the instructions set forth on the applicable Ballot or (ii) first class mail, overnight courier, or hand delivery to Marelli Ballot Processing Center c/o KCC dba Verita, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245, so that they are actually received by the Claims, Noticing, and Solicitation Agent no later than the Voting Deadline, *i.e.* **October 9, 2026, at 4:00 p.m. (prevailing Eastern Time)**.

Because there is only one Class of Claims entitled to vote under the Plan, Holders in Class 4 will receive a single Ballot. You may receive more than one Ballot if you hold Claims through one or more affiliated funds, in which case the vote cast by each such affiliated fund will be counted separately. Separate Claims held by affiliated funds in the Voting Class shall not be aggregated, and the vote of each such affiliated fund related to its Claims shall be treated as a separate vote to accept or reject the Plan (as applicable). If you hold any portion of a single Claim, you and all other Holders of any portion of such Claim will be (i) treated as a single creditor for voting purposes and (ii) required to vote every portion of such Claim collectively to either accept or reject the Plan.

**IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.**

**ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.**

**EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN THE VOTING CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST. IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE**

**SAME CLAIM PRIOR TO THE VOTING DEADLINE, THE LAST PROPERLY EXECUTED BALLOT TIMELY RECEIVED WILL BE DEEMED TO REFLECT THAT VOTER'S INTENT AND WILL SUPERSEDE AND REVOKE ANY PRIOR RECEIVED BALLOT.**

**IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASS FOLLOWS THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS. NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.**

### G. Voting Tabulation

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted. A Ballot will be deemed delivered only when the Claims, Noticing, and Solicitation Agent actually receives the executed Ballot as instructed in the applicable voting instructions. No Ballot should be sent to the Debtors, the Debtors' agents (other than the Claims, Noticing, and Solicitation Agent) or the Debtors' financial or legal advisors, and if so sent will not be counted.

The Bankruptcy Court may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to confirmation of the Plan. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Debtors will file with the Bankruptcy Court the voting report prepared by the Claims, Noticing, and Solicitation Agent (the "Voting Report") no later than **3 Business Days prior to the Confirmation Hearing**. The Voting Report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile, or damaged (collectively, in each case, an "Irregular Ballot"). The Voting Report shall indicate the Debtors' intentions with regard to each Irregular Ballot. Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification.

### H. Ballots Not Counted

Subject to any order of the Court, the Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; *provided* that any such rejections will be documented in the Voting Report. No Ballot will be counted in determining the acceptance or rejection of the Plan if, among other things: (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims, Noticing, and Solicitation Agent), or the Debtors' financial or legal advisors instead of the Claims, Noticing, and Solicitation Agent; (5) it is unsigned or lacking an original signature; or (6) it is not marked to either accept or reject the Plan or is marked both to accept and reject the Plan. Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT TOLL-FREE NUMBER AT (877) 606-7509 (DOMESTIC) or +1(310) 751-2626 (INTERNATIONAL).**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL NOT BE COUNTED.**

# XI. CONFIRMATION OF THE PLAN

## A. Requirements of Section 1129(a) of the Bankruptcy Code

Among the requirements for Confirmation are the following: (i) the Plan is accepted by all impaired Classes of Claims and Interests or, if the Plan is rejected by an impaired Class, at least one impaired Class of Claims has voted to accept the Plan without counting the votes of any insiders in such Class of Claims and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims or Interests in all rejecting impaired classes; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Impaired Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code. Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.
- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.
- The Plan has been proposed in good faith and not by any means forbidden by law.
- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment: (i) made before Confirmation will be reasonable or (ii) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.
- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.
- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim or Other Priority Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.
- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.
- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.
- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class that vote on the plan. Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class that vote on the plan.

### B. Best Interests of Creditors—Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit F**, showing that the value of the distributions provided to Holders of Allowed Claims and Interests under the Plan would be the same as or greater than under a hypothetical chapter 7 liquidation. Accordingly, the Debtors believe that the Plan is in the best interests of creditors and interest holders.

### C. Feasibility

The Bankruptcy Code requires that to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor(s) unless contemplated by the plan.

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared the financial projections (the "Financial Projections"). Creditors and other interested parties should review Article IX of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors. The Financial Projections are attached hereto as **Exhibit D** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

Additionally, the Plan provides for the deleveraging of the Debtors and the distribution of their assets. The Debtors believe that sufficient funds will exist to make all payments required by the Plan. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### D. Valuation

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors, which estimate is attached to this Disclosure Statement as **Exhibit E** (the "Valuation Analysis"). The Valuation Analysis should be considered in conjunction with the Risk Factors discussed in Article IX of this Disclosure Statement, entitled "Risk Factors," and the Financial Projections. The Valuation Analysis is dated as of [●], 2026, and is based on data and information as of that date. The Valuation Analysis is subject to various important qualifiers and assumptions that are set forth in **Exhibit E**, and Holders of Claims and Interests should carefully review the information in **Exhibit E** in its entirety. The Debtors believe that the Valuation Analysis demonstrates that the Plan is "fair and equitable" to the non-accepting classes.

### E. Acceptance by Impaired Class

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or (iii) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their ballots in favor of acceptance. For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan. Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

### F. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class of claims without counting the votes of any insiders in such class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan. Under the Plan, only Class 4 (Senior Loan Claims) is Impaired and entitled to vote, and the Debtors intend to seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to each Class that is deemed to reject the Plan.

If any Impaired Class of Claims or Interests rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors reserve the right to request Confirmation of the Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

#### 1. No Unfair Discrimination

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan. The test does not require that the treatment be the same or equivalent, but that the treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. Accordingly, the Debtors believe that the Plan meets the standard to demonstrate that the Plan does not unfairly discriminate, and the Debtors will be prepared to meet their burden to establish that there is no unfair discrimination as part of Confirmation of the Plan.

#### 2. Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class. As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class. The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan. There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Plan.

**(a) Secured Claims**

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the claimant's liens.

**(b) Unsecured Claims**

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

**(c) Interests**

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either: (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

## XII. IMPORTANT SECURITIES LAWS DISCLOSURES

The Debtors believe the New Common Stock to be issued pursuant to the Plan to be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable Blue-Sky Laws. The Debtors further believe that the offer, sale, issuance, and initial distribution of the New Common Stock pursuant to the Plan is exempt from federal and state securities registration requirements under the Securities Act, the Bankruptcy Code, and applicable state Blue-Sky Laws, as described in more detail below. No registration statement for the New Common Stock issued under the Plan will be filed under the Securities Act or any state securities laws. The rights of holders of the New Common Stock, including the right to transfer such New Common Stock, will also be governed by the New Organizational Documents.

### A. Issuance of Section 1145 Securities under the Plan

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities issued by the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or "principally" in exchange for such claim or interest and "partly" for cash or property. In reliance upon this exemption, the Debtors believe that the offer and sale of the New Common Stock (other than the New Common Stock issued in respect of the Management Incentive Plan) to be issued pursuant to the Plan (collectively, the "1145 Securities") will be exempt from registration under the Securities Act and state securities laws, including Blue-Sky Laws. To the extent such exemption is not available, then such New Common Stock will be offered, issued, and distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws, including Blue-Sky Laws.

**B. Subsequent Transfers of 1145 Securities Issued under the Plan**

In general, securities issued under section 1145 of the Bankruptcy Code may be resold without registration under federal securities laws, subject to applicable state and local securities laws, including Blue-Sky Laws, unless the recipient is an "underwriter" with respect to those securities.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any entity who, except with respect to ordinary trading transactions of an entity that is not an issuer:

- purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such a claim or interest;
- offers to sell securities offered or sold under the plan of reorganization for the holders of such securities;
- offers to buy securities offered or sold under the plan of reorganization from the holders of such securities, if the offer to buy is (i) with a view to distribution of such securities; and (ii) under an agreement made in connection with the plan of reorganization, with the consummation of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or
- is an issuer with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

You should confer with your own legal advisors to help determine whether or not you are an "underwriter."

To the extent that persons who receive the securities issued under the Plan that are exempt from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code are deemed to be "underwriters," resales by those persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Persons deemed to be "underwriters" may, however, be permitted to sell such securities without registration pursuant to the provisions of Rule 144 under the Securities Act. These rules generally permit the public sale of securities received by "underwriters" subject to certain holding periods if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met. Reorganized Marelli is not expected to be a public reporting company and thereby current public information regarding Reorganized Marelli as may be required by Rule 144 may not be available.

Whether or not any particular person would be deemed to be an "underwriter" with respect to any securities issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular person receiving securities under the Plan would be an "underwriter" with respect to such securities.

**C. Issuance of 4(a)(2)/Regulation S Securities**

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under the Securities Act. Rule 506 of Regulation D is a nonexclusive safe harbor from registration promulgated by the SEC under section 4(a)(2) of the Securities Act. Regulation S under the Securities Act provides an exemption from registration under the Securities Act for the offering, issuance, and distribution of securities in certain transactions to persons outside of the United States.

The 4(a)(2)/Regulation S Securities will be considered "restricted securities" as defined by Rule 144 of the Securities Act and may not be resold under the Securities Act and applicable state securities laws absent an effective registration statement, or pursuant to an applicable exemption from registration, under the Securities Act and pursuant to applicable state securities laws, including Blue-Sky Laws. Generally, Rule 144 of the Securities Act would permit

the public sale of securities received by such person after a specified holding period if current information regarding the issuer is publicly available and certain other conditions are met, and, if such seller is an affiliate of the issuer (or was an affiliate during the three months preceding the sale), if volume limitations, manner of sale requirements and certain other conditions are met. Reorganized Marelli is not expected to be a public reporting company and thereby current public information regarding Reorganized Marelli as may be required by Rule 144 may not be available.

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell restricted securities pursuant to Rule 144 after a one-year holding period whether or not current public information regarding the issuer is available and without compliance with the volume, manner of sale, and notice requirements described below, subject to applicable state and local securities law.

In addition, in connection with resales of any New Common Stock offered, issued and distributed pursuant to Regulation S under the Securities Act: (i) the offer or sale, if made prior to the expiration of the one-year distribution compliance period (six months for a reporting issuer), may not be made to a U.S. person or for the account or benefit of a U.S. person (other than a distributor); and (ii) the offer or sale, if made prior to the expiration of the applicable one-year or six-month distribution compliance period, is made pursuant to the following conditions: (a) the purchaser (other than a distributor) certifies that it is not a U.S. person and is not acquiring the securities for the account or benefit of any U.S. person or is a U.S. person who purchased securities in a transaction that did not require registration under the Securities Act; and (b) the purchaser agrees to resell such securities only in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act, or pursuant to an available exemption from registration; and agrees not to engage in hedging transactions with regard to such securities unless in compliance with the Securities Act.

Any awards issued under the Management Incentive Plan are expected to be offered pursuant to an exemption from the registration requirements of the Securities Act in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, Regulation S of the Securities Act, or another applicable exemption from registration.

The Debtors express no view as to whether any person may freely resell the New Common Stock pursuant to federal, state, or local securities law, including Blue-Sky Laws.

Each certificate representing, or issued in exchange for or upon the transfer, sale or assignment of, any 4(a)(2)/Regulation S Security shall, upon issuance, be stamped or otherwise imprinted with a restrictive legend substantially consistent with the following form:

**THE OFFER AND SALE OF THIS SECURITY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND THIS SECURITY MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED, OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER AND APPLICABLE STATE SECURITIES LAWS.**

**PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS.**

**THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. WE MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH HOLDER AND PARTY-IN-INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF**

**WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.**

## XIII. CERTAIN U.S. FEDERAL TAX CONSEQUENCES AND JAPANESE TAX CONSEQUENCES OF THE PLAN

### A. Introduction

The following discussion is a summary of certain U.S. federal income tax consequences and Japanese tax consequences of the consummation of the Plan to the Debtors, the Reorganized Debtors, and to certain Holders of Claims entitled to vote on the Plan. The following summary does not address the U.S. federal income tax consequences or Japanese tax consequences to Holders of Claims or Interests not entitled to vote to accept or reject the Plan.

This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), Japanese tax laws and practices, and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein. This discussion does not purport to address all aspects of U.S. federal income taxation or Japanese tax considerations that may be relevant to the Debtors or to certain Holders of Claims in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders of Claims subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, non-U.S. taxpayers, controlled foreign corporations, passive foreign investment companies, Persons who are related to the Debtors within the meaning of the Tax Code, Persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, Claims, the New Common Stock, or any other consideration to be received under the Plan, as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, estate, gift, or non-U.S. (other than discussion of Japanese tax consequences to the Debtors and Holders of Allowed Claims included below) taxation is addressed. Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds Claims as "capital assets" (within the meaning of section 1221 of the Tax Code). This summary does not address any special arrangements or contractual rights that are not being received or entered into in respect of an underlying Claim, including the tax treatment of any backstop fees or similar arrangements (including any ramifications such arrangements may have on the treatment of a Holder under the Plan). This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

For purposes of this discussion, a "U.S. Holder" is a Holder that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons has authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend

upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the pass-through entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME AND JAPANESE TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

### B. Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors

As discussed immediately below, the Debtors do not anticipate that the Restructuring Transactions will result in material U.S. federal income tax consequences to the Debtors or the Reorganized Debtors, other than the effect that COD Income (as defined below) and Section 382 will have with respect to the U.S. tax attributes of the U.S. Entities (as defined below). This summary (a) does not address any determinations with respect to "earnings and profits" for U.S. tax purposes and (b) assumes that any intercompany obligation that is owed by a U.S. Entity to any entity outside of such U.S. Entity's U.S. federal consolidated tax group is not modified pursuant to the Plan.

#### 1. Cancellation of Debt Income

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") for U.S. federal income tax purposes upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (i) the adjusted issue price of the indebtedness satisfied, over (ii) the sum of (A) the amount of cash paid, (B) the issue price of any new indebtedness of the debtor issued, and (C) the fair market value of any other consideration (including stock or warrants of the debtor or another entity) given in satisfaction of such indebtedness at the time of the exchange.

A limited number of the Debtors are United States persons (within the meaning of section 7701(a)(30) of the Tax Code) (the "U.S. Entities"). Except with respect to certain of the DIP Facilities, the Debtors believe that the U.S. Entities should not be treated as borrowers for tax purposes with respect to the debt that will be discharged pursuant to the Plan. Moreover, the non-U.S. Entities that are primary obligors (for U.S. federal income tax purposes) on the debt that will be discharged pursuant to the Plan are generally not subject to U.S. federal income tax. This position is not free from doubt, and if the IRS or a court were to take a different position as to whether any U.S. Entity is a borrower with respect to the debt that will be discharged pursuant to the Plan for tax purposes, the amount of COD Income that could be incurred as a result of the Restructuring Transactions could differ from the following discussion. Although certain of the U.S. Entities guarantee debt that is being discharged pursuant to the Plan, the release of a guarantee generally does not cause U.S. federal income tax consequences to the guarantor unless the guarantor is treated as a primary or co-obligor on the underlying debt instrument under a facts-and-circumstances analysis. The Debtors do not believe that any U.S. Entity would be treated as a primary or co-obligor under these principles other than for certain DIP Facilities. Accordingly, the Debtors (including the U.S. Entities) do not currently expect to realize significant COD Income for U.S. federal income tax purposes as a result of the Restructuring Transactions, except potentially with respect to certain DIP Facilities as described below.

The U.S. Entities are further expected to have limited, if any, COD Income for U.S. federal income tax purposes with respect to the DIP Facilities. To the extent there is COD Income, the amount is expected to depend on the issue price of any Exit Facility Loans, the fair market value of any New Common Stock, and the amount of any Cash received by holders of the Tranche B DIP Loans. To the extent the U.S. Entities have COD Income, such COD Income is expected to be excluded from income pursuant to section 108 of the Tax Code and the U.S. Entities may be required to reduce certain tax attributes as a consequence of such exclusion, including NOL and credit carryforwards and tax basis.

### 2. Limitation of NOL Carryovers and Other Tax Attributes

As of December 31, 2025, based on current estimates, the U.S. Entities had approximately $97.6 million of net operating losses ("NOL") and approximately $5.8 million of federal research and development credit carryforwards. These NOLs and credits, and any other U.S. tax attributes of the U.S. Entities, will be subject to the rules discussed immediately below.

In general, NOLs may be able to offset future taxable income for up to 20 years in the case of NOLs arising before 2018 and indefinitely for NOLs arising in taxable years starting in 2018. Subject to any applicable limitations, NOLs carried to a taxable year starting with 2021 may be used to offset 80 percent of taxable income for any tax year thereafter. Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its surviving NOL carryovers, capital loss carryovers, tax credit carryovers, and certain other tax attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the Debtors and the Reorganized Debtors allocable to periods before the Effective Date (collectively, the "Pre-Change Losses") that may be utilized to offset future taxable income generally is subject to an annual limitation. The rules of sections 382 and 383 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the distribution of the New Common Stock pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes, and that the Debtors' and the Reorganized Debtors' use of their Pre-Change Losses (if any) will be subject to limitation unless an exception to the general rules of sections 382 and 383 of the Tax Code applies.

Under section 382 of the Tax Code, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then, generally, built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 and (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

#### (a) General Section 382 Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject to is equal to the product of (a) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments), and (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar month period ending with the calendar month in which the ownership change occurs, currently 3.77 percent for ownership changes occurring in August 2026). The annual limitation may be increased to the extent that the applicable Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65, but only to the extent that the Debtors have a net unrealized built in gain at the time of the ownership change. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

#### (b) Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when shareholders and so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their shares and Claims, respectively, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis, but, instead, NOL carryovers would be reduced by the amount of any interest deductions claimed by the debtor during any taxable year ending during the three-year period preceding the taxable year in which the ownership change occurs, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock pursuant to the reorganization. If the 382(l)(5) Exception applies and the debtor undergoes

another "ownership change" within two years after the Effective Date, then such debtor's Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (a) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (b) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryovers by the amount of interest deductions in the manner described above, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

It is very unclear whether the 382(l)(5) Exception could apply under the circumstances in these cases and, in any case, because the U.S. tax attributes of the Debtors are relatively immaterial, the Debtors do not anticipate that they will utilize the 382(l)(5) Exception.

### C. Japanese Tax Consequences to the Debtors

In general, subject to further analysis no Japanese corporate taxes for the Debtors or Reorganized Debtors are expected to arise in connection with the Plan. It is expected that Marelli Holdings Co., Ltd. will generate (i) foreign exchange gain through the settlement of the intercompany loan between Marelli Holdings Co., Ltd and Marelli Corporation and (ii) cancellation of debt income pursuant to the Plan. However, Marelli Holdings Co., Ltd. has existing NOLs and will generate a significant loss mainly from the transfer of Marelli Corporation's shares pursuant to the Restructuring Transactions. The total income from the foreign exchange gain and cancellation of debt is expected to be significantly less than the anticipated amount of NOLs of Marelli Holdings Co., Ltd., and, as a result, no Japanese corporate tax is expected to be triggered by the transaction.

### D. Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims

#### 1. General Considerations

The following discussion assumes that the Debtors will pursue the Restructuring Transactions currently contemplated by the Plan. U.S. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions. This section does not include any non-U.S. tax considerations. Because the issuers of the Senior Loans are not U.S. Entities, there generally should not be any U.S. federal income tax consequences to non-U.S. Holders with respect to the exchange of Claims under the Plan.

#### 2. Consequences to U.S. Holders of Allowed Senior Loan Claims

Pursuant to the Plan, except to the extent that any such Holder agrees to less favorable treatment, each Non-Participating Senior Lender shall, on account of such Holder's Allowed Senior Loan Claim, receive Cash in an amount equal to 11.00% of the principal amount of such Holder's Allowed Senior Loan Claim, and each Participating Senior Lender shall waive any recovery on account of such Holder's Allowed Senior Loan Claim.

Based on the assumptions set forth in this disclosure, a U.S. Holder of an Allowed Senior Loan Claim who receives Cash pursuant to the Plan should be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code. The U.S. Holder of such Claim should recognize gain or loss equal to the difference between (1) the amount of Cash received, and (2) such U.S. Holder's adjusted basis, if any, in such Claim which is deemed to be exchanged. The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the U.S. Holder, the rules regarding accrued but untaxed interest and market discount, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad debt deduction with respect to its Claim. If recognized gain

or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.

### 3. Distributions Attributable to Accrued Interest (and OID)

To the extent that any amount received by a U.S. Holder of a Claim exchanged under the Plan is attributable to accrued but untaxed interest (or OID) on the debt instruments constituting the exchanged Claim, such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already included in income by the U.S. Holder). Conversely, a U.S. Holder of an exchanged Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a U.S. Holder of an exchanged Claim will be attributable to accrued interest on the debt constituting the exchanged Claim is unclear. Certain legislative history and case law indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The Plan provides that amounts paid to U.S. Holders of Claims will be allocated first to unpaid principal and then to unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims are urged to consult their tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

### 4. Market Discount

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the exchanged Claim.

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of a Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debt instruments were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include such market discount in its income as the market discount accrued).

### 5. Net Investment Income Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, interest, dividends, and gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of debt of, and equity interests in, the Debtors and Reorganized Debtors.

### 6. Limitations on Use of Capital Losses

A U.S. Holder of a Claim who recognizes capital losses as a result of the exchanges under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (1) $3,000 annually ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### E. Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims

The Debtors do not anticipate that there will be material U.S. federal income tax consequences to non-U.S. Holders of Allowed Senior Loan Claims, because the issuers of the Senior Loans are not U.S. Entities.

### F. U.S. Information Reporting and Withholding

The Debtors or Reorganized Debtors, as applicable, will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors and Reorganized Debtors will also comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim or Interest under the Plan, as well as future payments made with respect to consideration received under the Plan.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

### G. FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or could be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding could apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules that were previously scheduled to take effect on January 1, 2019 would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Holder.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

### H. Japanese Tax Consequences to the Holders of Allowed Claims

#### 1. General Considerations

Pursuant to the Plan, Holders of Allowed Senior Loan Claims will receive consideration as described in "Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims – Consequences to Holders of Allowed Senior Loan Claims" above for full and final satisfaction, settlement, release, and discharge of its Claims. Both Japanese Holders (including both corporate Japanese Holders and individual Japanese Holders) and non-Japanese Holders of an Allowed Senior Loan Claims should recognize gain or loss equal to the difference between (i) the repayment amount of the Cash received and (ii) the Holder's acquisition cost of the Claims.

#### 2. Japanese Holders

As described above, Japanese Holders generally should recognize gain or loss equal to the difference between the amount of Cash received under the Plan and the Holder's acquisition cost of the Claims. Though Japanese Holders of Allowed Senior Loan Claims are not subject to Japanese withholding tax on any repayments to be made under the Plan, they are required to include any taxable gain arising from such payments in their taxable income for Japanese tax purposes and to file tax returns.

Since any foreign exchange gain or loss for Japanese Holders of Allowed Senior Loan Claims depends on their individual functional currency, each Holder should consult its own tax advisor regarding the possible impact of foreign exchange gain or loss on such Holder.

The losses arising from this debt forgiveness pursuant to the Plan should be deductible to the Japanese Holders of Allowed Senior Loan Claims for Japanese tax purposes. There are no limitations of amounts on such deduction and the Japanese Holders of Allowed Senior Loan Claims may carry over unused losses in a given tax year and apply such losses against future gains to the extent of 50% of the taxable income for the ten years following such tax year.

#### 3. Non-Japanese Holders

Assuming a tax treaty does not apply, if gain arises from the difference between (i) the repayment amount of the Cash received and (ii) a non-Japanese Holder's acquisition cost of the Claims, such gain should be regarded as Japan-source income under Japanese domestic tax law. Such gain would typically not be subject to withholding, but such non-Japanese Holder would instead be required to file a tax return and pay the applicable Japanese income tax directly at the tax rate of 25.59% if it does not have any permanent establishment in Japan.

#### 4. Amounts Attributable to Interest and Principal

The Plan provides that amounts paid to Holders of Allowed Senior Loan Claims will be allocated first to unpaid principal and then to unpaid interest, and such treatment is expected to be respected for Japanese tax purposes.

## XIV. RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to Holders of Allowed Claims and Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Interests than proposed under the Plan. Accordingly, the Debtors recommend that Holders of Claims entitled to vote to accept or reject the Plan support Confirmation and vote to accept the Plan.

Dated: August 3, 2026

Marelli Automotive Lighting USA LLC on behalf of itself and each of the other Debtors

By: */s/* John Nicholson
Name: John Nicholson
Title: General Counsel

# **<u>Exhibit A</u>**

## **Chapter 11 Plan**

[*Intentionally omitted for the purposes of filing*]

# Exhibit B

## Restructuring Support Agreement

[*Intentionally omitted for the purposes of filing*]

# Exhibit C

## Organizational Chart



# Exhibit D

## Financial Projections

The accompanying financial projections (the "Financial Projections") were developed by the Debtors to support the feasibility of the *Joint Plan of Reorganization of Marelli Automotive Lighting USA LLC and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as modified, amended, or supplemented from time to time, the "Plan") pursuant to chapter 11 of the Bankruptcy Code.

**THE FINANCIAL PROJECTIONS ARE BASED UPON A NUMBER OF SIGNIFICANT ASSUMPTIONS. ACTUAL OPERATING RESULTS AND VALUES MAY VARY SIGNIFICANTLY FROM THESE FINANCIAL PROJECTIONS.**

## I. Introduction

As a condition to Confirmation, the Bankruptcy Code requires, among other things, that the Debtors demonstrate that Confirmation is not likely to be followed by either a liquidation or the need to further reorganize the Debtors. In connection with developing the Plan, and for purposes of determining whether the Plan satisfies the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, the Debtors and their advisors have, through the development of the Financial Projections, analyzed the Reorganized Debtors' ability to meet their obligations under the Plan and generate free cash flow from January 2026 through December 2028 (the "Projection Period"). The Financial Projections will assist each Holder of an Allowed Claim in determining whether to vote to accept or reject the Plan and were prepared in good faith.

In general, as illustrated by the Financial Projections, the Debtors believe they should have sufficient liquidity to pay and service their debt obligations and to operate their businesses. The Debtors believe that Confirmation and consummation of the Plan are not likely to be followed by the liquidation or further reorganization of the Debtors. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

The Financial Projections were prepared by the Debtors, with the assistance of their advisors, and are based on several assumptions made by the Debtors with respect to the future performance of the Reorganized Debtors' operations, assuming the Restructuring Transactions are consummated. The Financial Projections were also based on available information, including information that has not been independently verified. The Financial Projections present, to the best of the Debtors' knowledge and belief, the Reorganized Debtors' projected results of operations and cash flows for the Projection Period. The Financial Projections should be read in conjunction with the assumptions and qualifications contained herein and as set out in the Disclosure Statement. Although the Debtors are of the opinion that the Financial Projections are reasonable under current circumstances, the Financial Projections are subject to inherent uncertainties, including, but not limited to:

- upward or downward changes in production volumes and commodity prices;
- the Reorganized Debtors' ability to generate sufficient cash to service debt issued as of the Effective Date;

- geopolitical uncertainty in markets where the Reorganized Debtors will conduct business;
- the loss of key personnel;
- increased competition from providers of products similar to those of the Debtors;
- the impact of economic conditions outside of the Reorganized Debtors' control and any corresponding impact on production and sales;
- changes in interest rates;
- changes in accounting standards;
- regulatory changes and judicial rulings impacting the Reorganized Debtors' businesses;
- the imposition of duties or taxes;
- fluctuations in foreign currency exchange rates;
- adverse results from litigation, governmental investigations, or tax related proceedings or audits, whether initiated prior or subsequent to the Effective Date;
- the Debtors' and the Reorganized Debtors' ability to maintain and/or enter into agreements with customers;
- the Debtors' and the Reorganized Debtors' ability to maintain and/or enter into agreements with suppliers;
- the Debtors' and the Reorganized Debtors' reliance on third-party vendors for various goods or services;
- supply chain disruptions resulting from various geopolitical and logistical issues;
- difficulties or interruptions that may arise from future integration of acquired businesses or facilities;
- other events beyond the control of the Reorganized Debtors that may result in unexpected adverse operating results;
- the possibility that the Bankruptcy Court does not confirm the Plan, or requires a re-solicitation of votes;
- any delays to the Effective Date; and
- the risks related to other parties objecting to the Plan and the resulting cost and expense of delays in the Chapter 11 Cases.

The likelihood, and related financial impact, of a change in any of these factors cannot be predicted with certainty. Consequently, actual financial results could differ materially from the Financial Projections.

The risk factors associated with the Plan are described more fully in Article IX of the Disclosure Statement.

The Debtors have historically prepared consolidated quarterly and annual financial statements in accordance with the international financial reporting standards ("IFRS") issued by

the International Accounting Standards Board. The financial information contained herein is limited in scope and is presented on a preliminary and unaudited basis. As such, the Financial Projections have not been subject to procedures that would typically be applied to financial statements prepared in accordance with IFRS, generally accepted accounting principles utilized in the United States of America ("GAAP"), or any other accounting standards, nor do the Financial Projections include all of the information and footnotes required by any such accounting standards. Upon the application of such procedures, the financial information could be subject to changes, which could be material. The Financial Projections neither purport to represent financial statements prepared in accordance with IFRS, nor is it intended to be fully reconciled with the financial statements of the Debtor.

**THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH MAY NOT BE REALIZED AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES WHICH ARE RECOGNIZED BY THE DEBTORS TO BE BEYOND THEIR CONTROL TO FULLY ASSESS. WHILE THE DEBTORS HAVE PREPARED THE FINANCIAL PROJECTIONS IN GOOD FAITH AND BELIEVE THE UNDERLYING ASSUMPTIONS TO BE REASONABLE, THE FINANCIAL PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY OTHER PERSON, AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED BY THE REORGANIZED DEBTORS FOLLOWING THE EFFECTIVE DATE. ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE PRESENTED IN THE FINANCIAL PROJECTIONS. HOLDERS OF CLAIMS OR INTERESTS MUST MAKE THEIR OWN ASSESSMENT AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS IN MAKING THEIR DETERMINATION OF WHETHER TO ACCEPT OR REJECT THE PLAN.**

The Debtors disclaim any obligation to (i) furnish updated Financial Projections to Holders of Claims or Interests prior to the Effective Date or to any other party after the Effective Date, except as required by the Plan, or (ii) otherwise make such updated information publicly available.

## II. Safe Harbor Under the Private Securities Litigation Reform Act of 1995

The Financial Projections and the assumptions that the Debtors believe to be significant to the Financial Projections contain certain statements that may be deemed "forward-looking" within the meaning of the Private Securities Litigation Reform Act of 1 995, as amended. Forward-looking statements in the Financial Projections include the intent, belief or current expectations of the Debtors and management with respect to the timing of, completion of, and scope of the current restructuring, the Plan, the Debtors' business plan, and market conditions, and the Debtors' future liquidity, as well as the assumptions upon which such statements are based. When used in the Financial Projections, or the assumptions, the words "anticipate," "believe," "project," "estimate," "will," "may," "intend," "strategy," "future," "opportunity," "plan," "pipeline," "expect," "target,"

"model," "can," "could," "should," "would" or similar expressions should be generally identified as forward-looking statements.

While the Debtors believe that the plans, intentions, and expectations reflected in the forward-looking statements are based upon reasonable assumptions within the bounds of their knowledge of their business and operations, parties in interest are cautioned that any such forward-looking statements are not guarantees of future performance, involve significant risks, uncertainties, and assumptions, and that actual results may differ materially and adversely from those expressed or implied by such forward-looking statements All forward-looking statements attributable to the Debtors or Person or Entity acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth herein Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether because of new information, future events, or otherwise

## III. General Assumptions

### 1. Overview

(a) The Financial Projections are based upon, and assume the successful implementation of, the Debtors' business plan during the course of the Projection Period.

(b) The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by October 31, 2026[1] ("Emergence" and such date, the "Effective Date"). Any significant delay in the Effective Date may have a significant negative effect on the operations and financial performance of the Debtors including an increased risk or inability to meet sales forecasts and the incurrence of higher reorganization expenses.

(c) The opening post-Emergence balance sheet as of November 1, 2026, was prepared utilizing the preliminary March 31, 2026, trial balance and projected results of operations and cash flows over the Projection Period to the assumed Effective Date. As noted above, they have historically prepared financial statements on a consolidated basis, and it is on that basis the Debtors have forecasted the ordinary course of their business. The Debtors made certain adjustments to their consolidated balance sheets, including but not limited to, the adjustment of accruals and the reclassification of certain balances. Actual balances may vary from those reflected in the opening balance sheet due to these adjustments and variances in projections and potential changes in cash needed to consummate the Plan. The

[1] This date is subject to change.

reorganized *pro forma* balance sheets for the Projection Period contain certain *pro forma* adjustments as a result of consummation of the Plan.

(d) "EBITDA" and "Normalized EBITDA" are non-generally accepted accounting principles ("GAAP") measures and should not be considered as an alternative to GAAP or IFRS measures, such as net income, operating income, cash flow from operating activities, or any other GAAP or IFRS measure of financial performance.

(e) The Financial Projections account for the reorganization and related transactions pursuant to the Plan. While the Debtors expect that they will be required to revalue some of their assets upon Emergence, they have not yet completed the work required to quantify the impact on the Financial Projections. When the Debtors fully implement their asset revaluation work, differences from the depiction presented are anticipated and those differences could be material. This restructuring transaction requires all assets, liabilities, and equity instruments to be valued at "fair value." In addition to valuing assets, liabilities, and equity instruments at fair value, the Debtors will have tax professionals analyze any go forward tax implications as a result of the Restructuring. The Financial Projections account for the anticipated Restructuring and related transactions pursuant to the Plan, but do not account for the final tax analysis that will be done upon Emergence. Moreover, the Financial Projections make certain assumptions about the transaction steps that will be taken to effectuate the Restructuring and related transactions pursuant to the Plan, which steps have not yet been finalized. The finalization of the transaction steps and tax analysis may materially impact these Financial Projections.

(f) The Financial Projections are presented in Euros ("€"), the Debtors' presentation currency, and all amounts set forth herein are stated in Euros unless otherwise indicated.

**2. Restructuring Assumptions**

The Financial Projections assume that, on or about the Effective Date, the Reorganized Debtors will enter into exit financing consisting of an approximately €1.7 billion senior secured term loan facility (the "Exit Facility").

As of the date of this Disclosure Statement, the Debtors are preparing to engage in discussions with potential financing sources regarding the terms of the Exit Facility. Accordingly, **the Exit Facility terms reflected in the Financial Projections are illustrative only**, are based on the Debtors' current estimates of available market terms developed in consultation with the Debtors' advisors, and remain subject to change based on, among other things, the outcome of ongoing negotiations, prevailing market conditions, and the negotiation and execution of definitive documentation. **The Debtors intend to file updated Financial Projections in a subsequent filing with the Bankruptcy Court reflecting the terms of the Exit Facility once such terms are finalized.**

Differences between the assumed and actual terms of the Exit Facility—including with respect to amount, structure, pricing, fees, amortization, maturity, and covenants—may be material and could materially affect the Financial Projections, including projected interest expense, cash flows, and liquidity. No assurance can be given that the Debtors will obtain exit financing on the terms assumed herein, on other terms, or at all.

## IV. Operational Assumptions

### 1. OEM Support

The Financial Projections reflect assumed financial and commercial support from certain of the Debtors' original equipment manufacturer customers (the "OEMs"), which may include, among other things, pricing adjustments, lump-sum payments, accelerated or modified payment terms, volume or sourcing commitments, and recovery of tooling, engineering, or capital expenditures (collectively, "OEM Support").

The amounts, form, and timing of OEM Support reflected in the Financial Projections are illustrative and are based on the status of the Debtors' ongoing negotiations with the OEMs. The Debtors' negotiations with individual OEMs remain ongoing, and the definitive terms of any OEM Support will be documented in accommodation agreements or similar definitive agreements to be entered into between the applicable Debtors and the applicable OEMs (the "Accommodation Agreements"). The Debtors intend to update the Financial Projections in a subsequent filing with the Bankruptcy Court to reflect the finalized terms of OEM Support as and when such terms are documented in executed Accommodation Agreements. Certain terms of the Accommodation Agreements may be subject to confidentiality restrictions and may be filed under seal or in summary form, subject to the approval of the Bankruptcy Court.

Actual OEM Support may differ materially from the amounts assumed in the Financial Projections in amount, form, and timing, and no assurance can be given that the Debtors will reach definitive agreement with any or all OEMs on the terms assumed herein or at all. Any failure to obtain assumed OEM Support, or any material change in its amount, form, or timing, could materially and adversely affect the Financial Projections, including the Debtors' projected revenue, profitability, cash flows, and liquidity, and could affect the feasibility of the proposed Plan.[2]

---

[2] **Note:** The Debtors have requested an amendment to the Restructuring Support Agreement's proposed Plan treatment of the Emergency Loan Claims and the Senior Loan Claims from the applicable Consenting Lenders.

Additionally, the Debtors are engaged in discussions with their key customers regarding the OEM Accommodation Agreements. The Debtors expect that they will reach an agreement on economic terms of the OEM Accommodation Agreements in advance of the Disclosure Statement Hearing and memorialize such economic terms in OEM Accommodation Agreements prior to the Confirmation Date. To the extent that the concessions obtained from the Debtors' customers are insufficient to support the business plan relied upon in the Debtors' exit financing process, the Debtors may seek further amendments to the terms of the Restructuring Support Agreement.

The Financial Projections assume continued operations of the Debtors' eight key segments:

(a) **Lighting and Sensing Technologies:** The Lighting business specializes in the development, design, and manufacturing of lighting systems and electrical services. With a global footprint of twenty-nine production plants, fourteen research and development and application centers, and approximately 16,000 employees, Lighting is the Company's largest business.

(b) **Electronics:** Electronics provides high-growth products, including hardware design and manufacturing, human-machine interfaces (*e.g.*, clusters and ignition switches), comfort electronics, control units that manage various sensor systems, telecommunications systems, and occupant detection systems. Employing approximately 6,300 employees across eleven manufacturing sites, Electronics is Marelli's second largest business and maintains a strong manufacturing presence in all major automotive regions, including strong research and development capabilities across numerous research and development and application centers.

(c) **Interior Experience:** Interiors' product portfolio includes, among other things, steering wheel components, instrument panels, central consoles, and passenger safety validation systems as well as on-site assembly services. Interiors' global footprint includes twenty-five manufacturing sites and approximately 5,900 employees.

(d) **Green Technology Systems:** Green Technologies produces exhaust systems and other components for both traditional and electric vehicles that are designed to improve emissions performance. With over 6,700 employees across twenty-six manufacturing sites, Green Technologies is one of the largest international providers of emission-regulating products.

(e) **Marelli Propulsion Solutions:** Propulsion manufactures, among other things, components for internal combustion engines (*e.g.*, air and fuel components, engine management systems, and transmission controls) and electric "engines" (*e.g.*, high/low voltage systems, high revolution speed eMotors, and power inverters). With a global footprint of nine manufacturing sites, Propulsion employs approximately 3,800 employees.

(f) **Ride Dynamics:** Ride Dynamics develops and manufactures products utilized in the frame and body, such as suspension systems and shock absorbers, of passenger and light commercial vehicles. Ride Dynamics employs approximately 3,400 employees across fourteen manufacturing sites and five research and development and application centers.

(g) **Aftermarket:** Marelli Aftermarket is a trading organization dedicated to supplying spare automotive parts and workshop services to the independent aftermarket (i.e., repair shops and distributors rather than car manufacturers) indirectly through a

service network. Marelli Aftermarket offers a wide portfolio of powertrain-agnostic products and services with a 70,000 SKU portfolio.

(h) **Motorsport:** Marelli's identity is deeply rooted in its passion for, and success in, motorsports. Marelli has a longstanding partnership with the Nissan Formula E Team5 as well as partnerships with Red Bull KTM Factory Racing, Ducati Corse Lenovo's MotoGP team, McLaren, Nissan, and Mercedez-Benz. Marelli's teams have thrived at iconic motorsport races such as Formula 1, the Grand Prix, the 24 Hours of Le Mans, and the World Championship of Motorcycle Racing.

## Notes to the Financial Projections

### Note A – Cash and Cash Equivalents

Consolidated cash balance of the Reorganized Debtors for all entities and subsidiaries.

### Note B – Working Capital Accounts

The Financial Projections assume the Reorganized Debtors' working capital accounts, including trade receivable, inventory, accounts payable and other payables continue to perform according to historical relationships with respect to revenue and expense activity. Accounts receivable, inventory and trade payable balances are projected based on days outstanding calculations and forecasted to be generally in-line with historical ratios. Working capital balances fluctuate significantly during the year depending on seasonality and the year-end balances shown herein may not be representative of the ending monthly balances during the year. The Financial Projections assume working capital will continue to normalize and gradually return to terms in line with historical levels, particularly Days Payable Outstanding.

### Note C – Plant, Property & Equipment, Net

Primarily include furniture, fixtures, certain office equipment, plant and machinery, industrial equipment, and tangible assets in progress. These assets are recorded at cost, minus accumulated depreciation. Capital expenditure assumptions cover specific investments for new program launches and historical run-rates for maintenance and improvement-related investments.

### Note D – Goodwill

Goodwill arising from business combinations is stated at historical cost less accumulated impairment losses. Goodwill is subject to material change based on valuation and potential implementation of reorganization valuation adjustments in connection with Emergence. Other intangible assets consist of various copyrights, industrial designs, patents, trademarks, internet domain names, websites and customer lists. Intangible assets are subject to material change based on valuation and potential implementation of reorganization valuation adjustments in connection with Emergence.

### Note E – Other Assets

Primarily includes deferred tax assets, investments in associate / joint ventures, receivables from tax authorities and third parties, advances to suppliers, and other assets. Other Assets include the impact of hypothetical reorganization adjustments and adjustments for illustrative asset revaluations at Emergence. This value is subject to material change upon fully implementing asset revaluations in connection with Emergence.

**Note F – Current Financial Liabilities**

Includes pre-Emergence secured debt comprising the approximate amounts outstanding under the Emergency Loan Facility, Senior Loan Facility, and DIP financing (Tranche A, Tranche A-1, Tranche B, and Tranche C), including accrued PIK and default interest during the pendency of the Chapter 11 Cases. The Financial Projections assume this debt receives the treatment set forth in the Plan, including the following repayments at Emergence: DIP Financing Tranche A, DIP Financing Tranche A-1, Emergency Loan, and the Senior Loan Cash Out Provision. The Financial Projections reflect assumptions regarding the Senior Loan Facility's treatment under the Plan. At Emergence, DIP financing facilities Tranche B and C are assumed to be equitized in full. Post-Emergence balances comprise facilities previously mentioned in Restructuring Assumptions.

**Note G – Deferred Tax Liabilities:**

Deferred tax liabilities are measured based on temporary differences between the tax bases of assets and liabilities, and their carrying amounts for financial reporting purposes.

**Note H – Provisions:**

Primarily includes net employee defined benefit liabilities related to defined benefit plans, defined contribution plans, accrued bonuses and absences, and other long-term employee benefits. Additionally, includes a provision for estimated customer service claims and recalls for the remaining warranty period.

**Note I – Exit Facility**

Represents the Exit Facility, as outlined in the Restructuring Assumptions noted above.

**Note J – Other Liabilities**

Primarily includes accrued expenses / deferred income for capital expenditure grants associated with customer programs and other payables.

**Note K – Stockholders' Equity**

Represents the net book value of stockholders' equity. The Financial Projections reflect illustrative assumptions on how prepetition stockholders' equity is treated under the Plan, as noted in the Restructuring Assumptions, these illustrative assumptions are subject to material change upon fully implementing asset revaluations post-Emergence.

**Note L – Gross and Net Revenues**

The Financial Projections reflect the Debtors' management's perspective on the Reorganized Debtors' market position, product strategies, and the broader economic outlook. These assumptions were formulated by division and incorporate IHS volume forecasts, alongside current market trends, customer demand data, and growth prospects from our Order Backlog.

Imposed parts reflect revenues from part purchases that the OEM has imposed on the Company.

**Note M – Cost of Goods Sold**

The Cost of Goods Sold ("COGS") encompasses the expenses associated with manufacturing the Debtors' products and supporting the production processes. For products produced in-house, these costs include raw materials, supplies, direct labor, factory overhead, purchasing, security, EHS functions, and other facility expenses. For products manufactured by third-party contractors, the costs are reflected in the contractor invoices. Cost of Goods Sold included depreciation of buildings and vehicles used for selling activities.

Management's assumptions project that material costs, as a percentage of revenue, will remain consistent with current run-rates throughout the Projection Period.

**Note N – Engineering Expenses**

Engineering costs encompass labor, depreciation, expenses, customer reimbursements, and intercompany recharges associated with Engineering and R&D activities.

**Note O – General and Administrative Expenses ("G&A")**

G&A costs encompass expenses related to selling products, general corporate and division functions, and administrative operations. This includes salaries and benefits for sales and administrative staff, marketing and advertising expenses, office supplies, legal and accounting services, IT services, travel costs, and facility expenses.

**Note P – Other Income / (Expense)**

Includes equity earnings, dividends, and other income and expenses.

**Note Q – Restructuring Expense**

Includes costs associated with the restructuring prior to the Effective Date, including professional fees, plant and other footprint restructuring costs, and other non-recurring items. Additionally, includes illustrative costs associated with effectuating the Plan and Emergence transaction, repayment and exit fees, and other items required to be paid in order to consummate the Plan.

**Note R – JV Profit / Loss Share**

Profit or losses from the equity method investments.

**Note S – Interest Expense**

Includes estimated cash and, where applicable, PIK amounts under the pre-Emergence and post-Emergence capital structure.

**Note T – Receivables Financing Expense**

Represents the cost of factoring and accelerating revenues.

**Note U – Reorganization Adjustments**

Represents the accounting gain on the cancellation of indebtedness associated with effectuating the Plan and Emergence transaction.

**Note V – Income Taxes**

Reflects the application of the estimated tax forecast as developed by the Debtors' various country finance teams. Consolidated income tax expense for FY 2026 to FY 2028 is projected to increase through the Projection Period due to increasing profitability levels during the Projection Period. These amounts could vary significantly pending the final tax analysis of the transaction by the Debtors and their advisors.

**Note W – Other Non-Cash Items, Net**

Reflects non-cash gains or losses included in Net Income (Loss). FY 2026 includes an estimated non-cash gain from the extinguishment of prepetition debt at approximately €3,863 million. The Financial Projections reflect illustrative assumptions on how prepetition liabilities are treated under the Plan and include high-level adjustments for asset revaluations in connection with Emergence. As noted in the Restructuring Assumptions, these illustrative assumptions are subject to material change upon fully implementing asset revaluations post-Emergence and accounting for the Plan.

**Note X – Accrued Expenses and Deferred Income**

Primarily reflects capital expenditure grants associated with customer programs.

**<u>Note Y – Net Increase (Decrease) in Debt Balances</u>**

Primarily reflects the change in debt balances associated with the paydown, exchange and debt issuance at Emergence, as well as the DIP Tranche A / A1 upsize in FY 2026.

**<u>Note Z – Liquidity</u>**

The Debtors project pro forma liquidity of approximately €732 million on the Effective Date. The Debtors assume at least €732 million of cash on Emergence and upon implementation of the Plan.

# CONSOLIDATED FINANCIAL STATEMENT
# €EUR IN MILLIONS
# (UNAUDITED)

**Non-GAAP Unaudited Projected Balance Sheet**

| | | M EUR | | |
|---|---|---|---|---|
| | | **2026** | **2027** | **2028** |
| **Assets** | | | | |
| Cash & Cash Equivalents | [A] | 865 | 1,063 | 1,207 |
| Trade Receivables | [B] | 1,009 | 1,108 | 1,108 |
| Inventory | [B] | 1,074 | 1,046 | 1,015 |
| PP&E | [C] | 1,731 | 1,724 | 1,710 |
| Goodwill | [D] | 1,005 | 1,005 | 1,005 |
| Other Assets | [E] | 2,015 | 2,015 | 2,015 |
| **Total Assets** | | **7,699** | **7,961** | **8,060** |
| **Liabilities** | | | | |
| Trade Payables | [B] | 2,035 | 2,277 | 2,272 |
| Current Financial Liabilities | [F] | 149 | 156 | 157 |
| Deferred Tax Liabilities | [G] | 16 | 16 | 16 |
| Provisions | [H] | 407 | 407 | 408 |
| Exit Facility | [I] | 1,642 | 1,652 | 1,662 |
| Other Liabilities | [J] | 1,101 | 973 | 944 |
| **Total Liabilities** | | **5,350** | **5,482** | **5,459** |
| **Total Stockholders' Equity** | [K] | **2,349** | **2,478** | **2,601** |
| **Total Liabilities and Stockholders' Equity** | | **7,699** | **7,961** | **8,060** |

**Non-GAAP Unaudited Projected Income Statement**

| | Ref. | 2026 | 2027 | 2028 |
|---|---|---|---|---|
| | | M EUR | | |
| **Revenue** | | | | |
| Gross Revenue | [L] | 9,809 | 9,595 | 9,494 |
| Imposed Sales | [L] | (1,353) | (1,200) | (1,167) |
| Total Net Revenue | [L] | 8,456 | 8,395 | 8,327 |
| **Expenses** | | | | |
| Operating Expense: | | | | |
| Variable Expense | [M] | (5,178) | (5,128) | (5,056) |
| Direct Expense | [M] | (646) | (655) | (651) |
| Indirect Production Expense | [M] | (1,254) | (1,281) | (1,304) |
| Engineering Expense | [N] | (379) | (381) | (393) |
| General & Administrative Expense | [O] | (492) | (493) | (497) |
| Other Income / (Expense) | [P] | 17 | 40 | 53 |
| Total Operating Expense | | (7,931) | (7,899) | (7,848) |
| Restructuring Expense | [Q] | (429) | (60) | (48) |
| Total Expense | | (8,361) | (7,959) | (7,896) |
| **EBIT** | | **95** | **436** | **431** |
| JV Profit/Loss Share | [R] | (21) | (26) | (28) |
| Interest Income | | 12 | -- | -- |
| Interest Expense | [S] | (246) | (182) | (182) |
| Receivables Financing Expense | [T] | (50) | (4) | (3) |
| Reorganization Adjustments | [U] | 4,219 | -- | -- |
| **Income Before Taxes** | | **4,010** | **225** | **218** |
| Income Taxes | [V] | (102) | (95) | (95) |
| **Net Income** | | **3,908** | **130** | **123** |

**Non-GAAP Unaudited Projected Statement of Cash Flows**

| | | M EUR | | |
|---|---|---|---|---|
| | | **2026** | **2027** | **2028** |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | |
| **Net Income** | | **3,908** | **130** | **123** |
| Non-Cash Addbacks | | | | |
| Depreciation | | 357 | 353 | 347 |
| Reorganization Adjustments | | (4,268) | -- | -- |
| Interest Expense Accrual | | 31 | 10 | 10 |
| **Non-Cash Charges** | **[W]** | **(3,880)** | **363** | **357** |
| Change in Assets and Liabilities: | | | | |
| Trade Receivable | [B] | 242 | (99) | (0) |
| Inventory | [B] | 80 | 28 | 31 |
| Trade Payables | [B] | (402) | 242 | (5) |
| Accrued Expenses / Deferred Income | [X] | 37 | (5) | (5) |
| Advances from Suppliers and Other Assets and Liabilities | | 147 | 7 | 1 |
| Other Operating Cash Flows | | 133 | (153) | (28) |
| **Cash Flows Provided by Operating Activities** | | **263** | **514** | **474** |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | |
| Proceeds From Sales of Securities and Investment Securities | | -- | -- | -- |
| Capital Expenditures | | (427) | (316) | (330) |
| Other Non-Current Investments | | (4) | -- | -- |
| Intangible Assets & PPE | | -- | -- | -- |
| **Cash Flows Provided by Investing Activities** | | **(431)** | **(316)** | **(330)** |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | |
| Debtor-In-Possession Financing | [Y] | (663) | -- | -- |
| Pre-Petition Debt | [Y] | (495) | -- | -- |
| Exit Financing - Debt | [Y] | 1,640 | -- | -- |
| Exit Financing - Equity | | -- | -- | -- |
| Other Financing Activity | | -- | -- | -- |
| **Cash Flows Provided by Financing Activities** | | **482** | -- | -- |
| Net Increase (Decrease) in Cash and Cash Equivalents | | 314 | 198 | 144 |
| Effect of Exchange Rates on Cash | | -- | -- | -- |
| Cash and Cash Equivalents at Beginning of Period | | 550 | 865 | 1,063 |
| **Cash and Cash Equivalents At End of Period** | [Z] | **865** | **1,063** | **1,207** |

**Exhibit E**

**Valuation Analysis**

[TO COME]

**Exhibit F**

**Liquidation Analysis**

[TO COME]